## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL PUCHTLER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BARCLAYS PLC, BARCLAYS BANK PLC, JAMES E. STALEY, TUSHAR MORZARIA, and C.S. VENKATAKRISHNAN,<br><br>Defendants. | Case No:  24-1872<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAW**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Michael Puchtler, by his undersigned attorneys, brings this action on behalf of himself and all others similarly situated, against Defendants Barclays PLC ("Barclays PLC"), and Barclays Bank PLC ("BBPLC") (Barclays PLC and BBPLC are collectively referred to as "Barclays), James E. Staley, Tushar Morzaria, and C.S. Venkatakrishnan.[1]

---

[1] The allegations alleged herein are based on Plaintiff's personal knowledge, and information and belief based upon, among other things, his counsel's investigation that included, without limitation, review and analysis of: (a) public filings made by Barclays and its wholly owned subsidiary, Barclays Bank PLC ("BBPLC") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, shareholder communications, Annual General Meeting ("AGM") statements, and other public statements disseminated by each Defendant (as defined below); (c) the SEC's September 29, 2022, Cease and Desist Order against BPLC and BBPLC's; and (f) other publicly available information concerning, among other things, BPLC, BBPLC, the Individual Defendants (as defined below), the VXX, the VIX, exchange traded notes, volatility traded securities, and structured products.

1

## NATURE OF THE CASE

1.     The Plaintiff, and the class he represents, are short sellers of a security known as Barclays' iPath Series B S&P 500 VIX Short-Term Futures ETN (Exchange Traded Note) that publicly trades on the Chicago Board Options Exchange (CBOE) under the symbol "VXXB" (hereinafter "VXX"). VXX is an exchange traded note (ETN) issued by Barclays that is designed to track VIX futures, and more generally short-term stock market volatility.

2.     Barclays marketed and sold VXX as a way for investors to take long and short positions on short term stock market volatility. Barclays did this by designing VXX to track VIX futures, which are securities linked to the CBOE's volatility index known as the VIX. Market participants trade in VXX ETNs and related securities such as VXX options to gain exposure to, and often as a hedge against, changes in stock market volatility. Traders who believe that stock market volatility will increase can take long positions in VXX, while those who believe that stock market volatility will decrease can take short positions in VXX.

3.     This class action lawsuit concerns unprecedented securities fraud caused by Barclays's omission to inform investors and the market that it had not implemented any internal controls to monitor the issuances of securities from its shelf registrations, and that it had issued and sold billions of dollars of unregistered securities, including VXX ETNs, in violation of the federal securities registration laws. Shockingly, Barclays illegally sold over $17 billion of unregistered securities over approximately 18 months. Once its misconduct came to light, Barclays had to suddenly and without warning suspend any further issuances and sales of new VXX ETNs. This suspension of sales, which was announced just before the market opened on March 14, 2022, caused the market price of VXX to skyrocket and investors who were short VXX to suffer substantial losses.

4.      This lawsuit is on behalf of short sellers of VXX ETNs, as well as investors who were short the security through VXX options, who were harmed as a consequence of a massive and sustained rise in the price of the VXX caused by Barclay's failure to disclose its illegal issuance of billions of dollars of unregistered securities in violation of the registration requirements of federal securities laws and Barclays subsequent corrective disclosure. It seeks to recover the hundreds of millions of dollars in losses suffered by Plaintiff and the class due to Barclay's securities law violations.

5.      The proposed Class of plaintiffs consists of all persons, corporations and other legal entities who acquired a short position in VXX due to selling VXX ETNs, selling VXX call options, and/or buying VXX put options, and held that position at the close of the market on March 13, 2022, the day before Barclays announced it was suspending sales of new VXX ETNs.[2]

6.      Plaintiff is an individual investor who was short VXX before the market opened on March 14, 2022. Specifically, he had sold call options on VXX that stood to lose value if the price of VXX increased. Plaintiff and all other investors who were short VXX would not have taken short positions if they had known that Barclays failed to maintain any controls to ensure that its issuances of new securities would be registered under prior shelf registrations, or that Barclays was legally prohibited from issuing new VXX securities, as Barclays's ability to issue new VXX securities is necessary to keep the price of the VXX from rising above its indicative value due to a short squeeze.

---

[2]   Excluded from the Class are the officers and directors of Barclays during the Class Period (the "Excluded D&Os"), and Excluded D&Os' immediate families, legal representatives, heirs, successors or assigns, and any entity in which any Defendant or the Excluded D&Os have or had a controlling interest.

7.      Unlike Exchange Traded Funds (ETFs), the value of an ETN is not determined by a collection of assets held by the issuer within a fund, but rather by a price determined by a mathematical formula and published by Barclays throughout each trading day. This price, known as the "indicative value," represents the price Barclays is obligated to purchase the note at the end of each trading day should it be "put" to Barclays (for purchase or redemption) by its holder pursuant to the rights attendant to the note. The mathematical formula used to calculate the indicative value, in turn, is tied to the value of VIX futures, which Barclays uses to hedge its own redemption obligations. As described in greater detail below, this redemption right causes the price of the security to stay at or above its indicative value.

8.      Equally important to market participants, and particularly short-sellers, is Barclays' ability to issue new securities, as that ability is needed to keep the price of the security from rising above its indicative value due to a short squeeze. This is particularly true in connection with the VXX, which was substantially shorted throughout the relevant period, with as much as 90% of the "float" sold short. Without Barclays having the ability to sell future securities into the market-place whenever the price of the security rose above its indicative value, no investor would sell the security short for fear of a short squeeze.

9.      Just minutes before the opening of the VXX market on Monday, March 14, 2022, Barclays announced it was suspending all further sales and issuances of VXX securities (along with its crude oil ETN) "because Barclays does not currently have sufficient issuance capacity to support further sales from inventory and any further issuances of the ETNs." The announcement predictably caused a short squeeze in the VXX, as buyers piled-into the security knowing that there was no means for short-sellers to counteract the rapid rise in price. In the hours that followed the announcement, the price of VXX skyrocketed to as high as 140% of its indicative value. The price

of the VXX stayed at elevated levels, detached from its indicative value, for nearly six months, until Barclays was able to correct its defective shelf registrations with the SEC and was again able to issue and sell new securities.

10.    The graph below shows just how dramatically Barclay's announcement affected short investors. In the months leading up to the announcement, the market price of the VXX closely tracked its indicative value ("NAV," or Net Asset Value, on the chart) just as it was designed to do. Then, on March 14, 2022, the price climbed rapidly as a short squeeze ensued, where it stayed for many months until late September 2022, when Barclays began once again issuing VXX securities.



https://ycharts.com/companies/VXX/discount_or_premium_to_nav

11.    Not until weeks after March 14, 2022, did Barclays disclose that the reason it had suspended all VXX sales and issuances was because it had illegally sold over $17 billion of unregistered securities, including VXX, over the preceding eighteen months, in excess of its stated shelf registrations and in violation of securities laws' registration requirements. Shortly thereafter, Barclays disclosed that the reason for its unprecedented sales of unregistered securities was

because it failed to put into place internal controls necessary to track the amount of securities it issued and sold off its multi-billion-dollar shelf registration statements.

12.    This lawsuit seeks to recover the significant damages suffered by VXX short investors, and those investors who were short VXX through VXX options, because of the rapid and sustained rise in price that was caused by Barclays' omissions of material facts in connection with purchases and sales of VXX securities.

## JURISDICTION AND VENUE

13.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, because this action is a civil action arising under the laws of the United States, and under Section 27 of the Exchange Act (15 U.S.C. § 78aa(a)), which vests jurisdiction for Rule 10b-5 violations in the District Courts of the United States.

15.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), (c), and (d) because Defendants are believed to have resided, transacted business, were found, or had agents in this District; a substantial part of the events giving rise to the claims occurred within this District, including many of the acts and omissions charged herein, including the omission of material information; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

16.    This Court has personal jurisdiction over each Defendant because each Defendant has substantial and continuous contacts within this District, and because the claims in this Complaint arise from conduct of the Defendants that substantially took place in this District.

Further, Defendant BBPLC consented to the personal jurisdiction of the United States Courts by registering its New York City branch with the New York State Department of Financial Services ("NYSDFS") under New York Banking Law §§ 200 and 200-b.

17.     The activities of Defendants were within the flow of and did have a substantial effect on the interstate commerce of the United States in connection with the acts, transactions, and conduct alleged herein. Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## **THE PARTIES**

18.     Plaintiff Michael Puchtler is an individual investor who resides in Pennsylvania. As set forth in the accompanying certification, incorporated by reference herein, Plaintiff had sold uncovered call options on the VXX ETN that were open as of the close of trading on March 13, 2022, and suffered damages as a result of the federal securities law violations and material omissions of material facts as alleged herein.

19.     Defendant Barclays PLC is a universal bank holding company that is headquartered in London, United Kingdom, where its principal executive offices are located. Through its operating subsidiaries, the Company provides global banking and other financial services including investment banking, capital markets and structured products that issue new publicly traded securities, and wealth management services. Barclays is a publicly traded company registered with the SEC whose American Depository Receipts ("ADR") trade on the NYSE under the ticker symbol "BCS." As a public company Barclays must file periodic reports with the SEC pursuant to Section 13(a) of the Securities Exchange Act of 1934.

20.     Defendant Barclays Bank PLC ("BBPLC") is a wholly owned subsidiary of BPLC that is also headquartered in London and New York City. BBPLC provides various financial services, including the creation, issuance and sale of structured notes, ETNs and other new derivative securities. BBPLC offers and sells an estimated $10 billion to $15 billion dollars' worth of newly issued securities each year in the United States.

21.     In 2019, the membership of the Barclays Board and BBPLC Board was consolidated. Today, membership of the BBPLC Board comprises a subset of the Barclays Board. All members of the Barclays Board, except the Senior Independent Director (Brian Gilvary), and the Chairman of Barclays Bank UK PLC ("BBUKPLC") (Crawford Gillies), also serve on the BBPLC Board.

22.     As a result of the consolidation, the Barclays Board Audit Committee and BBPLC Board Audit Committee were also consolidated, and BBPLC matters are covered in concurrent meetings. One of the roles of the Barclays Board Audit Committee is to evaluate the effectiveness of Barclays' internal controls.

23.     From December 2015 through October 31, 2021, Defendant James E. Staley ("Staley") served as the Chief Executive Officer ("CEO") of Barclays, as a Director on Barclays' Board of Directors ("Barclays Board"), as the CEO of BBPLC and as a Director on BBPLC's Board of Directors ("BBPLC Board").

24.     Staley signed a certification pursuant to 17 C.F.R. § 240.13(A)-14(A) that was attached to the Barclays 2020 20-F as Exhibit 12.1, and a certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2022 (18 U.S.C. § 1350) that was attached to the Barclays 2020 20-F as Exhibit 13.1, which omitted material factual information in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

25.     Defendant C.S. Venkatakrishnan ("Venkatakrishnan") has been the CEO of Barclays, a member of its executive Committee and a Director on the Barclays Board since November 1, 2021. He also served as the CEO of BBPLC and as a Director on the BBPLC Board since November 1, 2021. Prior to November 2021, Venkatakrishnan served as Barclays' Chief Risk Officer from May 2017 through May 2020, and as the Co-president of BBPLC from October 2020 to October 2021

26.     Venkatakrishnan signed a certification pursuant to 17 C.F.R. § 240.13(A)-14(A) that was attached to the Barclays 2021 20-F as Exhibit 12.1, and a SOX certification pursuant to Section 906 of the Sarbanes-Oxley Act that was attached to the Barclays 2021 20-F as Exhibit 13.1, which omitted material information in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. He also signed the SOX Certifications for Barclays' Form 20-F.

27.     Defendant Tushar Morzaria ("Morzaria") served as Barclays' Group Finance Director, a Member of Barclays Board, and as a Director on the BBPLC Board during all times relevant hereto. Morzaria retired from the BBPLC Board, Barclays Board, and as Group Finance Director effective April 22, 2022. , Morzaria currently serves as Chairman of the Global Financial Institutions Group of Barclay's Investment Bank.

28.     Morzaria signed the Barclays 2020 20-F and Barclays 2021 20-F certifications pursuant to 17 C.F.R. § 240.13(A)-14(A) that were attached to the Barclays 2020 20-F and Barclays 2021 20-F as Exhibits 12.1; and SOX certifications pursuant to Section 906 of the Sarbanes Oxley Act of 2022 that were attached to the Barclays 2020 20-F and Barclays 2021 20-F as Exhibits 13.1, all of which omitted material factual information in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

29.     Defendants Staley, Morzaria, and Venkatakrishnan (collectively the "Individual Defendants"), were provided with copies of and contributed to Barclays's annual reports and other SEC filings alleged herein to be misleading, and had the ability and opportunity to prevent their issuance or cause them to be corrected. The Section 906 Sox Certifications that each Individual Defendant personally signed generally provide that the respective Barclays Annual report "fully complies with the requirements of section 13(a) of the Securities Exchange Act of 1934 and the information contained in the Report fairly presents, in all material respects, the financial condition of Barclays."

30.     Because of their positions with Barclays, the Individual Defendants possessed the power and authority to control BBPLC and the contents of BBPLC's and Barclays' reports to the SEC and to the market.

## FACTUAL ALLEGATIONS

**Background Allegations**

A.     <u>BBPLC Created and Maintained a Deep and Liquid VXX Market.</u>

31.     Since its creation thirty years ago, the Chicago Board of Options Exchange's CBOE Volatility Index ("VIX") has become a recognized index reflecting short-term stock market volatility. VIX technically measures the near term (thirty-day) expected market volatility of the S&P 500 based on the real-time pricing of S&P 500 Index option contracts ("SPX Options") listed for trading on the CBOE. Because the VIX is just a mathematical calculation of ever-changing SPX Options prices, investors cannot directly invest in the VIX, and so the CBOE created VIX Futures and VIX Options linked to the VIX.

32.     Given strong investor interest in market volatility securities, financial institutions including Credit Suisse (in conjunction with "VelocityShares"), "ProShares," and Barclays'

"iPath" branded business at BBPLC, issued and sold billions of dollars' worth of various securities linked to VIX Futures.

33.     Barclays VXX ETN is one such security. The note was designed and marketed by Barclays as a way for investors to take a position on market volatility by either buying the VXX ETN or selling it short.

34.     Since its IPO on January 29, 2009, and six additional offerings from 2018 through 2021, Barclays nurtured and grew the VXX into one of the most successful and liquid volatility securities. In February 2022, daily trading volume reached $1 billion, and active VXX options exceeded six times that amount (or $6 billion).

35.     Investors who expected volatility to increase, and thus that the price of VXX would rise with an increase in VIX futures, could purchase VXX ETNs, buy VXX call options, or sell VXX put options. Conversely, investors who expected volatility to decrease, and thus for the VXX price to go down with the decrease in VIX futures, could sell VXX ETNs short, sell VXX call options, or buy VXX puts.

36.     Unlike their better-known cousins, exchange traded funds (ETFs), ETNs do not own a basket of underlying assets whose market value primarily determines the ETF's market price. To keep VXX's market price correlated to real-time market-based changes to the VIX, Barclays constructed VXX (like most ETNs) with three pricing mechanisms.

37.     First, Barclays calculates and publishes a so-called "indicative value" every fifteen seconds, and also a daily closing indicative value. The indicative value is a number calculated pursuant to a published mathematical formula tied to VIX futures. It is analogous to an Exchange Traded Fund's "net asset value," but because an ETN is not a collection of assets, the value instead represents a number tied to the level of the VIX index.

38.     Second, built into the note is the right of certain note holders to redeem their securities for the closing indicative value. This redemption right serves to keep the market price of VXX from falling below its indicative value, as these buyers know they can make a profit whenever the price falls below the published indicative value, by simply buying the note at the lower value and then putting the note to Barclays at the indicative value.

39.     Third, while Barclays does not obligate itself to issue and sell new VXX securities whenever the price rises above the indicative value, prior to March 14, 2022, it had done so. Actual sales by Barclays of new VXX ETNs into the market when the price rises above the indicative value, and just as importantly, the mere threat that Barclays may make such sales, has the effect of keeping the price from rising above the indicative value. Barclays' ability to issue new VXX securities from its shelf registration therefore keeps its price from rising above its indicative value, as (1) the newly issued securities tend to deflate the price as they satisfy excess demand, and (2) knowing that Barclays can issue new securities with this deflationary effect disincentivizes investors from bidding the price of VXX above its indicative value.

40.     Importantly, while Barclays is not legally obligated to make new sales of VXX ETNs into the market to keep the price from rising above the indicative value, market participants know that Barclays has strong financial and reputational incentives to sell VXX ETNs into the market whenever the price rises above the indicative value. There are two reasons for this. First, Barclays makes money with each direct sale of a VXX ETN. Second, Barclays knows that buyers and sellers of VXX will quickly abandon the security and the VXX market if they come to learn that Barclays is not ready and able to fulfill its vital selling function in order to keep the price from rising above the indicative value.

41.     Together, these three pricing mechanisms provide VXX investors with confidence that the price of the VXX will remain tethered to the VIX futures it was designed to track.

42.     The ability to redeem and issue new ETNs are standard practice pricing mechanisms employed by ETN issuers to maintain the integrity of their ETN, as Finra, the securities industry's self-governing body, recognizes:

> Issuers of ETNs issue and redeem notes as a means to keep the ETN's price in line with a calculated value, called the indicative value or closing indicative value for ETNs. This value is calculated and published at the end of each day by the ETN issuer. When an ETN is trading at a premium above the indicative value, issuing more notes to the market can bring the price down. Similarly, if an ETN is trading at a discount, redemption of notes by the issuer reduces the number of notes available in the market, which tends to raise the price. ETN issuers have primary control over the issuance and redemption processes in the ETN market.

*Finra's Investor Alert: Exchange-Traded Notes—Avoid Unpleasant Surprises.*

43.     Significantly, the last of the three pricing mechanisms—the fact that Barclays is ready and able to sell new securities into the market—is of paramount importance to short-sellers of the security. This is so because the security is highly shorted—with as much as 90% of the float being shorted on any given trading day. With so much of the float shorted, short sellers alone cannot counteract a rapid rise in price. Instead, they expect that Barclays can and will issue new securities to satisfy the increased demand. Absent Barclays being ready and able to fulfill its critical selling function, no short-seller would go short the security for fear of a short squeeze.

44.     Barclays understood that if BBPLC would not or could not issue and sell new VXX securities, buyers would have an incentive to bid VXX above its indicative value in order to squeeze short sellers, and thereby profit from those short sellers being forced to close out their short positions by buying at ever higher prices.

45.     Without BBPLC being ready and able to engage in further sales of the security, no investor would sell VXX short, or engage in short options trades, because the note would be virtually assured to rise above its indicative value due to a short squeeze.

46.     In the same vein, no investor heading into March 14, 2022, would be short the VXX ETN, or engage in options trading tied to the VXX ETN that, like short selling, would also profit from a decline in the VIX volatility index, had they known that BBPLC had no controls in place to determine whether it had any registered securities available to be sold or had breached its duty to register the securities it previously sold.

47.     The Plaintiff sold uncovered call options on the VXX ETN between January 24, 2022 and March 4, 2022, which positions were open at the close of the market on March 13, 2022, and going into the VXX market opening on March 14, 2022. The Plaintiff's uncovered call options were effectively short VXX, because they would expire without being exercised so long as the price of VXX did not rise above the exercise price by the strike date.

48.     Plaintiff, like all investors in the VXX, did not know that BBPLC had no controls in place to determine whether it had any registered securities available to be sold and had failed to register billions of dollars of VXX securities prior to March 14, 2022, and that any future issuances of the security would be an illegal sale in violation of the registration requirements of the federal securities laws, including 15 U.S.C. §5. Such omitted information would have been material to short sellers because they would have understood that Barclays could not serve its vital issuer and market-making functions of selling additional securities whenever the price rose above its indicative value.

49.     On March 14, 2022, BBPLC announced just minutes before the opening of the VXX market that it was immediately suspending any further issuances and sales of VXX notes.

That announcement predictably caused a substantial and persistent rise in the price of the VXX as buyers piled into the security, knowing that BBPLC and short sellers had no means to counteract the rapidly rising price.

50.     At first, Barclays did not disclose why it had suspended its issuance and sales of VXX notes. A few weeks later, on March 28, 2022, Barclays disclosed that the reason it halted future issuances was because it had sold billions of dollars' worth of unregistered securities in excess of its published shelf registrations, in violation of SEC rules.

B.     <u>BBPLC Is a Serial Issuer of Securities, and Barclays and BBPLC Knew BBPLC Needed to Register and Track in Real time the Issuance of Billions of Dollars' Worth of Securities it was Offering and Selling After Losing its Status as a "Well Known Seasoned Issuer."</u>

51.     Barclays and BBPLC knew that the registration of publicly issued securities is a foundational principle of the federal securities laws, as Section 5(a) and (c) of the federal Securities Act prohibit the offer and sale of securities unless they are covered by a valid registration statement filed and in effect. 15 U.S.C. § 77(e). Historically, BBPLC offered and sold billions of dollars' worth of securities pursuant to effective shelf registration statements on Form F-3.[3] A shelf registration statement permits prolific issuers such as BBPLC to have multiple public securities offerings based on the same shelf registration statement. BBPLC is also required to file annual and quarterly periodic reports with the SEC pursuant to Section 13(a) of the Exchange Act. Barclays and BBPLC had a duty to ensure proper registration of all VXX securities it issued and sold.

52.     Prior to May 10, 2017, Barclays and BBPLC achieved "well-known seasoned issuer" ("WKSI") status under Securities Act Rule 405 that, among other things, enabled them to file automatic shelf registration statements and to pay filing fees at the time of each securities issuance.

---

[3] SEC Cease and Desist Order against Barclays and BBPLC, ¶¶13-14.

53.     However, on May 10, 2017, BBPLC lost its WKSI status by settling SEC enforcement proceedings regarding client overcharges by Barclays' wealth management business.[4] As a result, BBPLC lost the ability to file automatic shelf registration statements to offer and sell unspecified amounts of different types of securities that are so essential to its business. Instead, BBPLC's shelf registrations were limited to the shelf's specified dollar amount of securities that could be sold off the shelf, and it would have to pay at filing all registration fees for the maximum number of securities set by the shelf.

54.     In a request for a waiver of its "ineligible issuer" status that Barclays filed with the SEC before the Company lost its WKSI status in 2017, the Company stated:

> Since 2011, Barclays has issued off the WKSI shelf the USD-equivalent of approximately $12.3 billion of regulatory capital securities, which represents 89% of all regulatory capital securities issued by Barclays in that period. In that same period … the USD-equivalent value of all securities issued by Barclays off the WKSI shelf is approximately $68 billion. These figures demonstrate the importance of the WKSI shelf to Barclays in meeting its capital and funding requirements.[5]

Not only did Barclays acknowledge the negative impact on their ability to "meet[] its capital and funding requirements," Barclays and BBPLC emphasized that loss of WKSI status would "curtail important channels of communication to investors," weaken their ability to respond to "current regulatory and market conditions and uncertainties that are significantly transforming the landscape for financial institutions like Barclays," and harm "the speed at which Barclays could strengthen its capital position if require to do so" by a financial regulator.[6]

---

[4] *In the Matter of Barclays Capital Inc. and BBPLC,* Adm. Proc. File No. 3-17978 (May 10, 2017).
[5] Barclays and BBPLC Letter to Eun Ah Choi, Division of Corporate Finance, Request for Waiver of "Ineligible Issuer" Status Under Rule 405 (January 27, 2016) (available at https://www.sec.gov/divisions/corpfin/ cf-noaction/2016/barclays-plc-020116-405.pdf)).

[6] (Id. at 11-13).

55.     As set forth in the SEC's Cease and Desist Order that Barclays and BBPLC entered into on or about September 29, 2022, Barclays and BBPLC knew after losing its WKSI status that BBPLC had to implement internal controls to track in real time its securities offers and sales off any shelf registration going forward:

> Following the loss of WKSI status, certain personnel from BBPLC understood the consequences of this status change, including that they should consider implementing a mechanism to track offers and sales of securities off any shelf, relative to the registered amount of securities available to be offered or sold off that shelf, in order to ensure that no securities in excess of the amount registered were offered or sold.
> SEC Order, ¶19.

C.     <u>BBPLC Establishes a Formal Working Group to Address its Ongoing Securities Offerings as a Non-WSKI Issuer; and Recognized the Need to Track Actual Offers and Sales Against Shelf Registrations.</u>

56.     To determine how BBPLC as a non-WKSI issuer would do its securities offerings going forward, in January 2018 BBPLC convened a "Working Group" consisting of the trading desk heads from its structured products group, product origination personnel, a compliance officer, and an in-house attorney. Among other things, the Working Group converted BBPLC's pending WKSI shelf into a non-WKSI, 2018 shelf registration that authorized BBPLC to sell up to $21.3 billion worth of securities over the next 18 months. It also obtained estimates of securities issuance needs from key business units, and based on those estimates BBPLC filed a 2019 Shelf registration statement that was deemed effective on August 1, 2019, and which authorized BBPLC to offer and sell up to $20.8 billion of mainly structured notes and ETNs, for a period of three years. SEC Order, ¶¶20-21.[7]

---

[7] BBPLC filed a 2019 shelf registration for $20.76 billion that became effective on August 1, 2019. It also paid the required upfront registration fees on the entire authorized amount. *See* www.sec.gov/Archives/edgar/data/312070/000119312519173793/0001193125-19-173793-index.htm; www.sec.gov/Archives/edgar/data/312070/000119312519206925/d778493df3a.htm

57.     "During the pendency of the Working Group's efforts, the need to track actual offers and sales of securities against the amount of registered securities on a real-time basis was understood by and discussed among members of the Working Group. Nevertheless, no internal control was established to track offers and sales of securities, nor was any member of the Working Group or other BBPLC personnel performing that task." SEC Order, ¶24.

58.     "At the time of the registration of both the 2018 Shelf and the 2019 Shelf, certain BBPLC personnel recognized the need to accurately record relevant information about securities that were offered or sold so as to be able to track the aggregate amount of securities that were cumulatively offered and sold from each respective Shelf on a real-time basis, thereby ensuring that BBPLC did not offer or sell any securities in excess of what had been registered." *Id.*, ¶5.

D.     <u>Defendants' Material Omissions in Barclays' SEC Filings as to the Effectiveness of its Internal Controls over Financial Reporting.</u>

59.     Despite knowing that it needed to implement controls to track issuances against prior shelf registrations, and that such information would be material to short-sellers, Barclays repeatedly failed to apprise the market that it had no controls in place.

60.     For example, in its 2020 Annual Report on Form 20-F signed by Defendant Morzaria and filed with the SEC on February 18, 2022 -- the same day that BBPLC exceeded the limit of 2019 Shelf -- Barclays stated that "management has assessed [BBPLC's] internal controls over financial reporting as of December 31, 2020" and concluded that "[BBPLC's] internal controls over financial reporting was effective as of 31 December 2020." [8] (alterations adopted). The 2020 Form 20-F also stated that Barclays and BBPLC's internal controls "successfully

---

[8] *See, e.g.*, Barclays' 2020 Annual Report on Form 20-F, filed with the SEC on February 18, 2021 ("2020 Barclays 20-F"), Barclays 2020 20-F, at 8, available at www.sec.gov/Archives/edgar/data/0000312069/000156276221000043/fy2020arbplc.htm.

completed" three-years of review and rigorous testing pursuant to Barclays Internal Control Environment Programme" ("BICEP") that "strengthen[ed] the internal control environment across the Group" and put Barclays and BBPLC "in a much stronger position." Barclays 2020 20-F at 14. Barclays in its 2020 20-F further represented that it "is committed to operating within a strong system of internal control," and the Company's "frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance." *Id.* at 39.

61.     Barclays' 2020 20-F also stated that "Management has assessed the internal control over financial reporting as of 31 December 2020", and management concludes "the Group has operated a sound system of internal control that provides reasonable assurance of financial and operational controls and compliance with laws and regulations." *Id.* Attached as Exhibit 12.1 to the Barclays 2020 20-F were certifications pursuant to 17 C.F.R. § 240.13(A)-14(A) signed by Defendants Staley and Morzaria, as well as Exhibit 13.1's certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2022 that was also signed by Staley and Morzaria.

62.     As 2021 progressed, BPLC issued and filed with the SEC three other reports attesting to the veracity of the companies' internal controls for financial reporting, including its First Quarter 2021 Report (1Q21 Results Announcement) on April 30, 2021; its Interim 2021 Financial Results on July 28, 2021; and its Third Quarter 2021 Results Announcement on October 21, 2021. Each of these disclosures incorporated the 2020 Form 20-F by reference and therefore failed to disclose the material weakness in their internal controls over financial reporting. [9]

---

[9] Barclays Q1 2021 RA, available at
www.sec.gov/Archives/edgar/data/312069/000156276221000175/q121ex991.htm;
Barclays Q2 2021 RA, available at
www.sec.gov/ix?doc=/Archives/edgar/data/0000312069/000031206921000064/bcs-20210630.htm.;
Barclays Q3 2021 RA, available at
www.sec.gov/Archives/edgar/data/312069/000031206921000089/q321barclaysplc6-kex991.htm.

63.     On or about February 23, 2022, Barclays filed its 2021 Annual Report (2021 Form 20-F) signed by Defendant Morzaria, which also failed to disclose the material weakness in it and its subsidiaries' internal controls, and instead touted the internal financial reporting controls. [10]

64.     As the SEC's Order states, "No internal control was established to address this issue, and the amount of securities that were offered and sold was not tracked" by BBPLC or Barclays. *Id.* As a result, beginning on or around June 26, 2019, BBPLC offered and sold securities in excess of the amount remaining on the 2018 Shelf, ultimately leading to BBPLC offering and selling approximately $1.3 billion of securities in excess of what was registered with the SEC on the 2018 Shelf. SEC Order, ¶6.

65.     Due to its failure to establish any internal controls to track the amount of securities that were offered or sold on a real-time basis, BBPLC sold and continued to illegally sell

---

[10] *See Barclays 2021 20-F, available at* *www.sec.gov/Archives/edgar/data/0000312069/000031206922000059/bcs-20211231.html.* For instance, it stated that Barclays' Audit Committee is charged with "Overseeing the integrity of our financial disclosures and the effectiveness of the internal control environment," and is "keenly focused on the Group's internal control environment"; the Audit Committee "continued to oversee the ongoing evolution and enhancement of the internal control environment"; the Company "is committed to operate within a strong system of internal control"; and the Company's "frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance."; and Barclays Board Audit Committee "concluded that, throughout the year ended 31 December 2021 the Group has operated a sound system of internal control that provides reasonable assurance of financial and operational controls and compliance with laws and regulations."  The Barclays 2021 20-F also affirmatively represented that Barclays Board Audit Committee "concluded that, throughout the year ended 31 December 2021 and to date, the Group has operated a sound system of internal control that provides reasonable assurance of financial and operational controls and compliance with laws and regulations." Attached as Exhibit 12.1 to the Barclays 2021 20-F were certifications pursuant to 17 C.F.R. § 240.13(A)-14(A) signed by Defendants Venkatakrishnan and Morzaria. The text of the certifications were identical to the certifications attached as Exhibit 12.1 to the Barclays 2020 20-F (¶52). *Id.* at 46. Additionally, the Barclays 2021 20-F stated that "Management has assessed the internal control over financial reporting as at 31 December 2021…and concluded that, based on its assessment, the internal control over financial reporting was effective as at 31 December. 2021." *Id.* at 23. In fact, there were no internal controls for purposes of ensuring that issuances were registered under prior shelf registrations, for on the same day the 2020 Annual report was filed, Barclays began issuing and selling securities in excess of the authorized amounts under its 2019 Shelf registration in violation of the federal securities laws' registration requirements.

unregistered securities in excess of the amounts authorized by the 2019 Shelf as well. Thus, beginning on or around January 28, 2021, BBPLC offered and sold securities in excess of what was registered on the 2019 Shelf. Over the next 14-month period, BBPLC offered and sold approximately $16.37 billion of securities in excess of what was registered with the Commission on the 2019 Shelf. *Id.*, ¶7.

66.     As a result of Barclays and BBPLC having no internal controls for purposes of ensuring that issuances were registered under existing shelf registrations, Barclays and BBPLC repeatedly violated the federal securities laws and SEC regulations by issuing billions of dollars of unregistered securities into the market-place. And as a consequence of having failed to register billions of dollars of securities, Barclays was legally prohibited from issuing any further VXX securities, which (as described earlier) is necessary to keep the VXX price tethered to its indicative value.

E.      Barclays Alerts the SEC of Internal Control Failures, Leading to its Suspension of Further VXX Sales.

67.     On March 9, 2022, BBPLC discovered that it failed to have internal controls in place necessary to track its issuances and sales of securities from its multi-billion-dollar shelf registration statements. On March 10, 2022, Barclays senior managers were informed of the company's failure to track sales and issuances off its shelf registrations, and that it had issued and sold billions of dollars of unregistered securities, including VXX notes. Yet it was not until March 14, 2022, that Barclays and BBPLC "alerted the regulators about the over-issuance and disclosed to the market that BBPLC did not have sufficient issuance capacity to support further sales from inventory and any further issuances of certain ETNs" including VXX. SEC Order, ¶31.

68.     That public disclosure was made approximately seventeen minutes before the VXX market opened on March 14, 2022, in which Barclays stated that it and BBPLC were

"immediately suspending until further notice, any further sales from inventory and further issuances" of securities, specifically including "VXX ETNs and another of its most popular ETNs that tracked the price of crude oil." Barclays further stated that the immediate suspension of VXX sales was not based on the substantial increase in market volatility following Russia's February 26, 2022, invasion of Ukraine (which increased VXX's daily trading float to nearly $1 billion a day), but only that it was because "Barclays does not currently have sufficient issuance capacity to support further sales from inventory and any further issuances of ETNs." *Id.*

69.     Barclays' shocking suspension and halt of further VXX sales had the predictable effect of causing the price of VXX to rise sharply, and to keep rising far above its indicative value, as it became untethered to the VIX volatility index. This was due to the fact that the VXX market knew that due to BBPLC's suspension it could no longer serve the essential market-making function of selling additional VXX notes to increase supply when the price rose above its indicative value. A significant short squeeze then ensued.

70.     Without BBPLC being ready and able to sell new notes to drive down its price, the market price of VXX skyrocketed, rising to more than 140% of its indicative value. Plaintiff was forced to close out his position and sustain substantial losses—losses entirely unrelated to the position he originally took on market volatility. Indeed, had the price of the VXX remained tethered to its indicative value, Plaintiff's position would have been "in the money."

71.     In a March 15, 2022 note, Goldman Sachs's analyst explained the expected impact as a result of BBPLC's immediate suspension of selling any more VXX notes:

> As long as this suspension remains in place, the creation/redemption mechanism that typically keeps the VXX share price close to its [indicative value] will only work in one direction: one can redeem shares for a cash payment equal to their [indicative value], setting [it] as a floor on the share price, but one can no longer create shares at [indicative value]. This leaves the potential for the share price to exceed its [indicative value] because of

the shares' scarcity. R. Wigglesworth, <u>Barclays' Galaxy -Brain Structured Notes Screw-up Explained,</u> Financial Times (4/1/22) https://www.ft.com/content/f6422619-fd92-4a32-9ffd-6bd3cfbb083c

F.    <u>Barclays and BBPLC's Subsequent Disclosures and Admissions</u>

72.    Not until two weeks after its VXX suspension did Barclays begin to answer the pressing question of why it imposed the VXX suspension. On March 28, 2021, Barclays and BBPLC finally admitted to the public that due to their failure to put into place internal controls necessary to track in real time BBPLC's securities offerings and sales from its shelf registrations, BBPLC had illegally offered and had sold more than $17 billion worth of unregistered securities in excess of its shelf registrations' capacity.[11]

73.    The materiality of this news was reflected in VXX trading at a large premium to its indicative value, and for a sustained period, due to the lack of supply as a result of BBPLC not issuing new ETNs, and further reflected in the loss of nearly 90% of VXX's daily trading volume. As of March 28, 2022, approximately two weeks after its announcement, VXX still traded at a 30% premium to its indicative value, with trading volumes down dramatically since Barclays' March 14th suspension of selling additional VXX ETNs.

74.    On April 28, 2022, Barclays issued its First Quarterly report for 2022, which disclosed that BBPLC began selling in excess of the $20.76 billion maximum issuance capacity as early as February 18, 2021, and that "securities issued in excess of the limit are considered to be 'unregistered securities' for the purposes of US securities law," giving rise to the right of rescission for all purchasers of such securities. Barclays Q122 at 37.[12]

---

[11] 3/28/22 Barclays and BBPLC Press Release, "Impact of over-issuance under BBPLC US Shelf", and filed with the SEC on Form 6-K on March 28, 2022 , available at www.sec.gov/Archives/edgar/data/0000312069/000165495422003926/a1574gn.htm

[12] *See* www.sec.gov/Archives/edgar/data/312069/000031206922000073/version2-barclaysplc6xkcom.htm

75.    Barclays also disclosed in its interim financial results for the quarter ending June 30, 2022, that BBPLC also exceeded the maximum issuance capacity of 2018 Shelf by $1.2 billion, and Barclays nearly tripled its estimated liability exposure by "an additional provision of £1.3bn for the expected rescission costs related to the over-issuance of securities". Barclays 2Q22 Form 6k, at p.3.

76.    Barclays further admitted that it put on specific hedges to protect itself from the costs of the over-issuance, which in its 2022 half year regulatory filing it estimated to be £1.5 billion. Specifically, Barclays disclosed that it put on specific "hedging arrangements" by the end of March 2022 and these hedging arrangements generated a profit of over $900 million: These hedging arrangements were essentially bets against short sellers of VXX like Plaintiff and may have further increased their damages by further inflating the price of VXX above its indicative value.

G.    Barclays Admits its Massive Over-Issuance and Sales of Unregistered Securities Was Due to its Failure to Put into Place or Maintain Adequate Internal Controls.

77.    Barclays and BBPLC admitted that BBPLC's massive over-issuance of unregistered securities was due to their failure to put into place and maintain proper internal financial and reporting control functions that, among other things, accounted in real time for BBPLC's securities sales and the remaining shelf issuance capacity. As Barclays admitted, "The over-issuance occurred because Barclays did not put into place a mechanism to track issuances after BBPLC first became subject to limits on issuance [in 2019]. Among the principal causes of the over-issuance were, first, a failure to identify and escalate to senior executives the consequences of the loss of well-known issuer status and, secondly, a decentralized ownership

structure for securities issuances."[13] This was particularly troubling since risk tracking and management was crucial to BBPLC's business, and it and its parent, Barclays, had made vast expenditures of time and money in purportedly strengthening its internal risk controls since 2016.

78.     On or about September 29, 2022, Barclays and BBPLC agreed to a $361 million settlement with the SEC, including a $200 million fine, to resolve the SEC's enforcement action against them for their "failure to put into place any internal control around the real-time tracking of securities being offered or sold off of its Commission-registered shelf registration statements" which led to BBPLC selling "an unprecedented amount of securities---cumulatively totaling approximately $17.7 billion in excess of what it had registered with the Commission, in violation of Sections 5(a) and(c) of the Securities Act…[and leading Barclays to] restate their year-end audited financial statements."[14] As the Director of the SEC's Division of Enforcement stated in releasing news of the settlement, "This case highlights why it is essential for firms like Barclays to have robust internal controls over their offers and sales of securities….[T]he control deficiencies and the scope of the conduct at issue here was simply staggering." 9/28/22  SEC Press Release, "Barclays Agrees to a $361 Million Settlement to Resolve SEC Charges Relating to Over-Issuances of Securities", https://www.sec.gov/news/press-release/2022-179.

79.     As set forth in the Barclays' SEC settlement, BBPLC knew that it had to put into place internal controls to track real time securities offerings and maintaining issuance capacity under its shelf registrations but, "no internal control was established to address this issue, and the amount of securities that were offered and sold was not tracked." *Id.* As a result, BBPLC offered

---

[13] Barclays' 9/30/22 filing entitled "Update on over-Issuance under Barclays Bank PLC U.S. Shelf", available at https://home.barclays/content/dam/home-barclays/documents/investor-relations/IRNewsPresentations/2022News/20220930-Update-on-over-issuance-under-BBPLC-US-Shelf.pdf.
[14] SEC Cease and Desist Order, ¶ 1, *In Re Barclays PLC and Barclays Bank PLC, File No. 3-1181* (9/29/22 SEC Admin Order) (emphasis added).

and sold billions of securities in excess of the 2018 and 2019 Shelf registrations' authorizations. SEC Order, ¶¶5-6.

> H.   Defendants' Admit That They Issued a Large Amount of Unregistered Securities for a Significant Period Prior to March 14, 2022

80.   On May 4, 2022, Barclays held its 2022 Annual General Meeting (AGM), where Nigel Higgins, Chairman of Barclays, and Defendant C.S. Venkatakrishnan, Barclays's Chief Executive, addressed investors in their 2022 AGM Statements. In his 2022 AGM Statement, Higgins addressed the over issuance:

> As I have said before, we do not get everything right. Let me say a few words about our recently reported failure to comply with SEC registration requirements, a failure which has cost us hundreds of millions of pounds, and more in reputation. First, all of us here were dismayed that, after so much progress, we had this entirely self-inflicted problem. We have not yet finished the review but I believe that we will find that, in all our complexities, we missed some simple tasks. This is not rocket science and we can and will do better, learning the lessons from this particular issue and applying discipline across all of our controls.[15]

81.   CEO Venkatakrishnan also addressed the over-issuance in his remarks on May 4, 2022, saying that:

> This situation was entirely avoidable and I am deeply disappointed that it occurred. The necessity of a strong controls culture has never been clearer to me. In fact, we have made considerable progress improving our controls since 2016. So, the fact that this happened is particularly upsetting.

82.   Barclays' senior management's admissions that the over-issuance was entirely avoidable, and that it was not "rocket science" to stop the over-issuance from taking place, confirms that the Defendants were severely or deliberately reckless in failing to ensure internal controls were in place to stop the over-issuance.

---

[15] *See* Barclays 2022 AGM Statement, available at home. Barclays/content/dam/home- barclays/documents/investor-relations/IRNewsPresentations/2022News/20220504-Barclays-AGMstatements-2022.pdf.

83. On September 19, 2022, more than six months after first halting further issuances of VXX ETNs, Barclays announced that it would once again issue new VXX securities. Predictably, the market price of VXX immediately returned to its indicative value. By that time, however, the damage was done. Traders (including the vast majority of short sellers) had long left the security, with daily trading volumes but at a fraction of what they were on March 13, 2022.

## ADDITIONAL SCIENTER ALLEGATIONS

84. As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless in not knowing and/or failing to disclose material information during the Class Period.

85. Among other things, each Defendant knew that the issuing and selling of securities is a core business of Barclays and BBPLC, and BBPLC's shelf registrations –no longer being a WSKI issuer—were critical to this core business of issuing and selling securities.

86. Barclays and BBPLC were responsible for creating, and all Defendants were responsible for overseeing, Barclays' and BBPLC's internal controls over financial reporting. Even though Barclays and BBPLC were experts in the registration requirements of the federal securities laws by virtue of being serial issuers who issued and sold between $10 billion and $15 billion of newly issued securities each year, they and the Individual Defendants utterly failed or recklessly disregarded the need to implement "simple" control procedures to ensure that the "entirely avoidable" over-issuance of billions of dollars of unregistered securities above the maximum amount of securities registered under Barclays March 2018 and August 2019 Shelf Registration Statements did not occur. As admitted by Nigel Higgins, Chairman of Barclays, "this is not rocket science."

87. Defendants further knew or were reckless in not knowing that VXX short sellers would be substantially harmed should it be forced to stop fulfilling its vital market function of

being ready and able to issue new securities whenever the price of the ETN rose above its indicative value.

88.     Barclays and the Individual Defendants were reckless in supervising BBPLC's offering and sales of securities, and their supervisory failures are especially noteworthy because they knew the severe consequence to investors in their securities should they fail to comply with the securities laws' registration requirements.

89.     Even after uncovering their unlawful sale of billions of dollars in unregistered securities on March 9, 2022, Barclays and BBPLC waited several days before reporting their internal control failures to the SEC or to the public, and even their March 14, 2022, disclosure was incomplete and cryptic. During this nondisclosure period, Barclays and BBPLC were able to put in place hedges that generated over $900 million in profits to offset the costs of their malfeasance. Some of those hedging profits may have come at the expense of those investors like Plaintiff and the other members of the class who were short the VXX.

90.     Given this obvious risk to investors, and the potential exposure of BBPLC and Barclays to the securities laws and legal liability from the over-issuance of securities, the need to have control procedures in place to account for the number of securities issued against the number of securities registered is so obvious that the failure to have done so constitutes deliberate recklessness.

91.     Due to the control failures that caused BBPLC to illegally issue and sell over $ 17.7 billion of unregistered securities, Barclays clawed back more than $ 1.2 million in compensation from the Individual Defendants.

## CLASS ACTION ALLEGATIONS

92.     Barclays and BBPLC's failures to inform investors and the market that it had no controls in place to determine whether it had any registered securities available to be sold, and that it had been selling unregistered VXX securities, caused great harm to the Class members during the class period, as they lost substantial sums as the VXX price became untethered from its underlying indicative value and the VIX, and the value of their short positions declined quickly and sharply.

93.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of itself and all members of the proposed Class defined as follows:

> All persons, corporations and other legal entities who had acquired a short position in VXX due to selling VXX ETNs, selling VXX call options, and/or buying VXX put options[16] and who held that position as of the close of the market on March 13, 2022.

94.     The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds and possibly thousands of members in the proposed Class.

95.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal securities laws as complained of herein.

---

[16] Excluded from the Class are Defendant in this action, the officers and directors of the Company during the Class Period (the Excluded D&Os), members of Defendant's and Excluded D&Os' immediate families, legal representatives, heirs, successors or assigns, and any entity in which Defendants or the Excluded D&Os have or had a controlling interest, and its parent, subsidiaries and corporate affiliates, officers, directors, employees, assigns, successors, and co-conspirators; the Court and its staff; Defendant's counsel, and all respective immediate family members of the excluded entities described above. Plaintiff reserves the right to revise the definition of the Class based upon subsequently discovered information and reserves the right to establish Sub-Classes where appropriate.

96.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that conflict with those of the Class.

97.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether Defendants violated Section 10b of the Exchange Act and Rule 10b-5 by the omissions as alleged herein;

(b) Whether Defendants knew or recklessly disregarded that their omissions were materially false and misleading; and

(c) Whether the Class members sustained damages, the proper measure of damages, and the actual amounts of actual damages, costs, restitution, disgorgement, and pre and post judgment interest should be awarded to the Class.

98.     Plaintiff's claims are typical of the claims of the Class Plaintiff seeks to represent. As alleged herein, Plaintiff and the Class sustained damages arising out of the same illegal actions and conduct by Defendants.

99.     Plaintiff is willing and prepared to serve the Class in a representative capacity with all of the obligations and duties material thereto. Plaintiff will fairly and adequately protect the interests of the Class and have no interests adverse to or in conflict with the interests of the other members of the Class.

100.     Plaintiff's interests are co-extensive with and are not antagonistic to those of absent Class members. Plaintiff will undertake to represent and protect the interests of absent Class members and will vigorously prosecute this action.

101.     Plaintiff has engaged the services of the undersigned counsel. Counsel is experienced in complex litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiff and absent Class members.

102.     Class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

103.     Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to Class members predominate over any questions affecting only individual Class members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

104.     Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

105.     For all of these reasons, a class action therefore is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

**<u>LOSS CAUSATION</u>**

106.     Defendants' wrongful omissions of material fact, as alleged herein, directly and proximately caused the economic loss, i.e., damages, suffered by Plaintiff and the Class.

107.   During the Class Period, as detailed herein, Defendants failed to disclose material information. This artificially maintained the prices of VXX and operated as a fraud or deceit on the Class.

108.   When BBPLC imposed an immediate suspension on its VXX sales, the price of VXX soared above its indicative values and became untethered from its underlying VIX volatility index, inflicting great loss, damage and harm to the Plaintiff and the Class.

## RELIANCE UNDER *AFFILIATED UTE*

109.   A Class-wide presumption of reliance is appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded in Defendants' omissions of material fact, which they had a duty to disclose, including but not limited to the fact that BBPLC had no controls in place to determine whether it had any registered securities available to be sold, and was selling unregistered securities.

110.   Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects, information that Defendants had a duty to disclose during the Class Period but did not, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions. Given the importance of the Class Period omissions set forth above, that requirement is satisfied here.

## CAUSES OF ACTION

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against All Defendants)

111. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

112. This cause of action is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

113. Based upon the facts alleged herein, during the Class Period Defendants violated Section 10(b) and Rule 10b-5 in connection with the purchase and sale of Barclay's VXX ETNs, by:

      (a) using or employing manipulative and deceptive devices or contrivances in contravention of rules and regulations set forth by the SEC;

      (b) employing devices, schemes, and artifices to defraud;

      (c) omitted to state material facts necessary to make prior statements not misleading; and/or

      (d) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the Plaintiff and the Class.

114. Defendants engaged in a plan, scheme, and course of conduct that was intended to and did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially maintain a market for VXX ETNs; and (iii) cause Plaintiff and other members of the Class to invest in VXX ETNs by short-selling those securities or by purchasing or selling short options contracts based on the investors' expectations that Defendants could continue

to sell the VXX securities. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

115.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Barclays' business and operations, as specified herein.

116.    The Individual Defendants made, or caused to be made, material omissions that and because of their positions within Barclays, possessed the power and authority to control the contents of Barclays and BBPLC's reports to the SEC. Each of the Individual Defendants was provided with copies of and/or contributed to Barclays' material   omissions of fact alleged herein, and each had the ability and opportunity to prevent their issuance or caused them to be corrected. Because of their positions, and their access to material non-public information available to them but not to the public, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations and omissions being made were materially misleading. The Individual Defendants are liable for the material omissions pleaded herein.

117.    Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning Barclays and BBPLC. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating Barclays' SEC filings that contained false and misleading statements and omitted to disclose the material information alleged herein, were aware of, or recklessly disregarded, the misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

118.     Defendants, individually and in concert, directly and indirectly, employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information which they had a duty to disclose.

119.     Defendants knew or should have known of the omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Defendants' omissions were done knowingly or recklessly and for the purpose and effect of artificially maintaining the public market for VXX.

120.     As demonstrated by Defendants' omissions of material fact, if they did not have actual knowledge of the omissions alleged, then they were reckless and/or grossly reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to ensure that only the registered amount of securities were issued.

121.     As a result of the omitted material facts, as set forth above, the market price of, and market for, Barclays' VXX ETNs and VXX options, were artificially maintained, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, and not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class took short positions in Barclays' VXX ETNs during the Class Period and were damaged thereby.

122.     VXX ETNs are traded in interstate commerce. Indeed, many billions of dollars of purchases and sales of VXX ETNs and other VIX-linked instruments such as options and futures contracts are entered into each year in interstate commerce in the United States. Defendants' unlawful issuance of unregistered securities including VXX ETNs had a direct, substantial, and foreseeable impact on interstate commerce in the United States.

123.    At the time of said omissions, had Plaintiff and the other members of the Class and the marketplace known of the truth regarding the sale of unregistered securities by BBPLC, and its inability to know whether it had any registered securities available to sell, Plaintiff and the other members of the Class would not have taken short positions in VXX ETNs, either through selling VXX short or by buying or selling options.

124.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

125.    Defendants are liable both directly and indirectly for their violations of Section 10(b) and Rule 10b-5 and the wrongs complained of herein.

126.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of positions which were short the VXX during the Class Period.

## COUNT II

## Violations of Section 20(a) of the Exchange Act Against Barclays and the Individual Defendants

127.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

128.    Barclays functioned as a controlling person of BBPLC within the meaning of Section 20(a) of the Exchange Function as alleged herein.

129.    By virtue of Barclays' ownership and control over its wholly-owned subsidiary BBPLC, and Barclays' intimate knowledge of and participation in BBPLC's business affairs and operations including BBPLC's issuance of unregistered securities, Barclays had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company.

130.    Barclays also was responsible for creating and testing its own internal controls and BBPLC's internal controls over securities issuances and operational and financial reporting and failed to install controls that Barclays recognizes were "simple" and "not rocket science" that would have prevented the sale of unregistered securities.

131.    As set forth above, Barclays by virtue of its position as controlling person of BBPLC, violated Section 10(b) and Rule 10b-5 by its omissions as alleged in this Complaint. As a direct and proximate result thereof, Plaintiff and other members of the Class suffered damages in connection with their VXX short sales or options trades during the Class Period.

132.    The Individual Defendants, as senior executive officers of Barclays and BBPLC, were able to and did control the content of various SEC filings and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided with copies of the documents and statements alleged herein to contain factual omissions that rendered the SEC filings as materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

133.    The Individual Defendants, due to their positions of control and authority as senior executive officers and directors of Barclays and BBPLC, had access to the adverse undisclosed information about BBPLC's core business' reliance on its ability and expertise in using its shelf registrations to issue and sell billions of dollars' worth of securities into public markets, including through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held meetings,

as well as other management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.

134.    As senior officers and controlling persons of a publicly held company and its primary subsidiary, BBPLC, who regularly issued and sold securities, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information issued in statements that were or had become materially misleading or untrue, so that the market price of VXX would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

135.    As set forth above, the Individual Defendants had control over Barclays and made the materially false and misleading omissions on behalf of Barclays and BBPLC within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their executive positions and their culpable participation, as alleged above, the Individual Defendants had the power and influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged herein to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

136.    In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company, and therefore are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and all others similarly situated, respectfully requests that this Court enter judgment against each of the Defendants and in favor of Plaintiff and the Class, and award the following relief:

A.     Certifying this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein, declaring Plaintiff as the representative of the Class, and finding that Plaintiff's counsel will serve as counsel for the Class;

B.     Enter judgment in favor of Plaintiff and the other members of the Class and adverse to each of the Defendants for the damages incurred by Plaintiff and the Class;

C.     An award of actual damages, restitution, disgorgement, statutory pre-and post-judgment interest, reasonable attorneys' fees, expert witness fees and other costs in amounts to be proven, and in favor of Plaintiff and the Class and against each of the Defendants for their violations of the federal securities laws; and

D.     Awarding such other relief as this Court deems appropriate, just and equitable under the facts and circumstances of this action.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: March 12, 2024

**KAPLAN FOX & KILSHEIMER LLP**

*/s/ Frederic S. Fox*
Frederic S. Fox
Robert N. Kaplan
Donald R. Hall
800 Third Ave., 38th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
ffox@kaplanfox.com
rkaplan@kaplanfox.com
dhall@kaplanfox.com

**SPERLING & SLATER**
Joseph M. Vanek
Timothy Sperling
Jeff Bergman
Jerry Santangelo
55 West Monroe Street
Suite 3200
Chicago, IL 60603
Telephone: (312) 641-3200
Fax: (312) 641-6492
jvanek@sperling-law.com
tsperling@sperling-law.com
jbergman@sperling-law.com
jsantangelo@sperling-law.com

## <u>CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS</u>

I, Michael Puchtler, hereby certify as follows:

1.     I have reviewed a complaint for the securities class action against Barclays PLC and Barclays Bank PLC alleging violations of the securities laws.

2.     I did not sell the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.     I am willing to serve as a representative party on behalf of a class, including serving as a lead plaintiff in this case and all other related cases that may be consolidated with it and providing testimony at deposition and trial if necessary.  I fully understand the duties and responsibilities of the Lead Plaintiff under the Private Securities Litigation Reform Act of 1995, specifically concerning its selection and retention of counsel and overseeing and directing the prosecution of the action on behalf of the class.

4.     As of the close of the market on March 13, 2022, I had the short positions related to the Barclays' iPath Series B S&P 500 VIX Short-Term Futures ETN due to selling VXX ETNs, selling VXX call options, and/ or buying VXX put options that are set forth in Schedule A, which is attached hereto.

5.     I have not sought to serve as a lead plaintiff in any class action under the federal securities laws filed during the last three years.

6.     I will not accept any payment for serving as a representative party on behalf of a class beyond my pro-rata share of any recovery, except as ordered or approved by the court, including any award to a representative plaintiff of reasonable costs and expense directly related to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct, executed on this __8th__ day of March 2024.

_____
Michael Puchtler

**SCHEDULE A**

| Date/Time | Spread | Side | Qty | Pos Effect | Symbol | Exp | Strike | Type | Price | Net Price | Order Type | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/4/22 11:36 | SINGLE | SELL | -15 | TO OPEN | VXX | 16-Sep-22 | 35 | CALL | 7 | 7 | LMT | $ 10,500.00 |
| 3/4/22 11:36 | SINGLE | SELL | -15 | TO OPEN | VXX | 16-Sep-22 | 35 | CALL | 7 | 7 | LMT | $ 10,500.00 |
| 3/4/22 11:36 | SINGLE | SELL | -15 | TO OPEN | VXX | 16-Sep-22 | 35 | CALL | 7 | 7 | LMT | $ 10,500.00 |
| 3/4/22 11:36 | SINGLE | SELL | -5 | TO OPEN | VXX | 16-Sep-22 | 35 | CALL | 7 | 7 | LMT | $ 3,500.00 |
| 2/28/22 9:58 | SINGLE | SELL | -50 | TO OPEN | VXX | 16-Sep-22 | 35 | CALL | 5.65 | 5.65 | LMT | $ 28,250.00 |
| 2/24/22 9:48 | SINGLE | SELL | -19 | TO OPEN | VXX | 17-Jun-22 | 25 | PUT | 6.35 | 6.35 | LMT | $ 12,065.00 |
| 2/24/22 9:48 | SINGLE | SELL | -26 | TO OPEN | VXX | 17-Jun-22 | 25 | PUT | 6.35 | 6.35 | LMT | $ 16,510.00 |
| 2/24/22 9:47 | SINGLE | SELL | -11 | TO OPEN | VXX | 17-Jun-22 | 25 | PUT | 6.3 | 6.3 | LMT | $ 6,930.00 |
| 2/24/22 9:47 | SINGLE | SELL | -39 | TO OPEN | VXX | 17-Jun-22 | 25 | PUT | 6.3 | 6.3 | LMT | $ 24,570.00 |
| 2/24/22 9:42 | SINGLE | SELL | -5 | TO OPEN | VXX | 17-Jun-22 | 25 | PUT | 6.35 | 6.35 | LMT | $ 3,175.00 |
| 2/24/22 9:39 | SINGLE | SELL | -12 | TO OPEN | VXX | 20-May-22 | 25 | PUT | 5.5 | 5.5 | LMT | $ 6,600.00 |
| 2/24/22 9:39 | SINGLE | SELL | -1 | TO OPEN | VXX | 20-May-22 | 25 | PUT | 5.5 | 5.5 | LMT | $ 550.00 |
| 2/24/22 9:39 | SINGLE | SELL | -1 | TO OPEN | VXX | 20-May-22 | 25 | PUT | 5.5 | 5.5 | LMT | $ 550.00 |
| 2/24/22 9:39 | SINGLE | SELL | -1 | TO OPEN | VXX | 20-May-22 | 25 | PUT | 5.5 | 5.5 | LMT | $ 550.00 |
| 2/24/22 9:39 | SINGLE | SELL | -1 | TO OPEN | VXX | 20-May-22 | 25 | PUT | 5.5 | 5.5 | LMT | $ 550.00 |
| 2/24/22 9:39 | SINGLE | SELL | -1 | TO OPEN | VXX | 20-May-22 | 25 | PUT | 5.5 | 5.5 | LMT | $ 550.00 |
| 2/24/22 9:39 | SINGLE | SELL | -1 | TO OPEN | VXX | 20-May-22 | 25 | PUT | 5.5 | 5.5 | LMT | $ 550.00 |
| 2/24/22 9:39 | SINGLE | SELL | -25 | TO OPEN | VXX | 20-May-22 | 25 | PUT | 5.5 | 5.5 | LMT | $ 13,750.00 |
| 2/24/22 9:39 | SINGLE | SELL | -4 | TO OPEN | VXX | 20-May-22 | 25 | PUT | 5.5 | 5.5 | LMT | $ 2,200.00 |
| 2/24/22 9:39 | SINGLE | SELL | -1 | TO OPEN | VXX | 20-May-22 | 25 | PUT | 5.5 | 5.5 | LMT | $ 550.00 |
| 2/24/22 9:39 | SINGLE | SELL | -1 | TO OPEN | VXX | 20-May-22 | 25 | PUT | 5.5 | 5.5 | LMT | $ 550.00 |
| 2/23/22 11:30 | SINGLE | SELL | -50 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.6 | 6.6 | LMT | $ 33,000.00 |
| 2/22/22 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 650.00 |
| 2/22/22 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 650.00 |
| 2/22/22 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 650.00 |
| 2/22/22 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 650.00 |
| 2/22/22 13:21 | SINGLE | SELL | -3 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 1,950.00 |
| 2/22/22 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 650.00 |
| 2/22/22 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 650.00 |
| 2/22/22 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 650.00 |
| 2/22/22 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 650.00 |
| 2/22/22 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 650.00 |

| 2/22/22 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ | 650.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/22/22 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ | 650.00 |
| 2/22/22 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ | 650.00 |
| 2/22/22 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ | 650.00 |
| 2/22/22 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ | 650.00 |
| 2/22/22 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ | 650.00 |
| 2/22/22 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ | 650.00 |
| 2/22/22 13:21 | SINGLE | SELL | -10 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ | 6,500.00 |
| 2/22/22 13:21 | SINGLE | SELL | -10 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ | 6,500.00 |
| 2/22/22 13:21 | SINGLE | SELL | -10 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ | 6,500.00 |
| 2/18/22 12:30 | SINGLE | SELL | -37 | TO OPEN | VXX | 17-Jun-22 | 35 | CALL | 4.25 | 4.25 | LMT | $ | 15,725.00 |
| 2/18/22 12:30 | SINGLE | SELL | -13 | TO OPEN | VXX | 17-Jun-22 | 35 | CALL | 4.25 | 4.25 | LMT | $ | 5,525.00 |
| 2/18/22 11:03 | SINGLE | SELL | -10 | TO OPEN | VXX | 17-Jun-22 | 35 | CALL | 4.25 | 4.25 | LMT | $ | 4,250.00 |
| 2/18/22 11:03 | SINGLE | SELL | -15 | TO OPEN | VXX | 17-Jun-22 | 35 | CALL | 4.25 | 4.25 | LMT | $ | 6,375.00 |
| 2/18/22 11:02 | SINGLE | SELL | -25 | TO OPEN | VXX | 17-Jun-22 | 25 | CALL | 6 | 6 | LMT | $ | 15,000.00 |
| 2/17/22 15:40 | SINGLE | SELL | -25 | TO OPEN | VXX | 17-Jun-22 | 35 | CALL | 3.75 | 3.75 | LMT | $ | 9,375.00 |
| 2/17/22 14:46 | SINGLE | SELL | -5 | TO OPEN | VXX | 17-Jun-22 | 25 | CALL | 5.3 | 5.3 | LMT | $ | 2,650.00 |
| 2/17/22 14:46 | SINGLE | SELL | -10 | TO OPEN | VXX | 17-Jun-22 | 30 | CALL | 4.35 | 4.35 | LMT | $ | 4,350.00 |
| 2/17/22 14:46 | SINGLE | SELL | -15 | TO OPEN | VXX | 17-Jun-22 | 30 | CALL | 4.35 | 4.35 | LMT | $ | 6,525.00 |
| 2/17/22 14:46 | SINGLE | SELL | -5 | TO OPEN | VXX | 17-Jun-22 | 30 | CALL | 4.35 | 4.35 | LMT | $ | 2,175.00 |
| 2/17/22 13:36 | SINGLE | SELL | -20 | TO OPEN | VXX | 17-Jun-22 | 30 | CALL | 4.15 | 4.15 | LMT | $ | 8,300.00 |
| 2/17/22 13:35 | SINGLE | SELL | -20 | TO OPEN | VXX | 17-Jun-22 | 25 | CALL | 5.05 | 5.05 | LMT | $ | 10,100.00 |
| 2/15/22 13:29 | SINGLE | SELL | -44 | TO OPEN | VXX | 17-Jun-22 | 30 | CALL | 4.05 | 4.05 | LMT | $ | 17,820.00 |
| 2/15/22 13:29 | SINGLE | SELL | -1 | TO OPEN | VXX | 17-Jun-22 | 30 | CALL | 4.05 | 4.05 | LMT | $ | 405.00 |
| 2/15/22 13:29 | SINGLE | SELL | -5 | TO OPEN | VXX | 17-Jun-22 | 30 | CALL | 4.05 | 4.05 | LMT | $ | 2,025.00 |
| 2/15/22 9:30 | SINGLE | SELL | -37 | TO OPEN | VXX | 17-Jun-22 | 25 | CALL | 5.1 | 5.1 | LMT | $ | 18,870.00 |
| 2/15/22 9:30 | SINGLE | SELL | -8 | TO OPEN | VXX | 17-Jun-22 | 25 | CALL | 5.1 | 5.1 | LMT | $ | 4,080.00 |
| 2/15/22 9:30 | SINGLE | SELL | -5 | TO OPEN | VXX | 17-Jun-22 | 25 | CALL | 5.1 | 5.1 | LMT | $ | 2,550.00 |
| 2/4/22 15:21 | SINGLE | BUY | 50 | TO CLOSE | VXX | 17-Jun-22 | 25 | CALL | 4.5 | 4.5 | LMT | $ | 22,500.00 |
| 2/4/22 10:52 | SINGLE | BUY | 9 | TO CLOSE | VXX | 17-Jun-22 | 20 | CALL | 6.74 | 6.74 | LMT | $ | 6,066.00 |
| 2/4/22 10:52 | SINGLE | BUY | 8 | TO CLOSE | VXX | 17-Jun-22 | 20 | CALL | 6.74 | 6.74 | LMT | $ | 5,392.00 |
| 2/4/22 10:52 | SINGLE | BUY | 28 | TO CLOSE | VXX | 17-Jun-22 | 20 | CALL | 6.72 | 6.72 | LMT | $ | 18,816.00 |
| 2/4/22 10:52 | SINGLE | BUY | 2 | TO CLOSE | VXX | 17-Jun-22 | 20 | CALL | 6.72 | 6.72 | LMT | $ | 1,344.00 |
| 2/4/22 10:52 | SINGLE | BUY | 3 | TO CLOSE | VXX | 17-Jun-22 | 20 | CALL | 6.72 | 6.72 | LMT | $ | 2,016.00 |
| 2/1/22 11:40 | SINGLE | SELL | -50 | TO OPEN | VXX | 20-May-22 | 25 | CALL | 4.2 | 4.2 | LMT | $ | 21,000.00 |
| 2/1/22 10:41 | SINGLE | SELL | -46 | TO OPEN | VXX | 17-Jun-22 | 25 | CALL | 5.02 | 5.02 | LMT | $ | 23,092.00 |
| 2/1/22 10:41 | SINGLE | SELL | -4 | TO OPEN | VXX | 17-Jun-22 | 25 | CALL | 5 | 5 | LMT | $ | 2,000.00 |

| 2/1/22 9:34 | SINGLE | BUY | 42 | TO CLOSE | VXX | 18-Mar-22 | 20 | CALL | 3.6 | 3.6 | LMT | $ 15,120.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/1/22 9:34 | SINGLE | BUY | 8 | TO CLOSE | VXX | 18-Mar-22 | 20 | CALL | 3.6 | 3.6 | LMT | $ 2,880.00 |
| 2/1/22 9:31 | SINGLE | BUY | 45 | TO CLOSE | VXX | 18-Feb-22 | 20 | CALL | 2.25 | 2.25 | LMT | $ 10,125.00 |
| 2/1/22 9:31 | SINGLE | BUY | 5 | TO CLOSE | VXX | 18-Feb-22 | 20 | CALL | 2.25 | 2.25 | LMT | $ 1,125.00 |
| 1/26/22 11:40 | SINGLE | BUY | 2 | TO CLOSE | VXX | 4-Feb-22 | 24 | CALL | 1.74 | 1.74 | LMT | $ 348.00 |
| 1/26/22 11:40 | SINGLE | BUY | 48 | TO CLOSE | VXX | 4-Feb-22 | 24 | CALL | 1.74 | 1.74 | LMT | $ 8,352.00 |
| 1/26/22 11:32 | SINGLE | SELL | -50 | TO OPEN | VXX | 20-May-22 | 25 | CALL | 5.5 | 5.5 | LMT | $ 27,500.00 |
| 1/24/22 12:43 | SINGLE | SELL | -50 | TO OPEN | VXX | 17-Jun-22 | 25 | CALL | 9 | 9 | LMT | $ 45,000.00 |
| 1/24/22 12:05 | SINGLE | SELL | -50 | TO OPEN | VXX | 17-Jun-22 | 20 | CALL | 10.25 | 10.25 | LMT | $ 51,250.00 |
| 1/24/22 9:33 | SINGLE | SELL | -50 | TO OPEN | VXX | 18-Mar-22 | 20 | CALL | 7.2 | 7.2 | LMT | $ 36,000.00 |