**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL PUCHTLER, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>v.<br><br>BARCLAYS PLC, BARCLAYS BANK PLC, JAMES E. STALEY, TUSHAR MORZARIA, and C.S. VENKATAKRISHNAN,<br><br>                    Defendants. | Case No: 1:24-cv-01872-LJL<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAW**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

## <u>TABLE OF CONTENTS</u>

**Page(s)**

I.      OVERVIEW OF CLAIMS ................................................................................1

II.     JURISDICTION AND VENUE ........................................................................5

III.    PARTIES ..........................................................................................................6

IV.     FACTUAL BACKGROUND AND DEFENDANTS' MISCONDUCT ..........................10

        A.      Barclays and BBPLC Create the VXX and then Cause a
                Short Squeeze ...............................................................................10

        B.      Defendants Knowingly or Recklessly Made Inaccurate and
                Incomplete Statements Regarding Issuing Only Registered
                Securities During the Class Period ...............................................14

        C.      Defendants Knowingly or Recklessly Made Inaccurate and
                Incomplete Statements Regarding Their Internal Controls
                During the Class Period ...............................................................15

                1.      Barclays and BBPLC were aware of the additional responsibilities
                        that came with being a Non-WKSI issuer .................................15

                2.      Defendants Established a Formal Working Group to Address Their
                        Ongoing Securities Offerings as a Non-WKSI Issuer; and
                        Recognized the Need to Track Actual Offers and Sales Against
                        Shelf Registrations ................................................................20

        D.      Defendants' Incomplete and Inaccurate Statements
                Concerning Internal Controls During the Class Period .........................22

                1.      February 13, 2020: FY 2019 Results and Filing of Form 20-F ................22

                2.      February 14, 2020: BBPLC's FY 2019 Results and Filing of Form
                        20-F ........................................................................25

                3.      February 18, 2021: FY 2020 Results and Filing of Form 20-F ................28

                4.      February 18, 2021: BBPLC's FY 2020 Results and Filings of Form
                        20-F ........................................................................31

                5.      April 30, 2021: Q1 2021 Results and Filing of Form 6-K ........................33

                6.      July 28, 2021: Q2 2021 Results and Filing of Form 6-K ..........................34

                7.      October 21, 2021: Q3 2021 Results and Filing of Form 6-K ..................34

                8.      February 23, 2022: FY 2021 Results and Filing of Form 20-F ................34

                9.      February 23, 2022: BBPLC's FY 2021 Results and Filing of Form
                        20-F ........................................................................37

E.  BBPLC Abruptly Suspends Sales of VXX ETNs and Creates a Short Squeeze ................................................................. 39

F.  The Aftermath ................................................................................ 40

1.  Defendants Offer to Compensate Investors Who Were Long VXX Securities, Rather Than Those Short VXX Securities .............................. 40

2.  Defendants Admit to Recklessness ................................................ 42

3.  Further indicia of Recklessness ................................................ 45

(a)  Barclays agrees to settle the related SEC action and admits to having no internal controls regarding tracking issuances and to issuing billions of dollars of unregistered securities .................................. 45

(b)  Defendants claw back compensation ........................................ 47

V.   ADDITIONAL SCIENTER ALLEGATIONS .................................................. 49

VI.  ADDITIONAL LOSS CAUSATION ALLEGATIONS ...................................... 53

VII. NO SAFE HARBOR ................................................................................ 54

VIII. APPLICABILITY OF THE PRESUMPTION OF RELIANCE ...................... 54

IX.  CLASS ACTION ALLEGATIONS ........................................................... 57

X.   CAUSES OF ACTION .......................................................................... 60

COUNT I Violations of Section 10(b) of the Exchange Act and Rule 10b-5 (Against All Defendants) ...................................................... 60

COUNT II Violations of Section 20(a) of The Exchange Act  (Against Barclays and the Individual Defendants) .................................. 63

XI.  JURY DEMAND ................................................................................ 66

XII. PRAYER FOR RELIEF ...................................................................... 66

**"This is not rocket science**." Nigel Higgins, Chairman of Barclays,

2022 Annual General Meeting, May 4, 2022.

Lead Plaintiff Michael Puchtler ("Lead Plaintiff"), on behalf of himself and a class of similarly situated investors, by and through Lead Plaintiff's counsel, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. The investigation of counsel included, among other things: 1) a review of Barclays PLC's ("Barclays" or the "Company") and Barclays Bank PLC's ("BBPLC") public filings with the United States Securities and Exchange Commission ("SEC"); 2) press releases issued by the Company, and media, news and analyst reports about the Company; 3) Barclays' quarterly results announcements, and investor conferences with Company executives, and analysts and investors; 4) information based on consultation with experts in loss causation and economic loss; 5) publicly available information relating to the abrupt suspension of new sales of various Barclays ETNs in March 2022; 6) publicly available information relating to Barclays' over-issuance of securities leading up to March 2022, including the SEC Cease-and-Desist Order dated September 29, 2022 ("SEC 2022 Order")[1]; and 7) other publicly available data, including, but not limited to, publicly available trading data relating to the price and trading volume of Barclays' VXX notes. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    OVERVIEW OF CLAIMS

1.    This is a federal securities class action on behalf of all investors who acquired a

---

[1] *Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order*, SEC (Sept. 29, 2022).

short position in the Barclays Bank PLC iPath Series B S&P 500 VIX Short-Term Futures ETN ("VXX"), either through trading in the ETN itself or through options trading (such investors are referred to herein as "short sellers"), on or after May 9, 2019, and held the short position through the market opening on March 14, 2022 ("Class Period") and were damaged thereby (the "Class"). The claims asserted in this Amended Complaint (the "Action") are alleged against Barclays, BBPLC, and certain of Barclays' and BBPLCs' current and former officers and directors – James E. Staley ("Staley"), Tushar Morzaria ("Morzaria"), and C.S. Venkatakrishnan ("Venkatakrishnan" or "Venkat") – for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

2.      VXX is an Exchange Traded Note ("ETN") that is issued by Barclays and is publicly traded on the Chicago Board Options Exchange (CBOE) under the symbol "VXX." VXX is designed to track the CBOE's Volatility Index ("VIX"), and more generally short-term stock market volatility. Market participants trade in VXX ETNs and related VXX options to gain exposure to, and often as a hedge against, changes in stock market volatility. Traders who believe that stock market volatility will increase can take long positions in VXX, while those who believe that stock market volatility will decrease can take short positions in VXX.

3.      Lead Plaintiff is an individual investor who was short VXX securities on or after May 9, 2019, and maintained the position into the opening of the market on March 14, 2022. Specifically, he had sold call options on VXX that, like the positions held by all short sellers, decreased in value as the price of VXX rose.

4.      This Action concerns an unprecedented securities fraud caused by Defendants' failure, through a course of material misrepresentations and omissions, to inform investors and the

market that they did not have any internal controls to monitor the issuances of securities, including VXX ETNs, from their shelf registrations, and that they had issued and sold billions of dollars of unregistered VXX ETNs in violation of federal securities registration laws, despite claiming otherwise in prior incomplete and inaccurate statements

5.    More specifically, over a series of several years, Barclays and BBPLC repeatedly claimed in their SEC filings, including within their Annual Reports, Form 20-Fs, and Registration Statements, Form F-3s, that they had robust internal controls, and that they would issue only registered securities, when in fact they did not have any controls in place to monitor issuances against prior shelf registrations and had illegally issued billions of dollars of unregistered VXX securities.

6.    This omitted information was material to short sellers, like the Lead Plaintiff and Class Members, because had they known that Barclays lacked any controls to monitor issuances against its prior shelf registrations, or, alternatively, knew that Barclays had issued billions of dollars of unregistered securities, then they would not have made their short investments in VXX due to the substantial risk of a short squeeze in the event the SEC discovered the illegal sales and forced Barclays to halt further issuances of VXX ETNs.

7.    As explained in greater detail below, and as recognized by Goldman Sachs and many others, ETNs like VXX are highly susceptible to short squeezes upon an ETN issuer halting further sales of the ETN because further sales of an ETN by the issuer serve to cap the price of the ETN at or near its indicative value. Without that capacity, there is no viable mechanism to keep the price of an ETN from rising above its indicative value.

8.    On or about March 9, 2022, Barclays and BBPLC discovered that they had recklessly and illegally issued billions of unregistered securities, including VXX. Five days later,

on March 14, 2022, Barclays announced it was suspending any further issuances and sales of new VXX ETNs. The announcement predictably and foreseeably caused a significant short squeeze, as buyers piled into the security knowing that there was no mechanism capping the price of the ETN at or near its indicative value. In the hours that followed, the risk of having no internal control to track the sale of VXX securities materialized and caused the price of VXX securities to skyrocket more than 140% above its indicative value – far in excess of any deviation in the security's history.

9.      The price of VXX securities stayed at elevated levels, detached from its indicative value, for nearly six months, until Barclays was able to correct its defective shelf registrations with the SEC and was again able to issue and sell new securities.

10.     The graph below shows just how dramatically Barclays' announcement affected the ETN's price and short sellers. In the months leading up to the announcement, the market price of VXX securities closely tracked its indicative value ("NAV," or Net Asset Value, on the chart) just as it was designed to do. Then, on March 14, 2022, the price climbed rapidly as a short squeeze ensued, and the price stayed above the indicative value for many months until late September 2022, when Barclays once again began issuing VXX securities.



Figure 1: *iPath B S&P 500 VIX S/T Futs ETN (VXX)*, Y Charts,
https://ycharts.com/companies/VXX/discount_or_premium_to _nav

11.    Weeks after announcing its suspension of new sales and issuances of VXX ETNs, Barclays disclosed that the reason it had suspended all VXX sales and issuances was because it had illegally sold over $17.7 billion of unregistered securities, including VXX, in excess of its stated shelf registrations and in violation of SEC registration requirements. Barclays further admitted that the reason for its unprecedented sales of unregistered securities was because it failed to put into place any "simple" internal controls necessary to track the amount of securities it issued and sold off its multi-billion-dollar shelf registration statements.

12.    This lawsuit is on behalf of short sellers of VXX ETNs during the Class Period and seeks to recover the significant damages suffered by Lead Plaintiff and other VXX short sellers due to the rapid and sustained rise in price that was caused by Defendants' misrepresentations and omissions of material fact concerning their lack of any internal controls to monitor the sales of VXX securities from their shelf registrations, including VXX ETNs.

## II.    JURISDICTION AND VENUE

13.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, because this action is a civil action arising under the laws of the United States, and under Section 27 of the Exchange Act (15 U.S.C. § 78aa(a)), which vests jurisdiction for Rule 10b-5 violations in the District Courts of the United States.

15.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §§ 1391(b), (c), and (d) because Defendants are believed to have resided, transacted business, were found, or had agents

in this District; a substantial part of the events giving rise to the claims occurred within this District, including many of the acts and omissions charged herein, including the omission of material information; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

16.    This Court has personal jurisdiction over each Defendant because each Defendant has substantial and continuous contacts within this District, and because the claims in this Complaint arise from conduct of the Defendants that substantially took place in this District. Further, Defendant BBPLC consented to the personal jurisdiction of the United States Courts by registering its New York City branch with the New York State Department of Financial Services under New York Banking Law §§ 200 and 200-b.

17.    The activities of Defendants were within the flow of and did have a substantial effect on the interstate commerce of the United States in connection with the acts, transactions, and conduct alleged herein. Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

18.    Lead Plaintiff Michael Puchtler is an individual investor who resides in Pennsylvania. As set forth in the accompanying certification, incorporated by reference herein, Lead Plaintiff sold uncovered call options on the VXX ETN, during the relevant time period, that were open as of the start of trading on March 14, 2022, and suffered damages as a result of the federal securities law violations and material misrepresentations and omissions of material facts as alleged herein.

19.    Defendant Barclays PLC is a universal bank holding company that is headquartered in London, United Kingdom, where its principal executive offices are located. Through its

operating subsidiaries, the Company provides global banking and other financial services including investment banking and sponsoring structured products that issue new publicly traded securities. Barclays is a publicly traded company registered with the SEC whose American Depository Receipts trade on the New York Stock Exchange ("NYSE") under the ticker symbol "BCS." As a public company, Barclays must file periodic reports with the SEC pursuant to Section 13(a) of the Exchange Act.

20.    Defendant Barclays Bank PLC is a wholly owned subsidiary of Barclays that is headquartered in London and New York City. BBPLC is a bank that provides various financial services, including the creation, issuance and sale of structured notes, ETNs, and other new derivative securities. BBPLC offers and sells an estimated $10 billion to $15 billion dollars' worth of newly issued securities each year in the United States. BBPLC is the issuer of the iPath Series B S&P 500 VIX Short-Term Futures ETN.

21.    In 2019, the membership of the Barclays Board and BBPLC Board was consolidated. Today, membership of the BBPLC Board comprises of a subset of the Barclays Board. All members of the Barclays Board, except the Senior Independent Director (Brian Gilvary), and the Chairman of Barclays Bank UK PLC ("BBUKPLC") (Crawford Gillies), also serve on the BBPLC Board.

22.    As a result of the consolidation, the Barclays Board Audit Committee and BBPLC Board Audit Committee were consolidated, and BBPLC matters are covered in concurrent meetings. One of the roles of the Barclays Board Audit Committee is to evaluate the effectiveness of Barclays' internal controls. *See infra*, ¶¶ 83, 85.

23.    From December 2015 through October 31, 2021, Defendant James E. Staley served as: the Chief Executive Officer ("CEO") of Barclays, a Member of Barclay's Executive

Committee, and a Director on Barclays' Board of Directors ("Barclays Board"). From March 2019 through October 31, 2021, Staley also served as the CEO of BBPLC and as a Director on BBPLC's Board of Directors ("BBPLC Board").

24.    Staley signed a certification pursuant to 17 C.F.R. §§ 240.13(A)-14(A) that was attached to Barclays' 2020 Form 20-F as Exhibit 12.1, and a certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. § 1350) ("SOX certification") that was attached to the Barclays' 2020 Form 20-F as Exhibit 13.1, which contained material misrepresentations and omitted material factual information in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. These certifications declared that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to the Company's internal controls over financial reporting. These certifications were also incorporated by reference into Barclays' 2018 and 2019 Shelf Registration Statements. Staley was a direct and substantial participant in the fraud alleged herein.

25.    Defendant C.S. Venkatakrishnan has been the CEO of Barclays, a member of its Executive Committee and a Director on the Barclays Board since November 1, 2021. He also served as the CEO of BBPLC and as a Director on the BBPLC Board since November 1, 2021. Prior to November 2021, Venkatakrishnan served as Barclays' Chief Risk Officer from May 2017 through May 2020, and as the Co-President of BBPLC from October 2020 to October 2021, which included the entire time that Barclays was an ineligible issuer (May 2017 – May 2020), as alleged herein.

26.    Venkatakrishnan signed a certification pursuant to 17 C.F.R. § 240.13(A)-14(A) that was attached to Barclays' 2021 Form 20-F as Exhibit 12.1, and a SOX certification that was attached to Barclays' 2021 Form 20-F as Exhibit 13.1, which contained material

misrepresentations and omitted material information in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. He also signed the SOX certifications for Barclays' other relevant Form 20-Fs. These certifications declared that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to the Company's internal controls over financial reporting. Venkat was a direct and substantial participant in the fraud.

27.     Defendant Tushar Morzaria served as Barclays' Group Finance Director, a Member of Barclays Board, and a Director on the BBPLC Board during all times relevant hereto. Morzaria retired from the BBPLC Board, Barclays Board, and as Group Finance Director effective April 22, 2022. Morzaria currently serves as Chairman of the Global Financial Institutions Group of Barclay's Investment Bank.

28.     Morzaria signed Barclays' 2019, 2020, and 2021 Form 20-F certifications pursuant to 17 C.F.R. §§ 240.13(A)-14(A) that were attached to Barclays' 2019, 2020, and 2021 Form 20-Fs as Exhibits 12.1; and SOX certifications pursuant to Section 906 of the Sarbanes Oxley Act of 2002 that were attached to the Barclays 2019, 2020, and 2021 Form 20-Fs as Exhibits 13.1, all of which contained material misrepresentations and omitted material factual information in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. These certifications declared that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to the Company's internal controls over financial reporting. Morzaria was a direct and substantial participant in the fraud.

29.     Defendants Staley, Morzaria, and Venkatakrishnan (collectively the "Individual Defendants"), were provided with copies of and contributed to Barclays's and BBPLC's annual reports and other SEC filings alleged herein to be misleading and had the ability and opportunity

to prevent their issuance or cause them to be corrected. The Section 906 SOX certifications, which each Individual Defendant personally signed, generally provide that the respective Annual Reports "fully complies with the requirements of section 13(a) of the Securities Exchange Act of 1934 and the information contained in the Report fairly presents, in all material respects, the financial condition of Barclays."

30.    Because of their positions with Barclays and BBPLC, the Individual Defendants possessed the power and authority to control Barclays and BBPLC and the contents of their reports to the SEC and to the market. Furthermore, they were responsible for managing and overseeing Barclays' and BBPLC's internal controls.

## IV.    FACTUAL BACKGROUND AND DEFENDANTS' MISCONDUCT

### A.    Barclays and BBPLC Create the VXX and then Cause a Short Squeeze

31.    Since its creation thirty years ago, the CBOE's Volatility Index ("VIX") has become a recognized index reflecting short-term stock market volatility. The VIX technically measures the near term (thirty-day) expected market volatility of the S&P 500 based on the real-time pricing of S&P 500 Index option contracts ("SPX Options") listed for trading on the CBOE. Because the VIX is simply a mathematical calculation of ever-changing SPX Options prices, investors cannot directly invest in the VIX, and so the CBOE created VIX Futures and VIX Options linked to the VIX.

32.    Given strong investor interest in market volatility securities, financial institutions including Defendants Barclays and BBPLC, and Credit Suisse, created, issued, and sold various securities linked to VIX Futures.

33.    Barclays VXX ETN is one such security. The note was designed and marketed by Barclays and BBPLC as a way for investors to take a position on market volatility by either buying

VXX ETN or selling it short. The security was designed to mimic the VIX by representing a mathematical mix of one-month and two-month futures linked to the VIX.

34.    Since its IPO on January 29, 2009, and six additional offerings from 2018 through 2021, Barclays nurtured and grew VXX securities into one of the most successful and liquid volatility securities. Among the various securities created by financial institutions to mimic the VIX, Barclays' VXX was the clear market leader, with more than double the volume of any competing product. In February 2022, daily trading volume reached $1 billion, and active VXX options exceeded $6 billion.

35.    Investors who expected volatility to increase, and thus for the price of VXX securities to rise with an increase in VIX futures, could purchase VXX ETNs, buy VXX call options, or sell VXX put options. Conversely, investors who expected volatility to decrease, and thus for the VXX price to go down with the decrease in VIX futures, could sell VXX ETNs short, sell VXX call options, or buy VXX puts.

36.    To keep VXX's market price correlated to real-time market-based changes to VIX futures, Barclays constructed VXX securities with three pricing mechanisms that are typical of all ETNs.

37.    First, Barclays calculates and publishes a so-called "indicative value" every fifteen seconds, and also at the close of the market each day. The indicative value is a number calculated pursuant to a published mathematical formula tied to VIX futures, which Barclays regularly purchases to offset (or hedge) its redemption obligations (as discussed next). It is analogous to an Exchange Traded Fund's "net asset value," but because ETNs represent mere debt obligations on the part of the issuer rather than a share of a fund (as is the case with an Exchange Traded Fund, or ETF), the indicative value represents a mere mathematical formula number tied to VIX futures.

38.    Second, built into the note is the right of certain note holders to redeem their securities for the closing indicative value. This redemption right serves to keep the market price of VXX from falling below its indicative value, as market buyers know they can make a profit whenever the price of the security falls below the published indicative value by simply buying the note at the lower value and then putting the note to Barclays at the indicative value.

39.    Third, like all issuers of ETNs, Barclays maintains a shelf capacity to issue and sell new VXX securities whenever the price rises above the indicative value. This capacity is critical to keeping the price capped at or near its indicative value, as the sale of additional securities tends to decrease the price of the security as it satisfies excess demand. Indeed, the mere threat of Barclays issuing new securities upon the price of VXX securities rising above its indicative value disincentivizes buyers from bidding the price of the security above its indicative value in order to squeeze short sellers.

40.    Together, these three pricing mechanisms provide VXX investors with confidence that the price of VXX securities will remain tethered to the VIX futures it was designed to track.

41.    As recognized by FINRA, the ability to redeem and issue new securities are standard pricing mechanisms employed by ETN issuers to ensure that the price of the ETN remains "in-line" with their indicative value:

> Issuers of ETNs issue and redeem notes as a means to keep the ETN's price in line with a calculated value, called the indicative value or closing indicative value for ETNs. This value is calculated and published at the end of each day by the ETN issuer. When an ETN is trading at a premium above the indicative value, issuing more notes to the market can bring the price down. Similarly, if an ETN is trading at a discount, redemption of notes by the issuer reduces the number of notes available in the market, which tends to raise the price. ETN issuers have primary control over the issuance and redemption processes in the ETN market.

*Finra's Investor Alert: Exchange-Traded Notes—Avoid Unpleasant Surprises.*

42.     Significantly, the last of the three pricing mechanisms—the ability of an ETN issuer to sell new securities into the market—is of paramount importance to short sellers of ETNs, and particularly of ETNs like VXX that are heavily shorted. When an ETN is heavily shorted, short sellers alone cannot counteract a rapid rise in the price of the ETN because the security is already "hard to borrow" – meaning, that further "borrow" for purposes of supporting additional short sales is in limited supply. For this reason, short sellers of ETNs that are heavily shorted (like VXX) are especially dependent upon the ETN issuer maintaining appropriate shelf capacities to issue further securities whenever the price of the security rises above its indicative value.

43.     Barclays and BBPLC knew of or recklessly disregarded the risk that if they lost their ability to issue new securities, short sellers would be highly vulnerable to a short squeeze. Indeed, in years past, other similar securities, including Credit Suisse's TVIX, had experienced a short squeeze upon the issuer suddenly halting future issuances.

44.     In the same vein, short sellers would not have taken a short position if they knew that Barclays and BBPLC did not maintain any internal controls to ensure that they had adequate capacity to sell additional securities whenever the price of the security rose above its indicative value, or that Barclays had previously sold billions of dollars of unregistered securities, as such lapses would plainly put at risk Barclays' ability to issue future securities, thereby exposing short sellers to a potential short squeeze.

45.     Plaintiff, like all investors in VXX securities, did not know that Barclays and BBPLC did not have any controls in place to track its prior issuances against its shelf capacities, or that they sold billions of dollars of unregistered VXX securities prior to March 14, 2022, and that any future issuances of VXX ETNs would be illegal sales in violation of the registration requirements of the federal securities laws, including 15 U.S.C. §5. Indeed, as explained below,

Barclays and BBPLC repeatedly issued inaccurate and incomplete statements claiming just the opposite.

> **B.    Defendants Knowingly or Recklessly Made Inaccurate and Incomplete Statements Regarding Issuing Only Registered Securities During the Class Period**

46.    On May 9, 2019, BBPLC filed a Form 8-A12B Registration Statement for securities, including VXX. Attached to the 2019 Form 8-A12B as Exhibit 4.15 were the specific details relating to VXX securities. In this Exhibit, BBPLC stated: "This Security, and any other Securities of this series and of like tenor, are ***issuable only in registered form*** without coupons in denomination of any multiple of $50." BBPLC's 2019 Form 8-A12B, Ex. 4.15.

47.    BBPLC also made a representation in its Form F-3 filed on June 14, 2019, stating:

> **Item 10. Undertakings**
> The undersigned Registrant hereby undertakes:
> (1) To file, during any period in which offers or sales are being made, a post-effective amendment to this Registration Statement:…
>
>     (ii) To reflect in the prospectus any facts or events arising after the effective date of the Registration Statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the Registration Statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the SEC pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20 percent change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective Registration Statement; and
>
>     (iii) To include any material information with respect to the plan of distribution not previously disclosed in the Registration Statement or any material change to such information in the Registration Statement;

BBPLC 2019 Form F-3 at II-9.

48.    BBPLC continued to include identical representations in its Amendments to the Form F-3, which were filed on July 3, 2019 and July 30, 2019. *See* July 3, 2019 Form F-3/A at 8; July 30, 2019 Form F-3/A at II-7.

49.     These statements regarding issuing only registered securities were materially false and misleading. Starting June 26, 2019, Defendants began issuing unregistered securities from the 2018 Shelf. Then, starting January 28, 2021, Defendants began issuing unregistered securities from the 2019 Shelf. Thus, Defendants *did not issue* "only" registered securities as stated by BBPLC in its Registration Statements; nor did Defendants offer securities within the maximum aggregate range claimed by Defendants. Defendants had a duty to update this material information and failed to do so during the Class Period.

50.     As a result of Barclays materially false and misleading statements, as detailed above, investors who were short VXX, such as Lead Plaintiff and Class Members, were materially misled to believe that Barclays and BBPLC maintained internal controls sufficient to prevent the over-issuance of ETNs. This ultimately damaged short sellers because no investor heading into March 14, 2022, would be short the VXX ETN had they known that Barclays and BBPLC had no controls in place to track whether they had any registered securities available to be sold, or had breached their duty to register the securities they previously sold.

## C.     Defendants Knowingly or Recklessly Made Inaccurate and Incomplete Statements Regarding Their Internal Controls During the Class Period

### 1.     Barclays and BBPLC were aware of the additional responsibilities that came with being a Non-WKSI issuer

51.     As prolific issuers of securities, Barclays and BBPLC knew that the registration of publicly issued securities is a foundational principle of the federal securities laws, as Sections 5(a) and (c) of the federal Securities Act prohibit the offer and sale of securities unless they are covered by a valid registration statement filed and in effect. 15 U.S.C. § 77(e). Barclays and BBPLC had a duty to ensure proper registration of all VXX securities they issued and sold.

52.    Historically, BBPLC offered and sold billions of dollars' worth of securities pursuant to effective shelf registration statements on Form F-3s. SEC 2022 Order[2] ¶¶ 13, 14. A shelf registration statement permits prolific issuers such as Barclays and BBPLC to have multiple public securities offerings based on the same shelf registration statement. Barclays and BBPLC were also required to file annual and quarterly periodic reports with the SEC pursuant to Section 13(a) of the Exchange Act.

53.    Defendants' shelf registration statement is largely used by BBPLC's Structured Products Group for the offer or sale of ETNs and structured notes, and on occasion by the Group Treasury to sell corporate debt securities.

54.    Prior to May 10, 2017, Barclays and BBPLC achieved "well-known seasoned issuer" ("WKSI") status under Securities Act Rule 405 that, among other things, enabled them to file automatic shelf registration statements and to pay filing fees at the time of each security's issuance. As a WKSI, Defendants were able to simply issue securities, pay the registration fee, file the proper papers, and have the securities deemed "Effective" upon issuance. Crucially, a WKSI is not forced to wait several weeks or months for the Division of Corporation Finance at the SEC to review the registration statement and declare it effective before the WKSI is allowed to make offers and/or sales from that registration statement.

55.    Pursuant to Securities Act Rule 405 and Instruction I.A. on Form S-3, to qualify as a WKSI, an issuer must not be an "ineligible issuer." An issuer becomes an "ineligible issuer" when it (or a subsidiary) violates the anti-fraud provisions of the federal securities laws (or become subject to a judicial or administrative decree or order prohibiting certain conduct or activities

---

[2] An Order Instituting Cease-and-Desist Proceedings, *In the Matter of Barclays PLC and Barclays Bank PLC*, SEC (dated Sept. 29, 2022) ("SEC 2022 Order").

involving the anti-fraud provisions of federal securities laws) within the prior three years. Although "ineligible issuer" status attaches automatically after a securities violation, since the 2005 Offering Reform, the SEC has liberally granted waivers, upon request, thereby permitting companies to retain their WKSI status despite violating the federal securities laws.

56.     Between 2007 and 2016, Barclays requested and was regularly granted waivers regarding ineligible issuer status from the Division of Corporation Finance of the SEC. For example, in 2014, Barclays received a waiver of ineligible issuer status related to various violations of the Investment Advisers Act of 1940 and Rules thereunder, because of certain failures after Barclays Capital, Inc. ("BCI"), a wholly owned subsidiary of Barclays, acquired Lehman Brothers' investment advisory business in September 2008, including BCI's failure to: (i) enhance its infrastructure to support the new business; (ii) adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act; and (iii) make and keep certain books and records.

57.     In two earlier Waiver Requests submitted on May 20, 2015 and January 27, 2016, Barclays underscored to the SEC that "[t]he WKSI shelf[] process allows access to the widest possible global investor base and provides an important means of accessing capital and funding for Barclays' global operations." [3] 2015 Waiver Request at 10; 2016 Waiver Request at 11. These requests also stressed "the importance of the WKSI shelf to Barclays in meeting its capital and funding requirements." *Id.*

---

[3] Barclays and BBPLC Letter to Mary J. Kosterlitz, Division of Corporate Finance, Request for Waiver of "Ineligible Issuer" Status Under Rule 405 (May 20, 2015) (available at efaidnbmnnnibpcajpcglclefindmkaj/https://www.sec.gov/divisions/corpfin/cf-noaction/2015/barclays-plc-052015-405.pdf); Barclays and BBPLC Letter to Eun Ah Choi, Division of Corporate Finance, Request for Waiver of "Ineligible Issuer" Status Under Rule 405 (January 27, 2016) (available at https://www.sec.gov/divisions/corpfin/ cf-noaction/2016/barclays-plc-020116-405.pdf)).

58.    In the request for a waiver of its "ineligible issuer" status that Barclays filed with the SEC before the Company lost its WKSI status, the Company stated:

> Since 2011, Barclays has issued off the WKSI shelf the USD-equivalent of approximately $12.3 billion of regulatory capital securities, which represents 89% of all regulatory capital securities issued by Barclays in that period. In that same period … the USD-equivalent value of all securities issued by Barclays off the WKSI shelf is approximately $68 billion. These figures demonstrate the importance of the WKSI shelf to Barclays in meeting its capital and funding requirements.

2016 Waiver Request at 10.

59.    Barclays further emphasized that loss of WKSI status would "curtail important channels of communication to investors," weaken its ability to respond to "current regulatory and market conditions and uncertainties that are significantly transforming the landscape for financial institutions like Barclays," and harm "the speed at which Barclays could strengthen its capital position if required to do so" by a financial regulator. *Id*. at 11-13.

60.    On May 10, 2017, the SEC instituted a public administrative and cease-and-desist proceeding against BCI, wherein the SEC accused BCI of fraud. *In the Matter of Barclays Capital Inc.*, Adm. Proc. File No. 3-17978 (May 10, 2017). BCI and Barclays settled with the SEC for $97 million and lost their WKSI status due to securities fraud. Prior to these proceedings, Barclays had been able to retain its WKSI status by applying for a waiver, but the SEC refused to grant Barclays another waiver after the May 2017 settlement.

61.    As a result of the May 2017 SEC Settlement, Barclays automatically lost its status as a WKSI for a period of three (3) years. *See* 17 C.F.R. § 230.405. As a result, BBPLC lost the ability to file automatic shelf registration statements to offer and sell unspecified amounts of different types of securities that are so essential to its business. Instead, Barclays and BBPLC's shelf registrations were limited to a shelf's specified dollar amount of securities. Additionally, the change in status required Barclays and BBPLC to pay all registration fees, upon filing, for the

maximum number of securities set by the shelf, rather than paying such filing fees on a "pay-as-you-go" basis.

62.    The practical effect of the change in status was that Barclays and BBPLC were required to quantify the total amount of securities they planned to offer, well in advance, of issuing securities throughout the penalty period, and to pay any associated registration fees for those securities upfront. Defendants also needed to track the amounts of securities that they sold over the duration of the shelf to ensure that they did not exceed the amount previously registered and paid.

63.    As set forth in the SEC's Cease and Desist Order that Barclays and BBPLC entered into on or about September 29, 2022, Barclays and BBPLC knew after losing its WKSI status that BBPLC had to implement internal controls to track, in real time, its securities offers and sales off any shelf registration going forward:

> Following the loss of WKSI status, certain personnel from BBPLC understood the consequences of this status change, including that they should consider implementing a mechanism to track offers and sales of securities off any shelf, relative to the registered amount of securities available to be offered or sold off that shelf, in order to ensure that no securities in excess of the amount registered were offered or sold.

SEC 2022 Order, ¶19.

64.    Despite having become an ineligible issuer in March 2017, Barclays initially misrepresented on its Forms 20-F during the three-year penalty period, filed on February 22, 2018, by self-identifying as a WKSI.

65.    On March 19, 2018, Barclays filed a post-effective amendment to its 2017 Form 20-F ("2017 Form 20-F/A"), where it amended and acknowledged its new status as a non-WKSI issuer. Defendants at the same time, also declared that they understood the additional responsibilities of a non-WKSI.

66.    Barclays' acknowledgement in its 2017 Form 20-F/A that it was then a non-WKSI issuer and that it understood the additional responsibilities of its new status as a non-WKSI issuer reflect that Barclays was aware of its change in status, and that it was therefore required to change its internal processes.

2.    **Defendants Established a Formal Working Group to Address Their Ongoing Securities Offerings as a Non-WKSI Issuer; and Recognized the Need to Track Actual Offers and Sales Against Shelf Registrations**

67.    To determine how Barclays and BBPLC as a non-WKSI would conduct their securities offerings going forward, in January 2018, Barclays and BBPLC convened a "Working Group" consisting of the trading desk heads from their structured products group, product origination personnel, a compliance officer, and an in-house attorney. The Working Group converted BBPLC's pending WKSI shelf into a non-WKSI and filed the 2018 Shelf Registration that authorized BBPLC to sell up to $21.3 billion worth of securities over the next 18 months. It also obtained estimates of securities issuance needs from key business units, and based on those estimates BBPLC filed a 2019 Shelf Registration statement that was deemed effective on August 1, 2019, and which authorized BBPLC to offer and sell up to $20.8 billion of mainly structured notes and ETNs for a period of three years. SEC 2022 Order, ¶¶20-21[4]; Barclays' Form F-3, filed August 1, 2019.

68.    On March 28, 2018, Barclays filed a post-effective amendment, which amended its prior Registration Statement, and anticipated issuing some $21.3 billion worth of securities in only

---

[4] BBPLC filed a 2019 shelf registration for $20.76 billion that became effective on August 1, 2019. It also paid the required upfront registration fees on the entire authorized amount. *See* www.sec.gov/Archives/edgar/data/312070/000119312519173793/0001193125-19-173793-index.htm; www.sec.gov/Archives/edgar/data/312070/000119312519206925/d778493df3a.htm

18 months ("2018 Amended Shelf Registration"). The Company also paid for the filing fees for the 2018 Shelf.

69.    In 2019, the Working Group reconvened with largely the same membership as in 2018. However, unlike the calculations for the 2018 Shelf, in 2019, the Working Group was required to perform calculations to account for the remaining capacity in the 2018 Shelf.

70.    The SEC 2022 Order later exposed that "[a]t the time of the registration of both the 2018 Shelf and the 2019 Shelf, certain BBPLC personnel recognized the need to accurately record relevant information about securities that were offered or sold so as to be able to track the aggregate amount of securities that were cumulatively offered and sold from each respective Shelf on a real-time basis, thereby ensuring that BBPLC did not offer or sell any securities in excess of what had been registered." SEC 2022 Order, ¶5. As stated therein:

> During the pendency of the Working Group's efforts, the need to track actual offers and sales of securities against the amount of registered securities on a real-time basis was understood by and discussed among members of the Working Group. Nevertheless, no internal control was established to track offers and sales of securities, nor was any member of the Working Group or other BBPLC personnel performing that task.

*Id.*, ¶24.

71.    Although Defendants were aware of the additional responsibilities that resulted from losing their WKSI status and had impaneled a working group to explore the need for any changes to Barclays' and BBPLC's internal processes, Barclays and BBPLC inexplicably failed to task anyone with developing and maintaining an infrastructure with the technology and processes necessary to establish and implement internal controls.

**D.** **Defendants' Incomplete and Inaccurate Statements Concerning Internal Controls During the Class Period**

72.    Despite knowing that they needed to implement controls to track issuances against prior shelf registrations, and that such information would be material to short sellers, Defendants repeatedly failed to apprise the market that they had no controls in place.

73.    During the Class Period, Defendants disseminated materially false and misleading statements to investors in their filings with the SEC regarding their internal controls. Defendants further omitted material facts that they had a duty to disclose in order to make the statements made by Defendants, in light of the circumstances under which they were made, not misleading at the time they were made.[5]

**1.    February 13, 2020: FY 2019 Results and Filing of Form 20-F**

74.    On February 13, 2020, Barclays filed their 2019 Annual Report, signed by Defendant Morzaria. ("Barclays' 2019 Form 20-F").

75.    Barclays' 2019 Form 20-F touted the Company "is ***committed to operating within a strong system of internal control.***" Barclays' 2019 Form 20-F at 37. Barclays even specified that the Company was on track to complete a three-year program at the end of March 2020, known as the Barclays Internal Control Environment Programme or "BICEP," that "was ***focus[ed] on strengthening the internal control environment***," and had left the Company's internal controls environment "***in a much stronger position***." *Id.*  at 11, 91. Furthermore, the Company's "***frameworks, policies and standards enable Barclays to meet regulators' expectations relating***

---

[5] Statements highlighted in ***bold and italics*** within this section were materially false or misleading because, among other reasons, they omitted material information of which Defendants were aware or reckless in not knowing. Because Defendants chose to speak on the issues described below, it was important that they not mislead investors or withhold material information. Other statements are included to provide context and to demonstrate the materially false and misleading nature of Defendants' representations, and Defendants' material omissions.

*to internal control and assurance*." *Id*. at 37.

76.     Barclays' 2019 Form 20-F also stated that the Barclays Board Audit Committee "concluded that, throughout the year ended 31 December 2019 and to date, ***the Group has operated a sound system of internal control that provides reasonable assurance of financial and operational controls and compliance within laws and regulations***." *Id*. at 38.

77.     Furthermore, Barclays reassured that "***Management has assessed the internal control over financial reporting as of 31 December 2019. In making its assessment, management utilized the criteria set out in the 2013 COSO framework and concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2019.***" *Id*.

78.     Attached as Exhibit 12.1 to the 2019 Form 20-F were certifications pursuant to 17 C.F.R. § 240.13(A)-14(A) signed by Defendants Staley and Morzaria, which states:

1.  I have reviewed this annual report on Form 20-F of Barclays PLC;

2.  ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading with respect to the period covered by this report***;

3.  Based on my knowledge, ***the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;***

4.  The Company's **other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures** (as defined in Exchange Act Rules 13a-15(e) and 15-d-15(e)) and **internal control over financial reporting** (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

    (a) ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by other within those***

*entities*, particularly during the period in which this report is being prepared;

(b) *Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*;

(c) *Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation*; and

(d) *Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting*; and

5. The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's boards of directors (or persons performing the equivalent functions):

(a) *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize, and report financial information*; and

(b) *Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting*.

79.    Attached as Exhibit 13.1 to the 2019 Form 20-F was a certification pursuant to

Section 906 of the Sarbanes-Oxley Act of 2002 signed by Defendants Staley and Morzaria, which

states-:

> *2. The Annual Report on Form 20-F for the year ended December 31, 2018 (the "Report") of Barclays fully complies with the requirements of section 13(a) of the Securities Exchange Act of 1934 and information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Barclays*.

80.    Defendants' statements concerning Barclays' internal controls over financial

reporting contained in ¶¶ 75-77, and the certifications referenced in ¶¶ 78 and 79, were materially

false and/or misleading in that they failed to disclose:

> (a) that Barclays had no internal controls to track the issuance of VXX shares pursuant to the 2018 and 2019 shelf registration statements;

> (b) that Barclays had sold and was continuing to sell unregistered securities in excess of the amounts registered by the 2018 Shelf Registration Statement and the 2019 Shelf Registration Statement;

> (c) a material weakness existed in Barclays' internal control environment evidenced by the fact that the over-issuances had occurred; and

> (d) that Barclays would be required to halt the sale and issuance of VXX securities.

### 2. February 14, 2020: BBPLC's FY 2019 Results and Filing of Form 20-F

81.    On February 14, 2020, BBPLC filed with the SEC its 2020 Annual Report on Form 20-F (the "BBPLC's 2019 Form 20-F), which Chief Financial Officer, Steven Ewart signed. Similar to Barclays, BBPLC acknowledged that it did not have WKSI status. BBPLC's 2019 Form 20-F at 2.

82.    In BBPLC's 2019 Form 20-F, the Board begins its Corporate Governance Statement by outlining the Board's six core principles. *Id*. at 3-5. The fourth principle is "Audit, Risk and Internal Control." *Id*. at 4. This principle explicitly directs that

> The board should establish formal and transparent policies and procedures to (i) identify the nature and extent of principal risks the company is willing to take in order to achieve its long-term strategic objectives; (ii) manage such risks effectively; ***(iii) oversee the internal control framework***; (iv) promote the independence and effectiveness of internal and external audit functions; and (v) satisfy itself on the integrity of financial reporting.

*Id*.

83.    More specifically, the Board explained that the "[e]ffectiveness of risk management and internal controls is reviewed regularly by the Risk Committee (responsible for providing

oversight on current and potential future risk exposures) and the Audit Committee (responsible for controls, including reviewing audit reports, internal controls and risk management systems)." *Id*. Furthermore, during this time, the Audit Committee's "principal role and responsibilities" included "[*e*]*valuating the effectiveness of the Barclays Bank Group's internal controls*, including internal financial controls" and "*evaluating the status of the most material control issues identified by management, including the Barclays Group Internal Control Enhancement Programme; receiving deep dives on the status of specific control issues across the business of Barclays Bank Group and functions*, and on progress of the related remediation programmes and lessons learned from critical risk events." *Id*

84.     BBPLC similarly represented that "[t]he Company is committed to operating *within a strong system of internal control* that enables business to be transacted and risk taken without exposure to unacceptable potential losses or reputational damage." 2019 Form 20-F at 14. BBPLC reassured that "[a] framework of disclosure controls and procedures is in place to support the approval of the financial statements of the Barclays Bank Group." *Id*.

85.     BBPLC reiterated that "[t]he Board together with the Audit Committee is responsible for ensuring the independent and effectiveness of the internal and external audit functions." *Id*. Furthermore, "Management is responsible for establishing and maintaining adequate internal controls over financial reporting under the supervision of the principal executive and financial officers, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements, in accordance with International Financial Reporting Standards (IFRS)." *Id*. In fact, the Board noted:

> Internal control over financial reporting includes policies and procedures that pertain to the maintenance of records that, in reasonable detail:
> - Accurately and fairly reflect transactions and dispositions of assets;
> - Provide reasonable assurances that transactions are recorded as necessary to

permit prepraration of financial statements in accordance with IFRS and that receipts and expenditures are being made only in accordance with authorisations of management and the respective Directors; and

- Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of assets that could have a material effect on the financial statement.

*Id*.

86.    According to BBPLC's 2019 Form 20-F, "***Management has assessed the internal control over financial reporting as of 31 December 2019. In making its assessment, management utilised the criteria set out in the 2013 COSO framework and concluded that, based on its assessment, the internal control over financial reporting as effective as of 31 December 2019.***" *Id*. Furthermore, the Audit Committee concluded that "***[t]hroughout the year ended 31 December 2019 and to date, the Company has operated a system of internal control that provides reasonable assurance of effective operations covering all controls, including financial and operational controls and compliance with laws and regulations***." *Id*. at 14.

87.    The 2019 Form 20-F also noted that "[t]here have been no changes in the Barclays Group's internal control over financial reporting that occurred during the period covered by this report, which have materially affected or are reasonably likely to materially affect the Barclays Group's internal control over financial reporting." *Id*. at 15.

88.    BBPLC's 2019 Form 20-F specified that:

The Chief Executive Office, [Defendant] Staley… conducted with Barclays Bank Group management an evaluation of the effectiveness of the design and operation of the Barclays Bank Group's disclosure controls and procedures of Barclays Bank PLC as at 31 December 2019, which are designed are defined as those controls and procedures designed to ensure that information required to be disclosed in reports filed or submitted under the US Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified int eh US Securities and Exchange Commission's rules and forms. As of the date of the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the design and operation of these disclosure controls and procedures were effective.

*Id.* at 205.

89.     BBPLC further reassured that:

A framework of disclosure controls and procedures is in place to support the approval of the financial statements of the Barclays Bank Group. Specific governance committees are responsible for examining the financial reports and disclosures to ensure that they have been subject to adequate verification and comply applicable standards and legislation.

*Id*. at 14.

90.     Attached as Exhibit 12.1 to the 2019 Form 20-F were certifications, signed by Defendant Staley, which are identical to the language of the certification attached to Barclays' 2019 Form 20-F, which is stated in full above. *See* ¶ 78.

91.     Further, attached as Exhibit 13.1 to BBPLC's 2019 Form 20-F was a certification, also signed by Defendant Staley, which is identical to the SOX certification attached to Barclays' 2019 Form 20-F, and stated in full above. *See* ¶ 79.

92.     Defendants' statements concerning Barclays' internal controls over financial reporting contained in ¶¶ 84-89, and the certifications referenced in ¶¶ 90 and 91, were materially false and/or misleading in that they failed to disclose:

(a) that Barclays had no internal controls to track the issuance of VXX shares pursuant to the 2018 and 2019 shelf registration statements;

(b) that Barclays had sold and was continuing to sell unregistered securities in excess of the amounts registered by the 2018 Shelf Registration Statement and the 2019 Shelf Registration Statement;

(c) a material weakness existed in Barclays' internal control environment evidenced by the fact that the over-issuances had occurred; and

(d) that Barclays would be required to halt the sale and issuance of VXX securities.

### 3.   February 18, 2021: FY 2020 Results and Filing of Form 20-F

93.     On February 18, 2021, the same day that Barclays exceeded the limit of its

registered securities under the 2019 Shelf Registration Statement, Barclays filed with the SEC its 2020 Annual Report on Form 20-F (the "Barclays' 2020 Form 20-F), which Defendant Morzaria signed.

94.      In the 2020 Form 20-F, Barclays again detailed the Company's purportedly "***robust internal controls***" and highlighted that Barclays had "successfully completed" a three-year program, known as the Barclays Internal Control Environment Programme or "BICEP." Barclays' 2020 Form 20-F at 14. The 2020 Form 20-F explained that BICEP "***was focused on strengthening the internal control environment across the Group***" and, having undergone BICEP, "***[t]he Group's control environment [] now in a much stronger position***." *Id.*

95.      The 2020 Form 20-F also touted that Barclays "***is committed to operating within in strong system of internal control***," and that the Company's "***frameworks, policies, and standards enable Barclays to meet the regulators' expectations relating to internal control and assurance***." *Id.* at 39. Additionally, the Form 20-F stated that "***[m]anagement has assessed the internal control over financial reporting as of 31 December, 2020 [], utilized the criteria set out in the 2013 COSO framework and concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2020***." *Id.* at 40. More succinctly, Barclays repeatedly underscored that "Management has operated within a robust framework for identifying and responding to control issues with appropriate reporting to the Committee and other Board Committees." *Id.* at 14.

96.      Individual Defendants directly managed oversight of Barclays' and BBPLC's internal controls.  Barclays also disclosed that "joint personal objectives" for Defendant Staley included "[e]mpower the effective management of the risks and controls agenda." *Id.* at 69. Similarly, Defendant Morzaria included "[c]ontinue to optimize financial management and

reporting (particularly through technology) to drive benefits across the Group," and "[o]verse the effective management of the risks and controls agenda across Group Finance, Strategy, Tax and Treasury." *Id*. at 14. The 2020 Form 20-F included a Board Audit Committee report. The Board Audit Committee Report stated, "***The Committee reached the conclusion that there are no control issues that are considered to be a material weakness and which merit specific disclosure***." *Id.* The Board Audit Committee Report further stated, "***The Committee [] evaluated and tracked the status of the more significant control issues through regular reports from the Chief Controls Officer, including updates on the progress of remediation programmes, ongoing COVID-19 related issues and return to office planning***." *Id.* at 19. Finally, the Board Audit Committee Report stated that the Audit Committee "***concluded that, throughout the year ended 31 December 2020 and to date, the Group has operated a sound system of internal control that provides a reasonable assurance of financial and operational controls and compliance with laws and regulations***." *Id*. at 39.

97.    With respect to "Controls over financial reporting," the 2020 Form 20-F reported:

***A framework of disclosure controls and procedures is in place to support the approval of the financial statements of the Group.***

***Specific governance committees are responsible for examining the financial reports and disclosures to ensure that they have been subject to adequate verification and comply with applicable standards and legislation.***

***Where appropriate, these committees report their conclusions to the Board Audit Committee, which debates such conclusions and provides further challenge. Finally, the Board scrutinises and approves results announcements and the Annual Report and ensures that appropriate disclosures have been made. This governance process ensures that both management and the Board are given sufficient opportunity to debate and challenge the financial statements of the Group and other significant disclosures before they are made public.***

*Id*.

98.    Attached as Exhibit 12.1 to the 2020 Form 20-F were certifications, signed by

Defendants Staley and Morzaria, which are identical to the language to the certifications attached to 2019 Form 20-F, which is stated in full above. *See* ¶ 78.

99.    Further, attached as Exhibit 13.1 to the 2020 Form 20-F was a certification, signed by Defendants Staley and Morzaria, which is identical to the one attached to the 2019 Form 20-F, and stated in full above. *See* ¶ 79. In the SOX Certification, Defendants attested to the truthfulness of the statement: "***The Annual Report on Form 20-F for the year ended December 31, 2020 (the "Report") of Barclays fully complies with the requirements of section 13(a) of the Exchange Act of 1934 and information contained in the Report fairly presents, in all material respects, the financial conditions and results of operations of Barclays.***"

100.    Defendants' statements concerning Barclays' internal controls over financial reporting contained in ¶¶ 94-97, and the certifications referenced in ¶¶ 98 and 99, were materially false and/or misleading in that they failed to disclose:

(a)    that Barclays had no internal controls to track the issuance of VXX shares pursuant to the 2018 and 2019 shelf registration statements;

(b)    that Barclays had sold and was continuing to sell unregistered securities in excess of the amounts registered by the 2018 Shelf Registration Statement and the 2019 Shelf Registration Statement;

(c)    a material weakness existed in Barclays' internal control environment evidenced by the fact that the over-issuances had occurred; and

(d)    that Barclays would be required to halt the sale and issuance of VXX securities.

### 4. February 18, 2021: BBPLC's FY 2020 Results and Filings of Form 20-F

101.    On February 18, 2021, BBPLC filed its Annual Report, Form 20-F, for the year ending 2020. ("BBPLC's 2020 Form 20-F").

102.    As in its prior Annual Reports, BBPLC touted that "[t]he Company is committed to operating withing a ***strong system of internal control***." BBPLC's 2020 Form 20-F at 13. The BBPLC Board reassured that "[p]rocesses are in place for identifying, evaluating and managing the Principal Risks facing the Company." *Id*.

103.    The Audit Committee concluded that: "***Throughout the year ended 31 December 2020 and to date, the Company has operated a system of internal control that provides reasonable assurance of effective operations covering all controls, including financial and operational controls and compliance with law and regulations.***" *Id*. Furthermore, "***Management has assessed the internal control over financial reporting as of 31 December 2020. In making its assessment, management utilised the criteria set out in the 2013 COSO framework and concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2020.***" *Id*. The Board also reassured that "[t]here have been no changes in the Barclays Bank Group's internal control over financial reporting that occurred during the period covered by this report, which have materially affected or are reasonably likely to materially affect the Barclays Bank Group's internal control over financial reporting." *Id*. at 14.

104.    In BBPLC's 2020 Form 20-F, the Board again attested that:

The Chief Executive Officer, Jes Staley…conducted with Barclays Bank Group Management an evaluation of the effectiveness of the design and operation of the Barclays Bank Group's disclosure controls and procedures of Barclays Bank PLC as at 31 December 2020, which are defined as those controls and procedures designed to ensure that information required to be disclosed in reports filed or submitted under the US Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the US Securities and Exchange Commission's rules and forms. As of the date of the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the design and operation of these disclosure controls and procedures were effective.

*Id*. at 203.

105.    Attached as Exhibit 12.1 to the 2020 Form 20-F were certifications, signed by Defendant Staley, which are identical to the language of the certification attached to Barclays' 2019 Form 20-F, which is stated in full above. *See* ¶ 78.

106.    Further, attached as Exhibit 13.1 to BBPLC's 2020 Form 20-F was a certification, also signed by Defendant Staley, which is identical to the SOX certification attached to Barclays' 2019 Form 20-F, and stated in full above. *See* ¶ 79.

107.    Defendants' statements concerning Barclays' internal controls over financial reporting contained in ¶¶ 102-104, and the certifications referenced in ¶¶ 105 and 106, were materially false and/or misleading in that they failed to disclose:

(a)    that Barclays had no internal controls to track the issuance of VXX shares pursuant to the 2018 and 2019 shelf registration statements;

(b)    that Barclays had sold and was continuing to sell unregistered securities in excess of the amounts registered by the 2018 Shelf Registration Statement and the 2019 Shelf Registration Statement;

(c)    a material weakness existed in Barclays' internal control environment evidenced by the fact that the over-issuances had occurred; and

(d)    that Barclays would be required to halt the sale and issuance of VXX securities.

**5.  April 30, 2021: Q1 2021 Results and Filing of Form 6-K**

108.    On April 30, 2021, Barclays issued its Q1 2021 Results Announcement, containing financial results for Barclays for the quarter ending March 31, 2021 ("Q1 2021 RA"). Barclays filed a copy of the Q1 2021 RA as an attachment, Exhibit 99.1, to a Form 6-K filed with the SEC on April 30, 2021.

109.    Barclays continued to emphasize that "Barclays remain in a strong capital

position." Q1 2021 RA at 5.

110.    The Q1 2021 RA incorporated the 2020 Form 20-F by reference, discussed above in ¶¶ 94-99. Therefore, for the reasons set forth in ¶ 100, the statements in the Q1 2021 RA were materially false and/or misleading for their failure to disclose the true state of Barclays' internal controls.

### 6.    July 28, 2021: Q2 2021 Results and Filing of Form 6-K

111.    On July 28, 2021, Barclays issued its Interim 2021 Financial Results for the six-month period ending June 30, 2021 ("Q2 2021 RA"). Barclays filed a copy of the Q2 2021 RA as an attachment, Exhibit 99.1, to a Form 6-K filed with the SEC on July 28, 2021.

112.    The Q2 2021 RA incorporated the 2020 Form 20-F by reference, discussed above in ¶¶ 94-99. Therefore, for the reasons set forth in ¶ 100, the statements in the Q1 2021 RA were materially false and/or misleading for their failure to disclose the true state of Barclays' internal controls.

### 7.    October 21, 2021: Q3 2021 Results and Filing of Form 6-K

113.    On October 21, 2021, Barclays issued its Q3 2021 Results Announcement, containing financial results for the nine months ended September 30, 2021 ("Q3 2021 RA"). Barclays filed a copy of the Q3 2021 RA as an attachment, Exhibit 99.1, to a Form 6-K filed with the SEC on October 21, 2021.

114.    The Q3 2021 RA incorporated the 2020 Form 20-F by reference, discussed above in ¶¶ 94-99. Therefore, for the reasons set forth in ¶ 100, the statements in the Q1 2021 RA were materially false and/or misleading for their failure to disclose the true state of Barclays' internal controls.

### 8.    February 23, 2022: FY 2021 Results and Filing of Form 20-F

115.    On February 23, 2022, Barclays filed its 2021 Form 20-F. ("Barclays' 2021 Form 20-F). The 2021 Form 20-F was signed by Defendant Morzaria.

116.    The 2021 Form 20-F stated, in pertinent part, that Barclays **"is committed to operating within a strong system of internal control,"** and that the Company's **"frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance."** Barclays' 2021 Form 20-F at 45. Similar to its 2020 Form 20-F, the 2021 Form 20-F stated that **"[m]anagement has assessed the internal control over financial reporting as at 31 December 2021… and concluded that, based on its assessment, the internal control over financial reporting was effective as at 31 December 2021."** *Id.* at 46.

117.    The 2021 Form 20-F further stated that Barclays' Audit Committee: was charged with "[o]verseeing the integrity of our financial disclosures and the effectiveness of the internal control environment," was **"[k]eenly focused on the Group's internal control environment" and "continued to oversee the ongoing evolution and enhancement of the internal control environment."** *Id.* at 22.

118.    The 2021 Form 20-F also stated within its section on "Risk management and internal control" that "*[t]he Group is committed to operating within a strong system of internal control." Id.* at 45. In the next paragraph, the Annual Report states that "*[p]roccesses are in place for identifying, evaluating and managing the Principal Risks facing the Group in accordance with the 'Guidance on Risk Management, Internal Control and Related Financial and Business Reporting', published by the FRC." Id.* Defendants falsely reassured that "*Group-wide frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance." Id*.

119.    In the 2021 Form 20-F, Barclays also noted in its section on "Effectiveness of

internal controls," that the Board's Audit Committee "*has concluded that, throughout the year ended 31 December 2021 and to date, the Group has operated a sound system of internal control that provides reasonable assurance of financial and operational controls and compliance with laws and regulations.*" *Id.* Within the section on "controls over financial reporting," Defendants represented that "*[a] framework of disclosure controls and procedures is in place to support the approval of financial statements of the group.*" *Id.* at 45.

120.    Attached as Exhibit 12.1 to the Barclays 2021 Form 20-F were certifications signed by Defendants Vakatakrishnan and Morzaria. The text of the certifications was identical to the certifications attached as Exhibit 12.1 to the Barclays 2019 Form 20-F. *See ¶* 78.

121.    Attached as Exhibit 13.1 to the Barclays 2021 Form 20-F was a certification signed by Defendants Vankatakrishnan and Morzaria. The text of the certification was identical to the certification attached as Exhibit 13.1 to the Barclays 2019 Form 20-F, except the certification was made for the Barclays 2021 20-F. *See* ¶ 79.

122.    Defendants' statements concerning Barclays' internal controls over financial reporting contained in ¶¶ 116-119, and the certifications referenced in ¶¶ 120 and 121, were materially false and/or misleading in that they failed to disclose:

(a)    that Barclays had no internal controls to track the issuance of VXX shares pursuant to the 2018 and 2019 shelf registration statements;

(b)    that Barclays had sold and was continuing to sell unregistered securities in excess of the amounts registered by the 2018 Shelf Registration Statement and the 2019 Shelf Registration Statement;

(c)    that a material weakness existed in Barclays' internal control environment evidenced by the fact that the over-issuances had occurred; and

(d) that Barclays would be required to halt the sale and issuance of VXX securities.

### 9. February 23, 2022: BBPLC's FY 2021 Results and Filing of Form 20-F

123.    On February 23, 2022, BBPLC filed its Annual Report, Form 20-F, for the year ending in 2021. ("BBPLC's 2021 Form 20-F").

124.    As in prior Annual Reports, the Board stated: "The Company is committed to operating within a ***strong system of internal control***." BBPLC's 2021 Form 20-F at 13.

125.    BBPLC's 2021 Form 20-F reassured:

A framework of disclosure controls and procedures is in place to support the approval of the financial statements of the Barclays Bank Group. Specific governance committees are responsible for examining the financial reports and disclosures to ensure that they have been subject to adequate verification and comply with the applicable standards and legislation.

*Id*. at 12.

126.    The Audit Committee concluded that "***Throughout the year ended 31 December 2021 and to date, the Company has operated a system of internal control that provides reasonable assurance of effective operations covering all controls, including financial and operational controls and compliance with laws and regulations.***" *Id.* Furthermore, "***Management has assessed the internal control over financial reporting as at 31 December 2021. In making its assessment, management utilised the criteria set out in the 2013 COSO framework and concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2021.***" *Id*.

127.    The Board also noted that "[t]here have been no changes in the Barclays Bank Group's internal control over financial reporting that occurred during the period, covered by this report, which have materially affected or are reasonably likely to materially affect the Barclays Bank Group's internal control over financial reporting." *Id*.

128.    BBPLC's 2021 Form 20-F also noted that Defendant Venkat was appointed as CEO in November 2021. *Id*. at 13. Furthermore, it attested that:

> The Chief Executive, C.S. Venkatakrishnan…conducted with Barclays Bank Group Management an evaluation of the effectiveness of the design and operation of the Barclays Bank Group's disclosure controls and procedures of Barclays Bank PLC as at 31 December 31, which are defined as those controls and procedures designed to ensure that information required to be disclosed in reports filed or submitted under the US Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the US Securities and Exchange Commission's rules and forms. As of the date of the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the design and operation of these disclosures and procedures were effective.

*Id*. at 207.

129.    Attached as Exhibit 12.1 to the 2021 Form 20-F were certifications, signed by Defendant Venkat, which are identical to the language of the certification attached to Barclays' 2019 Form 20-F, which is stated in full above. *See* ¶ 78.

130.    Further, attached as Exhibit 13.1 to BBPLC's 2021 Form 20-F was a certification, also signed by Defendant Venkat, which is identical to the SOX certification attached to Barclays' 2019 Form 20-F, and stated in full above. *See* ¶ 79.

131.    Defendants' statements concerning Barclays' internal controls over financial reporting contained in ¶¶ 124-128, and the certifications referenced in ¶¶ 129 and 130, were materially false and/or misleading in that they failed to disclose:

(a)    that Barclays had no internal controls to track the issuance of VXX shares pursuant to the 2018 and 2019 shelf registration statements;

(b)    that Barclays had sold and was continuing to sell unregistered securities in excess of the amounts registered by the 2018 Shelf Registration Statement and the 2019 Shelf Registration Statement;

(c)    a material weakness existed in Barclays' internal control environment evidenced by the

fact that the over-issuances had occurred; and

(d) that Barclays would be required to halt the sale and issuance of VXX securities.

**E.    BBPLC Abruptly Suspends Sales of VXX ETNs and Creates a Short Squeeze**

132.    On March 8, 2022, a member of Group Treasury at Barclays reached out to a member of the legal department asking about the available securities from the 2019 Shelf because Group Treasury was planning a sale of corporate debt securities. SEC 2022 Order, ¶ 29. After Barclays attempted to calculate the total amount of securities offered and sold from the 2019 Shelf, "it became clear to all involved that there was no internal control in place to track in real time the amount of securities offered and sold against the amount of securities registered." *Id*. ¶ 30. Around March 9, 2022, Barclays' senior managers were informed of the company's major failure and that it had issued and sold billions of unregistered securities, 39ncludeng VXX notes.

133.    On March 14, 2022, Barclays and BBPLC "alerted the regulators about the over-issuance and disclosed to the market that BBPLC did not have sufficient issuance capacity to support further sales from inventory and any further issuances of certain ETNS," including VXX. *Id*. ¶ 31. This disclosure was made approximately seventeen minutes before the VXX securities market opened on March 14, 2022, and stated that Barclays and BBPLC were "immediately suspending until further notice, any further sales from inventory and further issuances" of securities, specifically including "VXX ETNs and another of its most popular ETNs that tracked the price of crude oil." Barclays further stated that the immediate suspension of VXX sales was because "Barclays does not currently have sufficient issuance capacity to support further sales from inventory and any further issuances of ETNs." *Id*.

134.    Barclays' shocking suspension of further VXX ETNs had the predictable and foreseeable effect of causing the price of VXX securities to rise sharply relative to its indicative value, as buyers came to appreciate that Barclays and BBPLC could no longer serve its critical

function of selling additional securities upon the price rising above its indicative value. A significant short squeeze ensued.

135.    In the hours that followed, the market price of VXX securities skyrocketed, rising to more than 140% of its indicative value—higher than any price deviation in the security's history.[6] The security's price remained untethered from its indicative value for months, until Barclays and BBPLC were once again allowed to issue VXX securities, in September 2022.

136.    In a March 15, 2022 note, Goldman Sachs's analyst explained the impact of Barclays' and BBPLC's abrupt suspension:

> As long as this suspension remains in place, the creation/redemption mechanism that typically keeps the VXX share price close to its [indicative value] will only work in one direction: one can redeem shares for a cash payment equal to their [indicative value], setting [it] as a floor on the share price, but one can no longer create shares at [indicative value]. This leaves the potential for the share price to exceed its [indicative value] because of the shares' scarcity.[7]

137.    Lead Plaintiff was forced to close out his position and sustain substantial losses – losses entirely unrelated to the position he took on market volatility. Indeed, had the price of the VXX securities remained tethered to its indicative value, the call options that Lead Plaintiff sold would have expired "in the money"—without being exercised, since the indicative value of the security never exceeded the strike prices of the options.

**F.    The Aftermath**

**1.    Defendants Offer to Compensate Investors Who Were Long VXX Securities, Rather Than Those Short VXX Securities**

---

[6] Barclays further admitted that prior to March 31, 2022, it put on specific hedges to offset the costs of illegally selling billions of dollars of unregistered securities. In its 2022 half year regulatory filing, Barclays estimated that the costs of the over-issuance to be £ 1.5 billion, which was "substantially offset by £0.8bn of income from hedging arrangements" put on after discovery of the over-issuance. Interim Results Announcement, Form 6-F, for Second Quarter of 2022, filed July 28, 2022 ("Q2 2022 RA") at 2. These hedging arrangements were essentially bets against short sellers of VXX like Lead Plaintiff and the Class, thereby contributing to the rapid and sustained rise in price of VXX securities following the March 14, 2022 disclosure.

[7]  R. Wigglesworth, Barclays' Galaxy -Brain Structured Notes Screw-up Explained, Financial Times (4/1/22) https://www.ft.com/content/f6422619-fd92-4a32-9ffd-6bd3cfbb083c

138.    While investors that were "long" the security benefited from Barclays' suspension of sales, because the price of the security rose relative to its indicative value, Barclays nonetheless was required by SEC regulation to offer to rescind any purchases by direct purchasers who bought the unregistered securities from Barclays and who had lost money in the subsequent months.

139.    On July 25, 2022, Barclays issued a one-paragraph press release announcing that "BBPLC expects to commence a rescission offer on 1 August 2022 to eligible purchasers of c.U.S.$17.6 billion of relevant securities issued in excess of amounts registered by BBPLC under its U.S. shelf registration statements." This public announcement was formalized in Barclays' Prospectus Supplement, Form 6-K, filed prior to the market opening on August 1, 2022 ("Rescission Offer"), which was amended on August 12, 2022. This Offer expired on September 12, 2022.[8]

140.    According to the Rescission Offer, Barclays offered to give direct purchasers of the securities who had sold the affected securities, "at a loss: an amount equal to the excess, if any, of the amount you paid for such Subject Security over the proceeds from the subsequent sale, redemption or maturity of each such Subject Security, *plus* interest." Rescission Offer at 1. Months later, the Company filed a Form 6-K on September 15, 2022 ("September 2022 Form 6-K") disclosing that investors of the impacted structured notes validly submitted claims valued at nearly $7.7 billion.

141.    Thus, direct purchasers of VXX securities from Barclays received a windfall—they

---

[8] The Rescission Offer further disclosed that from February 18, 2021, through March 14, 2022, BBPLC sold $16.37 billion of unregistered securities in excess of the maximum $20.8 billion of securities registered under the August 2019 Shelf Registration Statement (for a total of approximately $37 billion). *Id.* at S-6, S-25. The Rescission Offer also disclosed that BBPLC sold an additional $1.27 billion of unregistered securities in excess of the maximum registered pursuant to the 2018 Shelf Registration Statement. *Id.*

got their money back and interest, even though their original bet proved directionally incorrect; while short sellers, whose investment was directionally correct and suffered actual harm due to Barclays' and BBPLC's abrupt suspension of further issuances, got nothing. Worse, in at least one respect, Barclays benefited from its suspension, because the halting of further issuances caused the price of the security to rapidly rise and remain elevated, thereby reducing the losses Barclays had to otherwise pay direct purchasers under its legally mandated Recission Offer. Stated differently, if Barclays had not suspended further issuances and the price of VXX securities remained tethered to its indicative value, the cost of Barclays' Recission Offer would have been even higher.

## 2.     Defendants Admit to Recklessness

142.     In the months following March 14, 2022, Defendants issued a series of admissions relating to their lack of internal controls and their issuances of unregistered securities. In these statements, Defendants acknowledge their responsibility and admit reckless disregard in their misconduct during the Class Period.

143.     For example, Defendants admitted that:

a)   BBPLC began selling in excess of the $20.76 billion maximum issuance capacity as early as February 18, 2020, and that "securities issued in excess of the limit are considered to be 'unregistered securities' for the purposes of US securities law…" First Quarterly Report for 2022, filed April 28, 2022 ("Q1 2022 RA");

b)   "management has concluded that, by virtue of the fact that the over-issuances occurred and was not immediately identified, both BPLC and BBPLC had a material weakness in relation to certain aspects of their internal control environment and, as a consequence, their internal control over financial reporting for the year ended 31 December 2021 was not effective…" *Id*.;

42

c) BBPLC amended its 2021 Form 20-F on May 23, 2022, to "amend the disclosure…to reflect management's conclusion that the Company's **internal control over financial reporting and disclosure controls and procedures were not effective under the applicable Committee of Sponsoring Organizations (COSO) Framework as of 31 December 2021 due to a material weakness in the Company's internal control over financial reporting** identified subsequent to the Original Filing Date **as a result of the Over-issuance of Securities having occurred and not been immediately identified**." BBPLC's 2021 Form 20-F/A at Explanatory Note.

d) "…we do not get everything right. Let me say a few words about our recently reported failure to comply with SEC registration requirements, a failure which has cost us hundreds of millions of pounds, and more in reputation…. **This is not rocket science** and we can and will do better, learning from this particular issue and applying discipline across all our controls." Nigel Higgins, Chairman of Barclays, 2022 Annual General Meeting, May 4, 2022;

e) "…First, all of us here were dismayed that, after so much progress, we had this entirely self-inflicted problem. We have not yet finished the review, but I believe that we will find that, in all our complexities, **we missed some simple tasks.** Defendant Venkat, 2022 Annual General Meeting, May 4, 2022;

f) "**This situation was entirely avoidable and I am deeply disappointed that it occurred.** The necessity of a strong controls culture has never been clearer to me." CEO Venkat, 2022 Annual General Meeting, May 4, 2022;

g) "…management has concluded that, by virtue of the fact that there was a weakness in controls over the identification of external regulatory limits related to securities issuance

and monitoring against these limits, the Barclays Bank Group had a material weakness in relation to certain aspects of its internal control environment, and, as a consequence, its internal control over financial reporting and disclosure controls and procedures as at 31 December 2021 were not effective." Interim Results Announcement, Form 6-F, for Second Quarter of 2022, filed July 28, 2022 ("Q2 2022 RA") at 5, 6;

h) "[t]he material weakness that has been identified relates to a weakness in controls over the identification of external regulatory limits related to security issuance…**As a result of this weakness,** Barclays Bank PLC issued securities in excess of the amount under the U.S. shelf registration statements…" *Id.* at 5;

i) "the issuance of securities in excess of the maximum aggregate offering price for Barclays Bank PLC's 2019 U.S. Shelf **resulted from a failure to monitor issuances during the period in which Barclays Bank PLC's status changed from a 'well-known seasoned issuer' to an 'ineligible issuer' for U.S. securities law purposes…**" *Id.* at 29;

j) "…while the majority of over-issuance occurred under the 2019 Shelf, a small portion of the over-issuance also occurred under the Predecessor Shelf." *Id.* at 5-6, 30; and "The over-issuance occurred because Barclays did not put in place a mechanism to track issuances after BBPLC became subject to a limit on issuance. Among the principal causes of the over-issuance were, **first, the failure to identify and escalate to senior executives the consequences of the loss of well-known issuer status and, secondly, a decentralized ownership structure for securities issuances."** Form 6-K, filed September 30, 2022. ("Sept. 2022 Form 6-K")

144.    Defendants' admissions underscore the fact that they knew or were deliberately reckless in failing to implement appropriate internal controls and/or discover the over-issuances;

44

or, alternatively, to apprise the market of the lack of such controls and that they had sold billions of dollars of unregistered securities.

### 3. Further indicia of Recklessness

**(a) Barclays agrees to settle the related SEC action and admits to having no internal controls regarding tracking issuances and to issuing billions of dollars of unregistered securities**

145. Similar to the $97 million settlement with the SEC in 2017, on September 29, 2022, the SEC ordered cease-and-desist proceedings against Barclays and BBPLC concerning "BBPLC's failure to put into place any internal control around the real-time tracking of securities being offered or sold off of its Commission-registered shelf registration statement." *In the Matter of Barclays PLC and Barclays Bank PLC* (SEC Sept. 29, 2022), ¶ 1.

146. The SEC 2022 Order, which included the settlement between Barclays and the SEC, highlighted that "[a]t the time of the registration of both the 2018 Shelf and the 2019 Shelf, certain BBPLC personnel recognized the need to accurately record relevant information about securities that were offered or sold so as to be able to track the aggregate amount of securities that were cumulatively offered and sold from each respective [s]helf on a real-time basis." *Id.* ¶ 5. Such tracking would "ensur[e] that BBPLC did not offer or sell any securities in excess of what had been registered." *Id.* Yet, "no internal control was established" and "the amount of securities that were offered and sold was not tracked." *Id.*, ¶ 24.

147. The SEC's investigation exposed that "[n]o internal control was established to address this issue, and the amounts of securities that were offered and sold was not tracked" by BBPLC or Barclays. *Id.*, ¶ 5. As a result, **beginning on or around June 26, 2019**, BBPLC offered and sold securities in excess of the amount remaining on the 2018 Shelf, ultimately leading to BBPLC offering and selling approximately $1.3 billion of securities in excess of what was registered with the SEC on the 2018 Shelf. *Id.*, ¶ 6.

45

148.    Due to its failure to establish any internal controls to track the amount of securities that were offered or sold on a real-time basis, BBPLC sold and continued to illegally sell unregistered securities in excess of the amounts authorized by the 2019 Shelf as well. Thus, "**beginning on or around January 28, 2021**, BBPLC offered and sold securities in excess of what was registered on the 2019 Shelf. Over the next 14-month period, BBPLC offered and sold approximately $16.37 billion of securities in excess of what was registered with the Commission on the 2019 Shelf." *Id*., ⁋ 7.

149.    The SEC required Barclays to adopt and implement the "BBPLC Shelf Review recommendations" which include:

(a)  the centralization of oversight of BBPLC's SEC-registered shelves in Group Treasury;

(b)  the maintenance of clear minimum control requirements for BBPLC's SEC-registered shelves, including, but not limited to, a process for reviewing any change in WKSI status for BBPLC and the tracking of offers and sales of BBPLC's SEC-registered shelves as appropriate; and

(c)  the maintenance of data repository, with appropriate controls and governance designed to ensure reliability of the data, for the purpose of tracking offers and sales, as appropriate, off of BBPLC's SEC-registered shelves.

*Id*. at p. 10.

150.    Furthermore, the SEC 2022 Order also instructed Barclays to complete an audit of its "policies and procedures and internal controls relating to compliance with Section 5 of the Securities Act in connection with Barclays' SEC-registered shelves to confirm the adoption and implementation" of the procedures described in the SEC 2022 Order and to submit an Internal Audit Report to the BBPLC Board of Directors Audit Committee. *Id*. The SEC further directed

Barclays to certify, in writing, compliance with the procedures described in the Order no later than thirty days after the Internal Audit report was submitted to the BBPLC Audit Committee. *Id*.

151.    As part of this SEC Order, Barclays and BBPLC agreed to a $361 million settlement with the SEC, including a $200 million fine, to resolve the SEC's enforcement action against them for their "failure to put into place any internal control around the real-time tracking of securities being offered or sold off of its Commission-registered shelf registration statements" which led to BBPLC selling "an unprecedented amount of securities---cumulatively totaling approximately $17.7 billion in excess of what it had registered with the Commission, in violation of Sections 5(a) and(c) of the Securities Act…[and leading Barclays to] restate their year-end audited financial statements." *Id*. ‖ 1. As the Director of the SEC's Division of Enforcement stated in releasing news of the settlement, "This case highlights why it is essential for firms like Barclays to have robust internal controls over their offers and sales of securities….[T]he control deficiencies and the scope of the conduct at issue here was simply staggering."[9]

152.    Significantly, the SEC 2022 Order refers to the tracking of offers and sales of securities as an "internal control" function, lending further support to Plaintiff's contention that Barclays' statements, highlighted above, concerning having "robust internal controls" were indeed misleading, inaccurate and incomplete.

**(b)    Defendants claw back compensation**

153.    Finally, a week after the Rescission Offer expired, on September 19, 2022, Barclays began issuing additional shares of VXX.

154.    Prior to the market opening on February 15, 2023, in its Annual Report, Form 20-

---

[9] 9/28/22 SEC Press Release,  "Barclays Agrees to a $361 Million Settlement to Resolve SEC Charges Relating to Over-Issuances of Securities", https://www.sec.gov/news/press-release/2022-179.

F, for the year ended 2022 ("2022 Form 20-F"), Barclays disclosed that it:

> Considered regular updates on the Over-Issuance of Securities, including its financial impact and associated hedging arrangements, the implications of the Over-Issuance of Securities for the Company's financial statements, including the approval of the restatement of the BBPLC 2021 financial statements included in the amended annual report on Form 20-F for the year ended 31 December 2021. ***The Board also approved the launch of the rescission offer and had oversight of the remediation of the material weakness in internal control over financial reporting which led to the Over-Issuance of Securities***, as well as work required to address the specific requirements of the [SEC], set out in its order of 29 September 2022. The Board also reviewed the findings of a review by external counsel of the facts and circumstances relating to the Over-Issuance of Securities and, among other things, the control environment related to such issuances.

2022 Form 20-F at 9.

155.    In fact, one of the principal activities of the Board's Risk Committee included "[c]onsidering updates on the Over-Issuance of Securities, including the hedging arrangements designed to manage the risks to Barclays arising out of the rescission offer." *Id*. at 12. The Audit Committee also had direct oversight of internal controls relating to financial reporting. *Id*.

156.    In the aftermath of this blunder that cost the Defendants billions of dollars in remediation, the Board's conclusion was: "Whilst the control environment was determined to be effective, the Over-Issuance of Securities underlined to the Board the need to continue to focus on embedding Barclays' Values and Mindset at all levels of the Barclays Bank Group to achieve operational and controls excellence." *Id*. at 14. The Board also delineated the additional changes made to their internal environment. *Id*. at 15.

157.    Barclays also revealed that the Company was clawing back compensation from Defendant Venkat and Defendant Morzaria by a combined £1 million ($1.2m) due to regulatory errors and oversights, including the over-issuance. Specifically, the Company decreased 2022 bonus for Defendant Venkat by £403,000 and prior compensation awards from Defendant Morzaria. *Id*. at 125.

158.    In the 2022 Form 20-F, Brian Gilvary, the Chair of the Barclays Boards' Remuneration Committee specified:

> The Over-issuance of Securities under BBPLC's US shelf registration statements was a deeply disappointing feature of 2022. A review of the facts and circumstances was completed by external counsel and the Committee has taken the findings of that review seriously. We have **thoughtfully and deliberately adjusted our remuneration decisions to ensure that this over-issuance matter is reflected.**

*Id.* at 120 (emphasis added).

159.    Notably, after an internal investigation, "[t]he [Remuneration] Committee exercised its discretion not to exclude the impacts associated with the Over-issuance of Securities in the US or the monetary penalties imposed by the SEC and CFTC for the use of unauthorized business communications channels." *Id.* at 125.

## V.    ADDITIONAL SCIENTER ALLEGATIONS

160.    The fact that Barclays and BBPLC did not have controls and had issued billions of dollars of unregistered securities under its 2018 and 2019 Shelf Registrations was material to VXX short investors.

161.    As alleged herein, during the Class Period, Defendants acted with scienter in that Defendants knew, or should have known that they had no internal controls in place to track the sale of VXX, which it failed to disclose.

162.    Among other things, each Defendant knew that issuing and selling securities has been and continues to be a core business of Barclays and BBPLC, and that since they no longer enjoyed WKSI status, BBPLC's shelf registrations were critical to this core business of issuing and selling securities. The language included in Barclays' Waiver Requests, including the one for 2017, reflects Defendants' awareness of the burdens to their business operations that would arise from losing its WKSI status. As Barclays described, "The WKSI shelf[] process …provides an important means of accessing capital and funding for Barclays' global operations." More

specifically, as noted in prior Waiver Requests, since 2011, 89% of all regulatory capital securities issued by Barclays was issued off the WKSI shelf and losing the status would affect its $68 billion business of securities it was issuing off of the WKSI shelf. *See supra*, ⁋ 58.

163.    Moreover, Barclays itself recognized that loss of WKSI status would "curtail important channels of communication to investors," weaken the Company's ability to respond to "current regulatory and market conditions and uncertainties that are significantly transforming the landscape for financial institutions like Barclays," and harm "the speed at which Barclays could strengthen its capital position if require[d] to do so" by a financial regulator. *See* ⁋ 59.

164.    Barclays and BBPLC were responsible for creating, and all Defendants were responsible for overseeing Barclays' and BBPLC's internal controls. Even though Barclays and BBPLC were experts in the registration requirements of the federal securities laws by virtue of being serial issuers who issued and sold tens of billions of newly issued securities each year, they and the Individual Defendants utterly failed or recklessly disregarded the need to implement "simple" control procedures to ensure that the "entirely avoidable" over-issuance of billions of dollars of unregistered securities above the maximum amount of securities registered under Barclays March 2018 and August 2019 Shelf Registration Statements did not occur. *See supra,* ⁋ 143(f). As admitted by Nigel Higgins, Chairman of Barclays, "this is not rocket science." *See supra*, 143(d)

165.    Barclays' Form Amendment to and original 20-F filings on in 2018 also make clear that the Defendants were aware of the additional burdens created by losing its WKSI status. *See supra*, ⁋⁋ 64-66. Specifically, considering that in 2018 the Board filed an amendment admitting to its loss of WKSI status, there is no doubt that Defendants were aware of the additional securities obligations resulting from losing WKSI status. The SEC 2022 Order exposed and confirmed that

"[f]ollowing the loss of WKSI status, certain personnel from BBPLC understood the consequences of this status change, including that they should consider implementing a mechanism to track offers and sales of securities off any shelf." *See supra*, ¶ 63.

166.    Individual Defendant Staley served as the Company's CEO from December 2015 through October 2021 (including the entire time Barclays was an ineligible issuer), throughout which time he signed the SOX Certifications associated with the Company's Form 20-F filings. He also functioned as the CEO of BBPLC (the Barclays subsidiary at which the over-issuances occurred) from March 2019 through October 2021. Furthermore, as CEO, Defendant Staley attested in BBPLC's 2019 and 2020 Form 20-Fs that he, along with the CFO, had "conducted…an evaluation of the effectiveness of the design and operation of the Barclays Bank Group's disclosure controls and procedures of Barclays Bank PLC." *See* ¶¶ 88, 104.

167.    Individual Defendant Venkat served as the Company's Chief Risk Officer from May 2017 to May 2020 (including the entire time Barclays was an ineligible issuer); the Co-President of BBPLC from October 2020 to October 2021; and the CEO of Barclays after October 2021; he thereafter signed the SOX Certifications associated with the Company's Form 20-F filings in Staley's place. Furthermore, as CEO of BBPLC, Defendant Venkat attested in BBPLC's 2021 Form 20-F that he, along with the CFO, had "conducted…an evaluation of the effectiveness of the design and operation of the Barclays Bank Group's disclosure controls and procedures of Barclays Bank PLC." *See* ¶ 128.

168.    Individual Defendant Morzaria was the Group Finance Director (the most senior finance position at Barclays) throughout the time that Barclays was an ineligible issuer and when the bulk of the alleged misstatements were made; he signed the SOX Certifications associated with both 2020 and 2021 Form 20-Fs.

169.    As early as February 2018, Defendants were clearly on notice of at least two material weaknesses within their internal controls environments: (1) a failure to identify and escalate to senior executives the consequences of the loss of WKSI status; and (2) a decentralized ownership structure for securities issuances. During the entire Class Period, Defendants unlawfully failed to disclose these material weaknesses.

170.    Defendants further knew or were reckless in not knowing that VXX short sellers would be substantially harmed should they be forced to stop fulfilling their vital market issuer of being ready and able to issue new securities whenever the price of the ETN rose above its indicative value.

171.    Barclays and the Individual Defendants were reckless in supervising BBPLC's offering and sales of securities, and their supervisory failures are especially noteworthy because they knew the severe consequence to investors in their securities should they fail to comply with the securities laws' registration requirements.

172.    Among other indicia supporting Barclays' and BBPLC's knowledge and/or recklessness are the following known facts, as alleged herein:

i) Barclays and BBPLC were experts in the registration requirements of the federal securities laws by virtue of being serial issuers who issued and sold billions of newly issued securities each year;

ii) Defendants were aware that they had lost WKSI status and admitted to understanding the responsibilities that came with being a non-WKSI issuer;

iii) the Working Group was tasked only with proactively calculating the total amount of securities that the Company anticipated issuing from each shelf, and not actually designing and implementing a tracking system for such issuances;

iv) the SEC investigation determined that Defendants had "no internal control" in place to track the issuances of securities;

v) Barclays subsequent admission that its failure to have controls was "entirely avoidable," resulted from its failure to undertake a "simple task," was "deeply disappointing," and was "not rocket science";

vi) Barclays' settlement with the SEC in which it agreed to implement new controls relating to offers and sales of securities, and to pay a fine of several hundred million dollars;

vii) Barclays' need to implement a Rescission Offer, costing billions of dollars;

vii) Barclays' decision to claw-back over $1.2 million in compensation, a remuneration adjustment which focused on "the areas of the [Company] closest to where the incident occurred," for Defendants Morzaria and Venkat after an internal investigation; and

viii) the great magnitude of the harm inflicted on short sellers following Barclays halting future issuances, which caused the stock to rise more than 140% above its indicative value, particularly in light of the simple steps that could (and should) have been taken to avoid the harm.

## VI.    ADDITIONAL LOSS CAUSATION ALLEGATIONS

173.    As detailed herein, during the Class Period, Defendants engaged in a course of misconduct by making inaccurate and incomplete statements which omitted material information necessary to make statements by Defendants not misleading, which directly and proximately caused the economic loss, i.e., damages, suffered by Lead Plaintiff and the Class.

174.    The risk of not having internal controls to track the issuance of VXX materialized when Barclays and BBPLC imposed an immediate suspension on their VXX sales, which caused the price of VXX securities to soar above its indicative values and become untethered from its

underlying VIX volatility index, and inflicted substantial economic loss, damage, and harm to the Lead Plaintiff and the Class.

## VII.    NO SAFE HARBOR

175.    The statutory safe harbor provided by the Private Securities Litigation Reform Act of 1995 ("PSLRA") for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged herein.

176.    The statements alleged to be false and misleading herein are all related to then-existing facts and conditions. To the extent certain statements alleged to be false and misleading are determined to be mixed statements of historical or present information and future information, such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

177.    To the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningfully cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

178.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Barclays who knew that the statement was false when made.

## VIII.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE

179.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)      Defendants made public misrepresentation or failed to disclose material facts;

(b)      The omissions and misrepresentations were material;

(c)      The Company's VXX ETNs traded in an efficient market;

(d)      The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the security; and

(e)      Lead Plaintiff and other members of the Class purchased VXX ETNs before Defendants abruptly suspended the securities and during which time Defendants misrepresented or failed to disclose material facts.

180.    During the Class Period, the market for VXX ETNs was well-developed, efficient, and open for the following reasons, among others:

(a)      Barclays ETNs were listed and actively traded on CBOE, a highly efficient and automated market;

(b)      As a regulated issuer, Barclays filed periodic public reports with the SEC and/or the CBOE;

(c)      Barclays regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on major newswire services and through other wide-ranging public disclosures, such as communications with financial analysts, financial press, and other similar reporting services; and/or

(d)      Barclays was followed by securities analysts and firms, including UBS, Credit Suisse, Bank of America, Jeffries, Deutsche Bank, JP Morgan, and BNP Paribas, who published reports about the Company. These reports were then distributed to the sales force

and certain customers of their respective brokerage firms. These reports were also publicly available and entered the public marketplace.

181.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded in Defendants' omissions of material fact, which they had a duty to disclose, including but not limited to the fact that BBPLC had no controls in place to determine whether it had any registered securities available to be sold, and was selling unregistered securities.

182.    Because this Action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects, information that Defendants had a duty to disclose but did not, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions. Given the importance of the omissions set forth above, that requirement is satisfied here.

183.    Defendants' material misstatements and/or omissions, which the Defendants were aware or reckless in not knowing, artificially deflated and/or artificially maintained the price of VXX ETNs prior to Barclays' March 14 disclosure and operated in fraud or deceit on all persons or entities who entered into their short positions on or, after May 9, 2019, and maintained the short position on VXX ETNs through March 14, 2022. Defendants concealed or improperly failed to disclose material facts with respect to Barclays and its failure to maintain adequate internal controls following its loss of WKSI privileges; Lead Plaintiff and the Class sold short the Company's ETNs relying upon the integrity of the market and price of Barclays ETNs, and public information relating to Barclays and BBPLC, and have been damaged thereby.

184.    As a result of Defendants' material misstatements and omissions and sudden suspension of VXX ETNs, Lead Plaintiff and the Class suffered substantial economic loss. Under these circumstances, all persons or entities who sold or otherwise acquired short positions on VXX ETNs, on or after May 9, 2019, and held such positions through March 14, 2022, suffered similar injury through their sale of Barclays' VXX at artificially low or maintained prices, and the presumption of reliance applies.

## IX.    CLASS ACTION ALLEGATIONS

185.    Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all members of the proposed Class defined as follows:

> All persons, corporations, and other legal entities who had acquired, on or after May 9, 2019, a short position in VXX due to selling VXX ETNs, selling VXX call options, and/or buying VXX put options[10] and who maintained that position when the market opened on March 14, 2022.

186.    Because the Defendants' relevant acts and omissions were uniform and affect Class members uniformly throughout the United States, Lead Plaintiff seeks certification of a nationwide class under Rule 23(b)(3) and/or Rule 23(b)(2).

187.    <u>Numerosity</u>: The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds and possibly thousands of members in the proposed Class.

---

[10] Excluded from the Class are Defendant in this action, the officers and directors of the Company during the Class Period (the Excluded D&Os), members of Defendant's and Excluded D&Os' immediate families, legal representatives, heirs, successors or assigns, and any entity in which Defendants or the Excluded D&Os have or had a controlling interest, and its parent, subsidiaries and corporate affiliates, officers, directors, employees, assigns, successors, and co-conspirators; the Court and its staff; Defendant's counsel, and all respective immediate family members of the excluded entities described above. Plaintiff reserves the right to revise the definition of the Class based upon subsequently discovered information and reserves the right to establish Sub-Classes where appropriate.

188.    <u>Typicality</u>: Lead Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal securities laws as complained of herein. Lead Plaintiff and the Class sustained damages arising out of the same illegal actions and conduct by Defendants.

189.    <u>Adequacy</u>: Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

190.    <u>Commonality</u>: Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by the omissions as alleged herein;

(b)    Whether and when Defendants sold unregistered VXX ETNs;

(c)    Whether the securities were required to be registered under Section 5 of the Securities Act;

(d)    Whether the sales of unregistered VXX ETNs were the result of Defendants' failure to put in place reasonable internal controls;

(e)    Whether there have been violations of "material misstatement" liability provisions under Rule 10b-5 of the Exchange Act;

(f)    Whether Defendants knew or recklessly disregarded that their omissions were materially false and misleading;

(g)    Whether the price of the Company's VXX ETNs was artificially deflated and/or maintained; and

(h)      Whether the Class members sustained damages, the proper measure of damages, and the actual amount of actual damages, costs, restitution, disgorgement, and pre- and post-judgment interest should be awarded to the Class.

191.    Predominance: Common questions of law or fact predominate over any questions affecting only individual Class members.

192.    Superiority: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all Class members is economically unfeasible and procedurally impractical. Furthermore, individualized litigation would most likely result in varying, contradictory, and/or inconsistent judgments and unnecessarily worsen the delay and expense to all the parties and the court systems due to the necessity of multiple trials regarding the same underlying facts and issues. Finally, Lead Plaintiff knows of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

193.    Notice: Upon information and belief, Lead Plaintiff alleges that record owners and other members of the Class may be identified from records maintained by Barclays or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

194.    Lead Plaintiff is willing and prepared to serve the Class in a representative capacity with all of the obligations and duties material thereto. Lead Plaintiff will fairly and adequately protect the interests of the Class and have no interests adverse to or in conflict with the interests of the other members of the Class.

195.    Lead Plaintiff's interests are co-extensive with and are not antagonistic to those of absent Class members. Lead Plaintiff will undertake to represent and protect the interests of absent

Class members and will vigorously prosecute this action.

196.    Lead Plaintiff has engaged the services of the undersigned counsel. Counsel are experienced in complex litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Lead Plaintiff and absent Class members.

197.    Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

198.    For all of these reasons, a class action therefore is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

## X.    CAUSES OF ACTION

### COUNT I
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
**(Against All Defendants)**

199.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

200.    This cause of action is asserted pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, against all Defendants.

201.    Based upon the facts alleged herein, Defendants violated Section 10(b) and Rule 10b-5 in connection with the purchase and sale of Barclay's VXX ETNs, by:

>    (a) using or employing manipulative and deceptive devices or contrivances in contravention of rules and regulations set forth by the SEC;

>    (b) employing devices, schemes, and artifices to defraud;

(c) omitted to state material facts necessary to make prior statements not misleading; and/or

(d) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the Plaintiff and the Class.

202.    Defendants engaged in a plan, scheme, and course of conduct that was intended to and did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially maintain a market for VXX ETNs; and (iii) cause Lead Plaintiff and other members of the Class to invest in VXX ETNs. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

203.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information, as specified herein.

204.    The Individual Defendants made, or caused to be made, material misrepresentations and omissions. Each of the Individual Defendants contributed to Barclays' material omissions of fact alleged herein, and each had the ability and opportunity to prevent their issuance or caused them to be corrected. Because of their positions, and their access to material non-public information available to them but not to the public, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations and omissions being made were materially misleading.

205.    Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning Barclays and BBPLC. In addition, the Individual Defendants

disseminated Barclays' SEC filings that contained false and misleading statements and omitted to disclose the material information alleged herein, were aware of, or recklessly disregarded, the misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

206.    Defendants knew of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Defendants' material misrepresentations and omissions were done knowingly or recklessly and artificially maintained the public market for VXX securities.

207.    As demonstrated by Defendants' misrepresentations and omissions of material fact, if they did not have actual knowledge of the misrepresentations and omissions alleged, then they were reckless and/or grossly reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to ensure that only the registered amounts of securities were issued. If not actually aware of the acts and omissions stated herein, Defendants were reckless in failing to obtain such knowledge by deliberately and recklessly failing to take the steps necessary to mitigate the scheme or end it.

208.    As a result of the omitted material facts, as set forth above, the market price and market for Barclays' VXX ETNs and VXX options, were artificially maintained.

209.    Lead Plaintiff and the other members of the Class, relying directly or indirectly upon the integrity of the market in which VXX securities trade, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants (but not adequately disclosed in public statements by Defendants), entered into and  maintained short positions on VXX securities on or after May 9, 2019, and through March 14, 2022, and were damaged thereby.

210.    VXX ETNs are traded in interstate commerce. Indeed, many billions of dollars of purchases and sales of VXX ETNs and other VIX-linked instruments such as options and futures contracts are entered into each year in interstate commerce in the United States. Defendants' unlawful issuance of unregistered securities including VXX ETNs had a direct, substantial, and foreseeable impact on interstate commerce in the United States.

211.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class, who entered into short positions in VXX ETNs on or after May 9, 2019, and maintained the positions through March 14, 2022, suffered damages in connection with their sale and/or maintenance of short positions of VXX ETNs. At the time of said misrepresentations and omissions, had Lead Plaintiff and the other members of the Class and the marketplace known of the truth regarding the sale of unregistered securities by BBPLC, or Barclays' and BBPLC's failure to maintain any controls regarding its issuances versus prior Shelf registration capacities, Lead Plaintiff and other members of the Class would not have taken short positions in VXX ETNs, either through selling VXX short or buying or selling options.

212.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**(Against Barclays and the Individual Defendants)**

213.    Plaintiff respectfully incorporates paragraphs 1-212 of this Amended Complaint by reference. To the extent any factual allegation alleged in support of this claim conflicts with any other, it should be deemed to have been pled in the alternative.

214.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against Barclays and Individual Defendants, on behalf of Lead Plaintiff and the Class.

215.    Barclays and Individual Defendants functioned as controlling persons of BBPLC within the meaning of Section 20(a) of the Exchange Act as alleged herein.

216.    At all relevant times, directly or indirectly, Barclays had the power to and exercised its influence and control of the decision-making of BBPLC, its wholly owned subsidiary. Barclays had intimate knowledge and participation in BBPLC's business affairs, such as overseeing the August 2022 Rescission Offer for the over-issued securities. This is further supported by the fact that Barclays was also subject to the September 29, 2022, SEC Cease-and-Desist Order, which included a $200 million penalty.

217.    Barclays was also responsible for creating, testing, and maintaining its own internal controls and BBPLC's internal controls over securities issuances and operational and financial reporting and failed to install controls that Barclays recognizes were "simple" and "not rocket science" that would have prevented the misconduct alleged herein.

218.    The Individual Defendants, as senior executive officers and directors of Barclays and BBPLC, were able to and did control the content of various SEC filings and other public statements pertaining to the Company. Due to their positions of control and authority, Individual Defendants had access to the adverse undisclosed information about BBPLC's core business' reliance on its ability and expertise in using its shelf registrations to issue and sell billions of dollars' worth of securities into the public markets, including through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held meetings, other management and Board of Directors meetings and committees thereof, and requests and other information provided to them in connection therewith. Defendant Staley served as the CEO of Barclays, a Director on Barclays' Board of Directors, the CEO of BBPLC, and a Director on BBPLC's Board of Directors.

Defendant Venkatakrishnan has been the CEO of Barclays, a member of its executive Committee, Director on the Barclays' Board of Directors, CEO of BBPLC, and a Director on the BBPLC Board of Directors since November 1, 2021. Prior to that time, he served as Barclays' Chief Risk Officer from May 2017 through May 2020, and as Co-President of BBBPLC from October 2020 to October 2021. Defendant Morzaria served as Barclays' Group Finance Director, a Member of Barclays' Board of Directors, and as a Director on the BBPLC on the BBPLC Board. He retired from these positions effective April 22, 2022, and currently serves as Chairman of the Global Financial Institutions Group of Barclays' Investment Bank. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged herein to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

219.    The Individual Defendants had direct involvement in the day-to-day operations of the Company, and therefore are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein. The Individual Defendants signed forms and certifications attached with SEC filings and authorized the filings and dissemination of the Form 20-Fs, Form 6-Ks, and press releases alleged herein, which contained materially false and misleading statements or material omissions. Defendants Staley, Venkatakrishnan, and Morzaria signed certifications pursuant to 17 C.F.R. § 240.13(A)-14(A) that was attached to the Form 20-F as Exhibit 12.1, and certifications pursuant to Section 906 of the Sarbanes-Oxley Act of 2022 (18 U.S.C. § 1350) that was attached to the Form 20-Fs as Exhibit 13.1, which omitted material factual information in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

220.     As senior officers and controlling persons of a publicly held company and its primary subsidiary, BBPLC, who regularly issued and sold securities, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information issued in statements that were or had become materially misleading or untrue, so that the market price of VXX would be based upon truthful and accurate information. The Individual Defendants' wrongdoing violated these specific requirements and obligations and violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

221.     As set forth above, Barclays and the Individual Defendants by virtue of their positions as controlling persons of BBPLC, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, by its omissions and misrepresentations as alleged in this Complaint.

222.     This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with reckless disregard of the falsity of their statements and the fraudulent nature of its scheme.

223.     By reasons of such wrongful conduct, Barclays and Individual Defendants are liable pursuant to § 20(a) of the Exchange Act As a direct and proximate result of Barclays and Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their VXX short sales or options trades.

## XI.     JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

## XII.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully requests that this Court enter judgment against each of the Defendants and in favor of Lead Plaintiff

and the Class, and award the following relief:

A.    Declaring this class action to be proper pursuant to Rule 23(a), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Enter judgment in favor of Lead Plaintiff and the other members of the Class and adverse to each of the Defendants for the damages incurred by Lead Plaintiff and the Class;

C.    Awarding actual damages, restitution, disgorgement, statutory pre- and post-judgment interest, reasonable attorneys' fees, expert witness fees and other costs in amounts to be proven, and in favor of Plaintiff and the Class and against each of the Defendants for their violations of the federal securities laws; and

D.    Awarding other such relief as this Court deems appropriate, just and equitable under the facts and circumstances of this action.

Dated: July 26, 2024                **KAPLAN FOX & KILSHEIMER LLP**
                                    Frederic S. Fox
                                    Robert N. Kaplan
                                    Donald R. Hall
                                    Brandon Fox
                                    Chang Hahn
                                    800 Third Avenue, 38th Floor
                                    New York, NY 10022
                                    T:  212-687-1980
                                    F:  212-687-7714
                                    ffox@kaplanfox.com
                                    rkaplan@kaplanfox.com
                                    dhall@kaplanfox.com
                                    bfox@kaplanfox.com
                                    chahn@kaplanfox.com

                                    **SPERLING & SLATER**
                                    Joseph M. Vanek
                                    Timothy Sperling
                                    Jeff Bergman
                                    Jerry Santangelo
                                    55 West Monroe Street, Suite 3200

Chicago, IL 60603
Telephone: (312) 641-3200
Fax: (312) 641-6492
jvanek@sperling-law.com
tsperling@sperling-law.com
jbergman@sperling-law.com
jsantangelo@sperling-law.com

*Lead Co-Counsel for Lead Plaintiff Michael
Puchtler and the Proposed Class*

# Exhibit A

## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Michael Puchtler, hereby certify as follows:

1.      I have reviewed the Amended Complaint for the securities class action against Barclays PLC and Barclays Bank PLC alleging violations of the securities laws.

2.      I did not sell the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of a class, including serving as a lead plaintiff in this case and all other related cases that may be consolidated with it and providing testimony at deposition and trial if necessary. I fully understand the duties and responsibilities of the Lead Plaintiff under the Private Securities Litigation Reform Act of 1995, specifically concerning its selection and retention of counsel and overseeing and directing the prosecution of the action on behalf of the class.

4.      As of the open of the market on March 14, 2022, I had short positions relating to the Barclays' iPath Series B S&P 500 VIX Short-Term Futures ETN due to selling VXX ETNs, selling VXX call options, and/ or buying VXX put options during the Class Period. Schedule A includes all such positions which were opened during the Class Period and remained open through March 14, 2022.

5.      I have not sought to serve as a lead plaintiff in any class action under the federal securities laws filed during the last three years.

6.      I will not accept any payment for serving as a representative party on behalf of a class beyond my pro-rata share of any recovery, except as ordered or approved by the court, including any award to a representative plaintiff of reasonable costs and expense directly related to the representation of the class.

7.      I declare under penalty of perjury that the foregoing is true and correct, executed on this 26th day of July 2024.

_____
Michael Puchtler

**SCHEDULE A**

| Date/Time | Spread | Side | Qty | Pos Effect | Symbol | Exp | Strike | Type | Price | Net Price | Order Type | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/4/2022 11:36 | SINGLE | SELL | -15 | TO OPEN | VXX | 16-Sep-22 | 35 | CALL | 7 | 7 | LMT | $ 10,500.00 |
| 3/4/2022 11:36 | SINGLE | SELL | -15 | TO OPEN | VXX | 16-Sep-22 | 35 | CALL | 7 | 7 | LMT | $ 10,500.00 |
| 3/4/2022 11:36 | SINGLE | SELL | -15 | TO OPEN | VXX | 16-Sep-22 | 35 | CALL | 7 | 7 | LMT | $ 10,500.00 |
| 3/4/2022 11:36 | SINGLE | SELL | -5 | TO OPEN | VXX | 16-Sep-22 | 35 | CALL | 7 | 7 | LMT | $ 3,500.00 |
| 2/28/2022 9:58 | SINGLE | SELL | -50 | TO OPEN | VXX | 16-Sep-22 | 35 | CALL | 5.65 | 5.65 | LMT | $ 28,250.00 |
| 2/23/2022 11:30 | SINGLE | SELL | -50 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.6 | 6.6 | LMT | $ 33,000.00 |
| 2/22/2022 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 650.00 |
| 2/22/2022 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 650.00 |
| 2/22/2022 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 650.00 |
| 2/22/2022 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 650.00 |
| 2/22/2022 13:21 | SINGLE | SELL | -3 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 1,950.00 |
| 2/22/2022 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 650.00 |
| 2/22/2022 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 650.00 |
| 2/22/2022 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 650.00 |
| 2/22/2022 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 650.00 |
| 2/22/2022 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 650.00 |
| 2/22/2022 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 650.00 |
| 2/22/2022 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 650.00 |
| 2/22/2022 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 650.00 |
| 2/22/2022 13:21 | SINGLE | SELL | -1 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 650.00 |
| 2/22/2022 13:21 | SINGLE | SELL | -10 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 6,500.00 |
| 2/22/2022 13:21 | SINGLE | SELL | -10 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 6,500.00 |
| 2/22/2022 13:21 | SINGLE | SELL | -10 | TO OPEN | VXX | 18-Nov-22 | 35 | CALL | 6.5 | 6.5 | LMT | $ 6,500.00 |
| 2/18/2022 12:30 | SINGLE | SELL | -37 | TO OPEN | VXX | 17-Jun-22 | 35 | CALL | 4.25 | 4.25 | LMT | $ 15,725.00 |
| 2/18/2022 12:30 | SINGLE | SELL | -13 | TO OPEN | VXX | 17-Jun-22 | 35 | CALL | 4.25 | 4.25 | LMT | $ 5,525.00 |
| 2/18/2022 11:03 | SINGLE | SELL | -10 | TO OPEN | VXX | 17-Jun-22 | 35 | CALL | 4.25 | 4.25 | LMT | $ 4,250.00 |
| 2/18/2022 11:03 | SINGLE | SELL | -15 | TO OPEN | VXX | 17-Jun-22 | 35 | CALL | 4.25 | 4.25 | LMT | $ 6,375.00 |
| 2/18/2022 11:02 | SINGLE | SELL | -25 | TO OPEN | VXX | 17-Jun-22 | 25 | CALL | 6 | 6 | LMT | $ 15,000.00 |
| 2/17/2022 15:40 | SINGLE | SELL | -25 | TO OPEN | VXX | 17-Jun-22 | 35 | CALL | 3.75 | 3.75 | LMT | $ 9,375.00 |
| 2/17/2022 14:46 | SINGLE | SELL | -5 | TO OPEN | VXX | 17-Jun-22 | 25 | CALL | 5.3 | 5.3 | LMT | $ 2,650.00 |
| 2/17/2022 14:46 | SINGLE | SELL | -10 | TO OPEN | VXX | 17-Jun-22 | 30 | CALL | 4.35 | 4.35 | LMT | $ 4,350.00 |
| 2/17/2022 14:46 | SINGLE | SELL | -15 | TO OPEN | VXX | 17-Jun-22 | 30 | CALL | 4.35 | 4.35 | LMT | $ 6,525.00 |
| 2/17/2022 14:46 | SINGLE | SELL | -5 | TO OPEN | VXX | 17-Jun-22 | 30 | CALL | 4.35 | 4.35 | LMT | $ 2,175.00 |
| 2/17/2022 13:36 | SINGLE | SELL | -20 | TO OPEN | VXX | 17-Jun-22 | 30 | CALL | 4.15 | 4.15 | LMT | $ 8,300.00 |
| 2/17/2022 13:35 | SINGLE | SELL | -20 | TO OPEN | VXX | 17-Jun-22 | 25 | CALL | 5.05 | 5.05 | LMT | $ 10,100.00 |
| 2/15/2022 13:29 | SINGLE | SELL | -44 | TO OPEN | VXX | 17-Jun-22 | 30 | CALL | 4.05 | 4.05 | LMT | $ 17,820.00 |
| 2/15/2022 13:29 | SINGLE | SELL | -1 | TO OPEN | VXX | 17-Jun-22 | 30 | CALL | 4.05 | 4.05 | LMT | $ 405.00 |
| 2/15/2022 13:29 | SINGLE | SELL | -5 | TO OPEN | VXX | 17-Jun-22 | 30 | CALL | 4.05 | 4.05 | LMT | $ 2,025.00 |
| 2/15/2022 9:30 | SINGLE | SELL | -37 | TO OPEN | VXX | 17-Jun-22 | 25 | CALL | 5.1 | 5.1 | LMT | $ 18,870.00 |
| 2/15/2022 9:30 | SINGLE | SELL | -8 | TO OPEN | VXX | 17-Jun-22 | 25 | CALL | 5.1 | 5.1 | LMT | $ 4,080.00 |
| 2/15/2022 9:30 | SINGLE | SELL | -5 | TO OPEN | VXX | 17-Jun-22 | 25 | CALL | 5.1 | 5.1 | LMT | $ 2,550.00 |
| 2/1/2022 11:40 | SINGLE | SELL | -50 | TO OPEN | VXX | 20-May-22 | 25 | CALL | 4.2 | 4.2 | LMT | $ 21,000.00 |
| 2/1/2022 10:41 | SINGLE | SELL | -46 | TO OPEN | VXX | 17-Jun-22 | 25 | CALL | 5.02 | 5.02 | LMT | $ 23,092.00 |
| 2/1/2022 10:41 | SINGLE | SELL | -4 | TO OPEN | VXX | 17-Jun-22 | 25 | CALL | 5 | 5 | LMT | $ 2,000.00 |
| 1/26/2022 11:32 | SINGLE | SELL | -50 | TO OPEN | VXX | 20-May-22 | 25 | CALL | 5.5 | 5.5 | LMT | $ 27,500.00 |

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL PUCHTLER, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>v.<br><br>BARCLAYS PLC, BARCLAYS BANK PLC, JAMES E. STALEY, TUSHAR MORZARIA, and C.S. VENKATAKRISHNAN,<br><br>          Defendants. | Case No: 1:24-cv-01872-LJL<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAW**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Michael Puchtler, by his undersigned attorneys, brings this action on behalf of himself and all others similarly situated, against Defendants Barclays PLC ("Barclays PLC"), and Barclays Bank PLC ("BBPLC") (Barclays PLC and BBPLC are collectively referred to as "Barclays), James E. Staley, Tushar Morzaria, and C.S. Venkatakrishnan.[1]

---

[1] The allegations alleged herein are based on Plaintiff's personal knowledge, and information and belief based upon, among other things, his counsel's investigation that included, without limitation, review and analysis of: (a) public filings made by Barclays and its wholly owned subsidiary, Barclays Bank PLC ("BBPLC") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, shareholder communications, Annual General Meeting ("AGM") statements, and other public statements disseminated by each Defendant (as defined below); (c) the SEC's September 29, 2022, Cease and Desist Order against BPLC and BBPLC's; and (f) other publicly available information concerning, among other things, BPLC, BBPLC, the Individual Defendants (as defined below), the VXX, the VIX, exchange traded notes, volatility traded securities, and structured products.

## NATURE OF THE CASE

**(1)**     The Plaintiff, and the class he represents, are
short sellers of a security known as Barclays'
iPath Series B S&P 500 VIX Short-Term

# TABLE OF CONTENTS

Page(s)

I.     OVERVIEW OF CLAIMS ................................................................................1

II.    JURISDICTION AND VENUE ......................................................................8

III.   PARTIES .........................................................................................................9

IV.    FACTUAL BACKGROUND AND DEFENDANTS' MISCONDUCT ..........................13

       A.     Barclays and BBPLC Create the VXX and then Cause a
              Short Squeeze ...............................................................................13

       B.     Defendants Knowingly or Recklessly Made Inaccurate and
              Incomplete Statements Regarding Issuing Only Registered
              Securities During the Class Period ..............................................20

       C.     Defendants Knowingly or Recklessly Made Inaccurate and
              Incomplete Statements Regarding Their Internal Controls
              During the Class Period ...............................................................21

              1.     Barclays and BBPLC were aware of the additional responsibilities
                     that came with being a Non-WKSI issuer ............................................21

              2.     Defendants Established a Formal Working Group to Address Their
                     Ongoing Securities Offerings as a Non-WKSI Issuer; and
                     Recognized the Need to Track Actual Offers and Sales Against
                     Shelf Registrations .............................................................................27

       D.     Defendants' Incomplete and Inaccurate Statements
              Concerning Internal Controls During the Class Period ...............29

              1.     February 13, 2020: FY 2019 Results and Filing of Form 20-F ...............29

              2.     February 14, 2020: BBPLC's FY 2019 Results and Filing of Form
                     20-F ...................................................................................................33

              3.     February 18, 2021: FY 2020 Results and Filing of Form 20-F ...............36

              4.     February 18, 2021: BBPLC's FY 2020 Results and Filings of Form
                     20-F ...................................................................................................39

              5.     April 30, 2021: Q1 2021 Results and Filing of Form 6-K ......................41

              6.     July 28, 2021: Q2 2021 Results and Filing of Form 6-K .......................42

              7.     October 21, 2021: Q3 2021 Results and Filing of Form 6-K ..................42

              8.     February 23, 2022: FY 2021 Results and Filing of Form 20-F ...............43

              9.     February 23, 2022: BBPLC's FY 2021 Results and Filing of Form
                     20-F ...................................................................................................46

       E.      BBPLC Abruptly Suspends Sales of VXX ETNs and Creates a Short Squeeze .......................................................48

       F.      The Aftermath .................................................................................49

         1.     Defendants Offer to Compensate Investors Who Were Long VXX Securities, Rather Than Those Short VXX Securities ...............................49

         2.     Defendants Admit to Recklessness ....................................................51

         3.     Further indicia of Recklessness .........................................................54

           (a)  Barclays agrees to settle the related SEC action and admits to having no internal controls regarding tracking issuances and to issuing billions of dollars of unregistered securities ..................................54

           (b)  Defendants claw back compensation ........................................................61

V.     ADDITIONAL SCIENTER ALLEGATIONS ........................................................64

VI.    ADDITIONAL LOSS CAUSATION ALLEGATIONS ...........................................69

VII.   NO SAFE HARBOR .........................................................................................69

VIII.  APPLICABILITY OF THE PRESUMPTION OF RELIANCE ...............................70

IX.    CLASS ACTION ALLEGATIONS ......................................................................73

X.     CAUSES OF ACTION ........................................................................................78

       COUNT I Violations of Section 10(b) of the Exchange Act and Rule 10b-5 (Against All Defendants).....................................................................78

       COUNT II Violations of Section 20(a) of The Exchange Act  (Against Barclays and the Individual Defendants) ..................................................82

XI.    JURY DEMAND ................................................................................................86

XII.   PRAYER FOR RELIEF .....................................................................................86

**"This is not rocket science**." Nigel Higgins, Chairman of Barclays, 2022 Annual General Meeting, May 4, 2022.

Lead Plaintiff Michael Puchtler ("Lead Plaintiff"), on behalf of himself and a class of similarly situated investors, by and through Lead Plaintiff's counsel, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. The investigation of counsel included, among other things: 1) a review of Barclays PLC's ("Barclays" or the "Company") and Barclays Bank PLC's ("BBPLC") public filings with the United States Securities and Exchange Commission ("SEC"); 2) press releases issued by the Company, and media, news and analyst reports about the Company; 3) Barclays' quarterly results announcements, and investor conferences with Company executives, and analysts and investors; 4) information based on consultation with experts in loss causation and economic loss; 5) publicly available information relating to the abrupt suspension of new sales of various Barclays ETNs in March 2022; 6) publicly available information relating to Barclays' over-issuance of securities leading up to March 2022, including the SEC Cease-and-Desist Order dated September 29, 2022 ("SEC 2022 Order")[2]; and 7) other publicly available data, including, but not limited to, publicly available trading data relating to the price and trading volume of Barclays' VXX notes. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.      OVERVIEW OF CLAIMS

        1.      This is a federal securities class action on behalf of all investors who acquired a

---

[2] *Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order*, SEC (Sept. 29, 2022).

short position in the Barclays Bank PLC iPath Series B S&P 500 VIX Short-Term Futures ETN ("VXX"), either through trading in the ETN itself or through options trading (such investors are referred to herein as "short sellers"), on or after May 9, 2019, and held the short position through the market opening on March 14, 2022 ("Class Period") and were damaged thereby (the "Class"). The claims asserted in this Amended Complaint (the "Action") are alleged against Barclays, BBPLC, and certain of Barclays' and BBPLCs' current and former officers and directors – James E. Staley ("Staley"), Tushar Morzaria ("Morzaria"), and C.S. Venkatakrishnan ("Venkatakrishnan" or "Venkat") – for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

1. VXX is an Exchange Traded Note) ("ETN") that is issued by Barclays and is publicly ~~trades~~traded on the Chicago Board Options Exchange (CBOE) under the symbol "~~VXXB" (hereinafter "VXX"). VXX is an exchange traded note (ETN) issued by Barclays that~~ VXX." VXX is designed to track the CBOE's Volatility Index ("VIX ~~futures,~~"), and more generally short-term stock market volatility.

~~1.~~2. ~~Barclays marketed and sold VXX as a way for investors to take long and short positions on short term stock market volatility. Barclays did this by designing VXX to track VIX futures, which are securities linked to the CBOE's volatility index known as the VIX.~~ Market participants trade in VXX ETNs and related ~~securities such as~~ VXX options to gain exposure to, and often as a hedge against, changes in stock market volatility. Traders who believe that stock market volatility will increase can take long positions in VXX, while those who believe that stock market volatility will decrease can take short positions in VXX.

3. Lead Plaintiff is an individual investor who was short VXX securities on or after

May 9, 2019, and maintained the position into the opening of the market on March 14, 2022. Specifically, he had sold call options on VXX that, like the positions held by all short sellers, decreased in value as the price of VXX rose.

4.      This ~~class action lawsuit~~Action concerns an unprecedented securities fraud caused by ~~Barclays's omission~~Defendants' failure, through a course of material misrepresentations and omissions, to inform investors and the market that ~~it had~~they did not ~~implemented~~have any internal controls to monitor the issuances of securities~~,~~ , including VXX ETNs, from ~~its~~their shelf registrations, and that ~~it~~they had issued and sold billions of dollars of unregistered ~~securities, including~~ VXX ETNs, in violation of ~~the~~ federal securities registration laws. ~~Shockingly~~, despite claiming otherwise in prior incomplete and inaccurate statements

5.      More specifically, over a series of several years, Barclays ~~illegally sold over $17 billion of unregistered~~ and BBPLC repeatedly claimed in their SEC filings, including within their Annual Reports, Form 20-Fs, and Registration Statements, Form F-3s, that they had robust internal controls, and that they would issue only registered securities ~~over approximately 18 months. Once its misconduct came to light, Barclays had to suddenly and without warning suspend~~ , when in fact they did not have any controls in place to monitor issuances against prior shelf registrations and had illegally issued billions of dollars of unregistered VXX securities.

6.      This omitted information was material to short sellers, like the Lead Plaintiff and Class Members, because had they known that Barclays lacked any controls to monitor issuances against its prior shelf registrations, or, alternatively, knew that Barclays had issued billions of dollars of unregistered securities, then they would not have made their short investments in VXX due to the substantial risk of a short squeeze in the event the SEC discovered the illegal sales and forced Barclays to halt further issuances of VXX ETNs.

7.      As explained in greater detail below, and as recognized by Goldman Sachs and many others, ETNs like VXX are highly susceptible to short squeezes upon an ETN issuer halting further sales of the ETN because further sales of an ETN by the issuer serve to cap the price of the ETN at or near its indicative value. Without that capacity, there is no viable mechanism to keep the price of an ETN from rising above its indicative value.

2.8.      On or about March 9, 2022, Barclays and BBPLC discovered that they had recklessly and illegally issued billions of unregistered securities, including VXX. Five days later, on March 14, 2022, Barclays announced it was suspending any further issuances and sales of new VXX ETNs. This suspension of sales, which was announced just before the market opened on March 14, 2022,The announcement predictably and foreseeably caused the market price of VXX to skyrocket and investors who were short VXX to suffer substantial lossesa significant short squeeze, as buyers piled into the security knowing that there was no mechanism capping the price of the ETN at or near its indicative value. In the hours that followed, the risk of having no internal control to track the sale of VXX securities materialized and caused the price of VXX securities to skyrocket more than 140% above its indicative value – far in excess of any deviation in the security's history.

2.      This lawsuit is on behalf of short sellers of VXX ETNs, as well as investors who were short the security through VXX options, who were harmed as a consequence of a massive and sustained rise in the price of the VXX caused by Barclay's failure to disclose its illegal issuance of billions of dollars of unregistered securities in violation of the registration requirements of federal securities laws and Barclays subsequent corrective disclosure. It seeks to recover the hundreds of millions of dollars in losses suffered by Plaintiff and the class due to Barclay's securities law violations.

4

3.      The proposed Class of plaintiffs consists of all persons, corporations and other legal entities who acquired a short position in VXX due to selling VXX ETNs, selling VXX call options, and/or buying VXX put options, and held that position at the close of the market on March 13, 2022, the day before Barclays announced it was suspending sales of new VXX ETNs.[3]

4.      Plaintiff is an individual investor who was short VXX before the market opened on March 14, 2022. Specifically, he had sold call options on VXX that stood to lose value if the price of VXX increased. Plaintiff and all other investors who were short VXX would not have taken short positions if they had known that Barclays failed to maintain any controls to ensure that its issuances of new securities would be registered under prior shelf registrations, or that Barclays was legally prohibited from issuing new VXX securities, as Barclays's ability to issue new VXX securities is necessary to keep the price of the VXX from rising above its indicative value due to a short squeeze.

5.      Unlike Exchange Traded Funds (ETFs), the value of an ETN is not determined by a collection of assets held by the issuer within a fund, but rather by a price determined by a mathematical formula and published by Barclays throughout each trading day. This price, known as the "indicative value," represents the price Barclays is obligated to purchase the note at the end of each trading day should it be "put" to Barclays (for purchase or redemption) by its holder pursuant to the rights attendant to the note. The mathematical formula used to calculate the indicative value, in turn, is tied to the value of VIX futures, which Barclays uses to hedge its own

---

[3] Excluded from the Class are the officers and directors of Barclays during the Class Period (the "Excluded D&Os"), and Excluded D&Os' immediate families, legal representatives, heirs, successors or assigns, and any entity in which any Defendant or the Excluded D&Os have or had a controlling interest.

~~redemption obligations. As described in greater detail below, this redemption right causes the price of the security to stay at or above its indicative value.~~

~~6.    Equally important to market participants, and particularly short-sellers, is Barclays' ability to issue new securities, as that ability is needed to keep the price of the security from rising above its indicative value due to a short squeeze. This is particularly true in connection with the VXX, which was substantially shorted throughout the relevant period, with as much as 90% of the "float" sold short. Without Barclays having the ability to sell future securities into the market-place whenever the price of the security rose above its indicative value, no investor would sell the security short for fear of a short squeeze.~~

~~3.~~9.    ~~Just minutes before the opening of the VXX market on Monday, March 14, 2022, Barclays announced it was suspending all further sales and issuances of VXX securities (along with its crude oil ETN) "because Barclays does not currently have sufficient issuance capacity to support further sales from inventory and any further issuances of the ETNs." The announcement predictably caused a short squeeze in the VXX, as buyers piled into the security knowing that there was no means for short-sellers to counteract the rapid rise in price. In the hours that followed the announcement, the price of VXX skyrocketed to as high as 140% of its indicative value. The price of the VXX~~The price of VXX securities stayed at elevated levels, detached from its indicative value, for nearly six months, until Barclays was able to correct its defective shelf registrations with the SEC and was again able to issue and sell new securities.

~~4.~~10.    The graph below shows just how dramatically ~~Barclay's~~Barclays' announcement affected the ETN's price and short ~~investors~~sellers. In the months leading up to the announcement, the market price of ~~the~~ VXX securities closely tracked its indicative value ("NAV," or Net Asset Value, on the chart) just as it was designed to do. Then, on March 14, 2022, the price climbed

rapidly as a short squeeze ensued, ~~where it~~and the price stayed above the indicative value for many

months until late September 2022, when Barclays ~~began~~once again began issuing VXX securities.



https://ycharts.com/companies/VXX/discount_or_premium_to_nav



Not until weeks_____

Figure 1: *iPath B S&P 500 VIX S/T Futs ETN (VXX)*, Y Charts,
https://ycharts.com/companies/VXX/discount_or_premium_to_nav

~~5.~~11.   Weeks   after   ~~March  14,  2022,  did~~announcing  its  suspension  of  new  sales  and

issuances of VXX ETNs, Barclays ~~disclose~~disclosed that the reason it had suspended all VXX sales and issuances was because it had illegally sold over $17.7 billion of unregistered securities, including VXX, ~~over the preceding eighteen months,~~ in excess of its stated shelf registrations and in violation of ~~securities laws'~~SEC registration requirements. ~~Shortly thereafter,~~ Barclays ~~disclosed~~further admitted that the reason for its unprecedented sales of unregistered securities was because it failed to put into place any "simple" internal controls necessary to track the amount of securities it issued and sold off its multi-billion-dollar shelf registration statements.

~~6.~~12.    This lawsuit is on behalf of short sellers of VXX ETNs during the Class Period and seeks to recover the significant damages suffered by ~~VXX short investors, and those investors who were~~ Lead Plaintiff and other VXX short ~~VXX through VXX options, because of~~sellers due to the rapid and sustained rise in price that was caused by ~~Barclays'~~Defendants' misrepresentations and omissions of material ~~facts in connection with purchases and~~fact concerning their lack of any internal controls to monitor the sales of VXX securities~~.~~ from their shelf registrations, including VXX ETNs.

## ~~I.~~II.    JURISDICTION AND VENUE

~~7.~~13.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

~~8.~~14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, because this action is a civil action arising under the laws of the United States, and under Section 27 of the Exchange Act (15 U.S.C. § 78aa(a)), which vests jurisdiction for Rule 10b-5 violations in the District Courts of the United States.

9.15.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §§§ 1391(b), (c), and (d) because Defendants are believed to have resided, transacted business, were found, or had agents in this District; a substantial part of the events giving rise to the claims occurred within this District, including many of the acts and omissions charged herein, including the omission of material information; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

10.16.  This Court has personal jurisdiction over each Defendant because each Defendant has substantial and continuous contacts within this District, and because the claims in this Complaint arise from conduct of the Defendants that substantially took place in this District. Further, Defendant BBPLC consented to the personal jurisdiction of the United States Courts by registering its New York City branch with the New York State Department of Financial Services ("NYSDFS") under New York Banking Law §§ 200 and 200-b.

11.17.  The activities of Defendants were within the flow of and did have a substantial effect on the interstate commerce of the United States in connection with the acts, transactions, and conduct alleged herein. Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## II.III.  THE PARTIES

12.18. Lead Plaintiff Michael Puchtler is an individual investor who resides in Pennsylvania. As set forth in the accompanying certification, incorporated by reference herein, Lead Plaintiff had sold uncovered call options on the VXX ETN, during the relevant time period, that were open as of the closestart of trading on March 1314, 2022, and suffered damages as a

result of the federal securities law violations and material misrepresentations and omissions of material facts as alleged herein.

13.19.  Defendant Barclays PLC is a universal bank holding company that is headquartered in London, United Kingdom, where its principal executive offices are located. Through its operating subsidiaries, the Company provides global banking and other financial services including investment banking, capital markets and sponsoring structured products that issue new publicly traded securities, and wealth management services.. Barclays is a publicly traded company registered with the SEC whose American Depository Receipts ("ADR") trade on the New York Stock Exchange ("NYSE") under the ticker symbol "BCS." As a public company, Barclays must file periodic reports with the SEC pursuant to Section 13(a) of the Securities Exchange Act of 1934.

14.20.  Defendant Barclays Bank PLC ("BBPLC") is a wholly owned subsidiary of BPLCBarclays that is also headquartered in London and New York City. BBPLC is a bank that provides various financial services, including the creation, issuance and sale of structured notes, ETNs, and other new derivative securities. BBPLC offers and sells an estimated $10 billion to $15 billion dollars' worth of newly issued securities each year in the United States. BBPLC is the issuer of the iPath Series B S&P 500 VIX Short-Term Futures ETN.

15.21.  In 2019, the membership of the Barclays Board and BBPLC Board was consolidated. Today, membership of the BBPLC Board comprises of a subset of the Barclays Board. All members of the Barclays Board, except the Senior Independent Director (Brian Gilvary), and the Chairman of Barclays Bank UK PLC ("BBUKPLC") (Crawford Gillies), also serve on the BBPLC Board.

16.22.  As a result of the consolidation, the Barclays Board Audit Committee and BBPLC Board Audit Committee were ~~also~~ consolidated, and BBPLC matters are covered in concurrent meetings. One of the roles of the Barclays Board Audit Committee is to evaluate the effectiveness of Barclays' internal controls. *See infra*, ¶¶ 83, 85.

17.23.  From December 2015 through October 31, 2021, Defendant James E. Staley ("Staley") served as: the Chief Executive Officer ("CEO") of Barclays, ~~as a~~ Member of Barclay's Executive Committee, and a Director on Barclays' Board of Directors ("Barclays Board~~"),~~"). From March 2019 through October 31, 2021, Staley also served as the CEO of BBPLC and as a Director on BBPLC's Board of Directors ("BBPLC Board").

18.24.  Staley signed a certification pursuant to 17 C.F.R. §§ 240.13(A)-14(A) that was attached to ~~the Barclays~~ Barclays' 2020 Form 20-F as Exhibit 12.1, and a certification pursuant to Section 906 of the Sarbanes-Oxley Act of ~~2022~~2002 (18 U.S.C. § 1350) ("SOX certification") that was attached to the ~~Barclays~~Barclays' 2020 Form 20-F as Exhibit 13.1, which contained material misrepresentations and omitted material factual information in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. These certifications declared that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to the Company's internal controls over financial reporting. These certifications were also incorporated by reference into Barclays' 2018 and 2019 Shelf Registration Statements. Staley was a direct and substantial participant in the fraud alleged herein.

19.25.  Defendant C.S. Venkatakrishnan ~~("Venkatakrishnan")~~ has been the CEO of Barclays, a member of its ~~executive~~Executive Committee and a Director on the Barclays Board since November 1, 2021. He also served as the CEO of BBPLC and as a Director on the BBPLC Board since November 1, 2021. Prior to November 2021, Venkatakrishnan served as Barclays'

Chief Risk Officer from May 2017 through May 2020, and as the Co-~~president~~President of BBPLC from October 2020 to October 2021, which included the entire time that Barclays was an ineligible issuer (May 2017 – May 2020), as alleged herein.

~~20.~~26.  Venkatakrishnan signed a certification pursuant to 17 C.F.R. § 240.13(A)-14(A) that was attached to ~~the Barclays~~Barclays' 2021 Form 20-F as Exhibit 12.1, and a SOX certification ~~pursuant to Section 906 of the Sarbanes-Oxley Act~~ that was attached to ~~the Barclays~~Barclays' 2021 Form 20-F as Exhibit 13.1, which contained material misrepresentations and omitted material information in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. He also signed the SOX ~~Certifications~~certifications for Barclays' ~~Form 20-F.~~ other relevant Form 20-Fs. These certifications declared that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to the Company's internal controls over financial reporting. Venkat was a direct and substantial participant in the fraud.

~~21.~~27.  Defendant Tushar Morzaria ~~("Morzaria")~~ served as Barclays' Group Finance Director, a Member of Barclays Board, and ~~as~~ a Director on the BBPLC Board during all times relevant hereto. Morzaria retired from the BBPLC Board, Barclays Board, and as Group Finance Director effective April 22, 2022. ~~,~~Morzaria currently serves as Chairman of the Global Financial Institutions Group of Barclay's Investment Bank.

~~22.~~28.  Morzaria signed ~~the Barclays~~Barclays' 2019, 2020 ~~20-F,~~ and ~~Barclays~~2021 Form 20-F certifications pursuant to 17 C.F.R. ~~§~~§§ 240.13(A)-14(A) that were attached to ~~the Barclays~~Barclays' 2019, 2020 ~~20-F,~~ and ~~Barclays~~2021 Form 20-~~F~~Fs as Exhibits 12.1; and SOX certifications pursuant to Section 906 of the Sarbanes Oxley Act of ~~2022~~2002 that were attached to the Barclays 2019, 2020 ~~20-F,~~ and ~~Barclays~~2021 Form 20-~~F~~Fs as Exhibits 13.1, all of which

contained material misrepresentations and omitted material factual information in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. These certifications declared that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to the Company's internal controls over financial reporting. Morzaria was a direct and substantial participant in the fraud.

23.29. Defendants Staley, Morzaria, and Venkatakrishnan (collectively the "Individual Defendants"), were provided with copies of and contributed to Barclays's and BBPLC's annual reports and other SEC filings alleged herein to be misleading, and had the ability and opportunity to prevent their issuance or cause them to be corrected. The Section 906 Sox Certifications thatSOX certifications, which each Individual Defendant personally signed, generally provide that the respective Barclays Annual reportReports "fully complies with the requirements of section 13(a) of the Securities Exchange Act of 1934 and the information contained in the Report fairly presents, in all material respects, the financial condition of Barclays."

24.30. Because of their positions with Barclays and BBPLC, the Individual Defendants possessed the power and authority to control Barclays and BBPLC and the contents of BBPLC's and Barclays' their reports to the SEC and to the market. Furthermore, they were responsible for managing and overseeing Barclays' and BBPLC's internal controls.

**FACTUAL ALLEGATIONS**

**Background Allegations**

A.     BBPLC Created and Maintained a Deep and Liquid VXX Market.

**IV.     FACTUAL BACKGROUND AND DEFENDANTS' MISCONDUCT**

**A.     Barclays and BBPLC Create the VXX and then Cause a Short Squeeze**

13

25.31.  Since its creation thirty years ago, the ~~Chicago Board of Options Exchange's~~ ~~CBOE~~CBOE's Volatility Index ("VIX") has become a recognized index reflecting short-term stock market volatility. The VIX technically measures the near term (thirty-day) expected market volatility of the S&P 500 based on the real-time pricing of S&P 500 Index option contracts ("SPX Options") listed for trading on the CBOE. Because the VIX is ~~just~~simply a mathematical calculation of ever-changing SPX Options prices, investors cannot directly invest in the VIX, and so the CBOE created VIX Futures and VIX Options linked to the VIX.

26.32.  Given strong investor interest in market volatility securities, financial institutions including Defendants Barclays and BBPLC, and Credit Suisse ~~(in conjunction with "VelocityShares"), "ProShares," and Barclays' "iPath" branded business at BBPLC,~~ , created, issued, and sold ~~billions of dollars' worth of~~ various securities linked to VIX Futures.

27.33.  Barclays VXX ETN is one such security. The note was designed and marketed by Barclays and BBPLC as a way for investors to take a position on market volatility by either buying ~~the~~ VXX ETN or selling it short. The security was designed to mimic the VIX by representing a mathematical mix of one-month and two-month futures linked to the VIX.

28.34.  Since its IPO on January 29, 2009, and six additional offerings from 2018 through 2021, Barclays nurtured and grew ~~the~~ VXX securities into one of the most successful and liquid volatility securities. Among the various securities created by financial institutions to mimic the VIX, Barclays' VXX was the clear market leader, with more than double the volume of any competing product. In February 2022, daily trading volume reached $1 billion, and active VXX options exceeded ~~six times that amount (or~~ $6 billion~~).~~.

29.35.  Investors who expected volatility to increase, and thus ~~that~~for the price of VXX ~~would~~securities to rise with an increase in VIX futures, could purchase VXX ETNs, buy VXX call

options, or sell VXX put options. Conversely, investors who expected volatility to decrease, and thus for the VXX price to go down with the decrease in VIX futures, could sell VXX ETNs short, sell VXX call options, or buy VXX puts.

~~30.~~36.  ~~Unlike their better-known cousins, exchange traded funds (ETFs), ETNs do not own a basket of underlying assets whose market value primarily determines the ETF's market price.~~ To keep VXX's market price correlated to real-time market-based changes to ~~the~~ VIX futures, Barclays constructed VXX ~~(like most ETNs)~~securities with three pricing mechanisms that are typical of all ETNs.

~~31.~~37.  First, Barclays calculates and publishes a so-called "indicative value" every fifteen seconds, and also ~~a daily closing indicative value.~~at the close of the market each day. The indicative value is a number calculated pursuant to a published mathematical formula tied to VIX futures~~.~~, which Barclays regularly purchases to offset (or hedge) its redemption obligations (as discussed next). It is analogous to an Exchange Traded Fund's "net asset value," but because ~~an ETN is not a collection of assets,~~ETNs represent mere debt obligations on the part of the issuer rather than a share of a fund (as is the case with an Exchange Traded Fund, or ETF), the indicative value ~~instead~~ represents a mere mathematical formula number tied to ~~the level of the~~ VIX ~~index~~futures.

~~32.~~38.  Second, built into the note is the right of certain note holders to redeem their securities for the closing indicative value. This redemption right serves to keep the market price of VXX from falling below its indicative value, as ~~these~~market buyers know they can make a profit whenever the price of the security falls below the published indicative value~~,~~ by simply buying the note at the lower value and then putting the note to Barclays at the indicative value.

~~7.~~    Third, ~~while~~like all issuers of ETNs, Barclays ~~does not obligate itself~~maintains a shelf capacity to issue and sell new VXX securities whenever the price rises above the indicative value~~, prior~~. This capacity is critical to ~~March 14, 2022, it had done so. Actual sales by Barclays of new VXX ETNs into the market when the price rises above the~~ keeping the price capped at or near its indicative value, ~~and just as importantly~~as the sale of additional securities tends to decrease the price of the security as it satisfies excess demand. Indeed, the mere threat ~~that~~of Barclays ~~may make such sales, has the effect of keeping~~issuing new securities upon the price ~~from~~of VXX securities rising above ~~the~~its indicative value. ~~Barclays' ability to issue new VXX securities from its shelf registration therefore keeps its price from rising~~ disincentivizes buyers from bidding the price of the security above its indicative value~~, as (1) the newly issued securities tend to deflate the price as they satisfy excess demand, and (2) knowing that Barclays can issue new securities with this deflationary effect disincentivizes investors from bidding the price of VXX above its indicative value.~~

~~33.~~39.  ~~Importantly, while Barclays is not legally obligated to make new sales of VXX ETNs into the market to keep the price from rising above the indicative value, market participants know that Barclays has strong financial and reputational incentives to sell VXX ETNs into the market whenever the price rises above the indicative value. There are two reasons for this. First, Barclays makes money with each direct sale of a VXX ETN. Second, Barclays knows that buyers and sellers of VXX will quickly abandon the security and the VXX market if they come to learn that Barclays is not ready and able to fulfill its vital selling function~~ in order to ~~keep the price from rising above the indicative value.~~squeeze short sellers.

34.40.  Together, these three pricing mechanisms provide VXX investors with confidence that the price of ~~the~~ VXX securities will remain tethered to the VIX futures it was designed to track.

35.41.  ~~The~~ As recognized by FINRA, the ability to redeem and issue new ~~ETNs~~securities are standard ~~practice~~ pricing mechanisms employed by ETN issuers to ~~maintain~~ensure that the ~~integrity~~price of the ETN remains "in-line" with their ~~ETN, as Finra, the securities industry's self-governing body, recognizes:~~ indicative value:

> Issuers of ETNs issue and redeem notes as a means to keep the ETN's price in line with a calculated value, called the indicative value or closing indicative value for ETNs. This value is calculated and published at the end of each day by the ETN issuer. When an ETN is trading at a premium above the indicative value, issuing more notes to the market can bring the price down. Similarly, if an ETN is trading at a discount, redemption of notes by the issuer reduces the number of notes available in the market, which tends to raise the price. ETN issuers have primary control over the issuance and redemption processes in the ETN market.

*Finra's Investor Alert: Exchange-Traded Notes—Avoid Unpleasant Surprises.*

42.     Significantly, the last of the three pricing mechanisms—the ~~fact that Barclays is ready and able~~ability of an ETN issuer to sell new securities into the market—is of paramount importance to short- sellers of ~~the security. This is so because the security is highly~~ ETNs, and particularly of ETNs like VXX that are heavily shorted~~—with as much as 90% of the float being shorted on any given trading day. With so much of the float.~~ When an ETN is heavily shorted, short sellers alone cannot counteract a rapid rise in ~~price. Instead, they expect~~the price of the ETN because the security is already "hard to borrow" – meaning, that further "borrow" for purposes of supporting additional short sales is in limited supply. For this reason, short sellers of ETNs that are heavily shorted (like VXX) are especially dependent upon the ETN issuer maintaining

17

appropriate shelf capacities to issue further securities whenever the price of the security rises above its indicative value.

43.     Barclays and BBPLC knew of or recklessly disregarded the risk that if they lost their ability to issue new securities, short sellers would be highly vulnerable to a short squeeze. Indeed, in years past, other similar securities, including Credit Suisse's TVIX, had experienced a short squeeze upon the issuer suddenly halting future issuances.

~~36.~~44.  In the same vein, short sellers would not have taken a short position if they knew that Barclays ~~can and will issue new securities to satisfy the increased demand. Absent Barclays being ready and able to fulfill its critical selling function, no short-seller would go short~~ and BBPLC did not maintain any internal controls to ensure that they had adequate capacity to sell additional securities whenever the price of the security ~~for fear of a~~rose above its indicative value, or that Barclays had previously sold billions of dollars of unregistered securities, as such lapses would plainly put at risk Barclays' ability to issue future securities, thereby exposing short sellers to a potential short squeeze.

~~8.     Barclays understood that if BBPLC would not or could not issue and sell new VXX securities, buyers would have an incentive to bid VXX above its indicative value in order to squeeze short sellers, and thereby profit from those short sellers being forced to close out their short positions by buying at ever higher prices.~~

~~9.     Without BBPLC being ready and able to engage in further sales of the security, no investor would sell VXX short, or engage in short options trades, because the note would be virtually assured to rise above its indicative value due to a short squeeze.~~

~~10.     In the same vein, no investor heading into March 14, 2022, would be short the VXX ETN, or engage in options trading tied to the VXX ETN that, like short selling, would also profit~~

from a decline in the VIX volatility index, had they known that BBPLC had no controls in place to determine whether it had any registered securities available to be sold or had breached its duty to register the securities it previously sold.

11.    The Plaintiff sold uncovered call options on the VXX ETN between January 24, 2022 and March 4, 2022, which positions were open at the close of the market on March 13, 2022, and going into the VXX market opening on March 14, 2022. The Plaintiff's uncovered call options were effectively short VXX, because they would expire without being exercised so long as the price of VXX did not rise above the exercise price by the strike date.

37.45.  Plaintiff, like all investors in the VXX securities, did not know that Barclays and BBPLC had no did not have any controls in place to determine whether it had any registered securities available to betrack its prior issuances against its shelf capacities, or that they sold and had failed to register billions of dollars of unregistered VXX securities prior to March 14, 2022, and that any future issuances of the securityVXX ETNs would be an illegal salesales in violation of the registration requirements of the federal securities laws, including 15 U.S.C. §5. Such omitted information would have been material to short sellers because they would have understood that Barclays could not serve its vital issuer and market-making functions of selling additional securities whenever the price rose above its indicative valueIndeed, as explained below, Barclays and BBPLC repeatedly issued inaccurate and incomplete statements claiming just the opposite.

12.    On March 14, 2022, BBPLC announced just minutes before the opening of the VXX market that it was immediately suspending any further issuances and sales of VXX notes. That announcement predictably caused a substantial and persistent rise in the price of the VXX as buyers piled into the security, knowing that BBPLC and short sellers had no means to counteract the rapidly rising price.

13.    At first, Barclays did not disclose why it had suspended its issuance and sales of VXX notes. A few weeks later, on March 28, 2022, Barclays disclosed that the reason it halted future issuances was because it had sold billions of dollars' worth of unregistered securities in excess of its published shelf registrations, in violation of SEC rules.

B.    BBPLC Is a Serial Issuer of Securities, and Barclays and BBPLC Knew BBPLC Needed to Register and Track in Real-time the Issuance of Billions of Dollars' Worth of Securities it was Offering and Selling After Losing its Status as a "Well Known Seasoned Issuer."

**B.    Defendants Knowingly or Recklessly Made Inaccurate and Incomplete Statements Regarding Issuing Only Registered Securities During the Class Period**

46.    On May 9, 2019, BBPLC filed a Form 8-A12B Registration Statement for securities, including VXX. Attached to the 2019 Form 8-A12B as Exhibit 4.15 were the specific details relating to VXX securities. In this Exhibit, BBPLC stated: "This Security, and any other Securities of this series and of like tenor, are ***issuable only in registered form*** without coupons in denomination of any multiple of $50." BBPLC's 2019 Form 8-A12B, Ex. 4.15.

47.    BBPLC also made a representation in its Form F-3 filed on June 14, 2019, stating:

**Item 10. Undertakings**
The undersigned Registrant hereby undertakes:
(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this Registration Statement:…

    (ii) To reflect in the prospectus any facts or events arising after the effective date of the Registration Statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the Registration Statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the SEC pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20 percent change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective Registration Statement; and

(iii) To include any material information with respect to the plan of distribution not previously disclosed in the Registration Statement or any material change to such information in the Registration Statement;

BBPLC 2019 Form F-3 at II-9.

48.      BBPLC continued to include identical representations in its Amendments to the Form F-3, which were filed on July 3, 2019 and July 30, 2019. *See* July 3, 2019 Form F-3/A at 8; July 30, 2019 Form F-3/A at II-7.

49.      These statements regarding issuing only registered securities were materially false and misleading. Starting June 26, 2019, Defendants began issuing unregistered securities from the 2018 Shelf. Then, starting January 28, 2021, Defendants began issuing unregistered securities from the 2019 Shelf. Thus, Defendants *did not issue* "only" registered securities as stated by BBPLC in its Registration Statements; nor did Defendants offer securities within the maximum aggregate range claimed by Defendants. Defendants had a duty to update this material information and failed to do so during the Class Period.

50.      As a result of Barclays materially false and misleading statements, as detailed above, investors who were short VXX, such as Lead Plaintiff and Class Members, were materially misled to believe that Barclays and BBPLC maintained internal controls sufficient to prevent the over-issuance of ETNs. This ultimately damaged short sellers because no investor heading into March 14, 2022, would be short the VXX ETN had they known that Barclays and BBPLC had no controls in place to track whether they had any registered securities available to be sold, or had breached their duty to register the securities they previously sold.

### C.      Defendants Knowingly or Recklessly Made Inaccurate and Incomplete Statements Regarding Their Internal Controls During the Class Period

#### 1.   Barclays and BBPLC were aware of the additional responsibilities that came with being a Non-WKSI issuer

51.    As prolific issuers of securities, Barclays and BBPLC knew that the registration of publicly issued securities is a foundational principle of the federal securities laws, as ~~Section~~Sections 5(a) and (c) of the federal Securities Act prohibit the offer and sale of securities unless they are covered by a valid registration statement filed and in effect. 15 U.S.C. § 77(e). Barclays and BBPLC had a duty to ensure proper registration of all VXX securities they issued and sold.

~~38.~~52. Historically, BBPLC offered and sold billions of dollars' worth of securities pursuant to effective shelf registration statements on Form F-~~3.⁴~~3s. SEC 2022 Order[5] ¶¶ 13, 14. A shelf registration statement permits prolific issuers such as Barclays and BBPLC to have multiple public securities offerings based on the same shelf registration statement. Barclays and BBPLC ~~is~~were also required to file annual and quarterly periodic reports with the SEC pursuant to Section 13(a) of the Exchange Act. ~~Barclays and BBPLC had a duty to ensure proper registration of all VXX securities it issued and sold.~~

53.    Defendants' shelf registration statement is largely used by BBPLC's Structured Products Group for the offer or sale of ETNs and structured notes, and on occasion by the Group Treasury to sell corporate debt securities.

~~39.~~54. Prior to May 10, 2017, Barclays and BBPLC achieved "well-known seasoned issuer" ("WKSI") status under Securities Act Rule 405 that, among other things, enabled them to file automatic shelf registration statements and to pay filing fees at the time of each ~~securities issuance.~~security's issuance. As a WKSI, Defendants were able to simply issue securities, pay the

---

[4] ~~SEC Cease and Desist Order against Barclays and BBPLC, ¶¶13-14.~~

[5] An Order Instituting Cease-and-Desist Proceedings, *In the Matter of Barclays PLC and Barclays Bank PLC*, SEC (dated Sept. 29, 2022) ("SEC 2022 Order").

registration fee, file the proper papers, and have the securities deemed "Effective" upon issuance. Crucially, a WKSI is not forced to wait several weeks or months for the Division of Corporation Finance at the SEC to review the registration statement and declare it effective before the WKSI is allowed to make offers and/or sales from that registration statement.

14.    However, on May 10, 2017, BBPLC lost its WKSI status by settling SEC enforcement proceedings regarding client overcharges by Barclays' wealth management business.[6] As a result, BBPLC lost the ability to file automatic shelf registration statements to offer and sell unspecified amounts of different types of securities that are so essential to its business. Instead, BBPLC's shelf registrations were limited to the shelf's specified dollar amount of securities that could be sold off the shelf, and it would have to pay at filing all registration fees for the maximum number of securities set by the shelf.

55.    In aPursuant to Securities Act Rule 405 and Instruction I.A. on Form S-3, to qualify as a WKSI, an issuer must not be an "ineligible issuer." An issuer becomes an "ineligible issuer" when it (or a subsidiary) violates the anti-fraud provisions of the federal securities laws (or become subject to a judicial or administrative decree or order prohibiting certain conduct or activities involving the anti-fraud provisions of federal securities laws) within the prior three years. Although "ineligible issuer" status attaches automatically after a securities violation, since the 2005 Offering Reform, the SEC has liberally granted waivers, upon request, thereby permitting companies to retain their WKSI status despite violating the federal securities laws.

56.    Between 2007 and 2016, Barclays requested and was regularly granted waivers regarding ineligible issuer status from the Division of Corporation Finance of the SEC. For example, in 2014, Barclays received a waiver of ineligible issuer status related to various violations

___

[6] *In the Matter of Barclays Capital Inc. and BBPLC,* Adm. Proc. File No. 3-17978 (May 10, 2017).

23

of the Investment Advisers Act of 1940 and Rules thereunder, because of certain failures after Barclays Capital, Inc. ("BCI"), a wholly owned subsidiary of Barclays, acquired Lehman Brothers' investment advisory business in September 2008, including BCI's failure to: (i) enhance its infrastructure to support the new business; (ii) adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act; and (iii) make and keep certain books and records.

57.    In two earlier Waiver Requests submitted on May 20, 2015 and January 27, 2016, Barclays underscored to the SEC that "[t]he WKSI shelf[] process allows access to the widest possible global investor base and provides an important means of accessing capital and funding for Barclays' global operations."[7] 2015 Waiver Request at 10; 2016 Waiver Request at 11. These requests also stressed "the importance of the WKSI shelf to Barclays in meeting its capital and funding requirements." *Id*.

40.58.  In the request for a waiver of its "ineligible issuer" status that Barclays filed with the SEC before the Company lost its WKSI status in 2017, the Company stated:

> Since 2011, Barclays has issued off the WKSI shelf the USD-equivalent of approximately $12.3 billion of regulatory capital securities, which represents 89% of all regulatory capital securities issued by Barclays in that period. In that same period … the USD-equivalent value of all securities issued by Barclays off the WKSI shelf is approximately $68 billion. These figures demonstrate the importance of the WKSI shelf to Barclays in meeting its capital and funding requirements.[8]

---

[7] Barclays and BBPLC Letter to Mary J. Kosterlitz, Division of Corporate Finance, Request for Waiver of "Ineligible Issuer" Status Under Rule 405 (May 20, 2015) (available at efaidnbmnnnibpcajpcglclefindmkaj/https://www.sec.gov/divisions/corpfin/cf-noaction/2015/barclays-plc-052015-405.pdf); Barclays and BBPLC Letter to Eun Ah Choi, Division of Corporate Finance, Request for Waiver of "Ineligible Issuer" Status Under Rule 405 (January 27, 2016) (available at https://www.sec.gov/divisions/corpfin/ cf-noaction/2016/barclays-plc-020116-405.pdf)).

[8] Barclays and BBPLC Letter to Eun Ah Choi, Division of Corporate Finance, Request for Waiver of "Ineligible Issuer" Status Under Rule 405 (January 27, 2016) (available at https://www.sec.gov/divisions/corpfin/ cf-noaction/2016/barclays-plc-020116-405.pdf)).

Not only did 2016 Waiver Request at 10.

41.59.  Barclays acknowledge the negative impact on their ability to "meet[] its capital and funding requirements," Barclays and BBPLCfurther emphasized that loss of WKSI status would "curtail important channels of communication to investors," weaken theirits ability to respond to "current regulatory and market conditions and uncertainties that are significantly transforming the landscape for financial institutions like Barclays," and harm "the speed at which Barclays could strengthen its capital position if requirerequired to do so" by a financial regulator. *Id.* [9] at 11-13.

60.    On May 10, 2017, the SEC instituted a public administrative and cease-and-desist proceeding against BCI, wherein the SEC accused BCI of fraud.  *In the Matter of Barclays Capital Inc.*, Adm. Proc. File No. 3-17978 (May 10, 2017). BCI and Barclays settled with the SEC for $97 million and lost their WKSI status due to securities fraud. Prior to these proceedings, Barclays had been able to retain its WKSI status by applying for a waiver, but the SEC refused to grant Barclays another waiver after the May 2017 settlement.

As a result of the May 2017 SEC Settlement, Barclays automatically lost its status as a WKSI for a period of three (3) years. *See* 17 C.F.R. § 230.405. As a result, BBPLC lost the ability to file automatic shelf registration statements to offer and sell unspecified amounts of different types of securities that are so essential to its business.

61.    Instead, Barclays and BBPLC's shelf registrations were limited to a shelf's specified dollar amount of securities. Additionally, the change in status required Barclays and BBPLC to pay all registration fees, upon filing, for the maximum number of securities set by the shelf, rather than paying such filing fees on a "pay-as-you-go" basis.

---

[9] (Id. at 11-13).

25

62.    The practical effect of the change in status was that Barclays and BBPLC were required to quantify the total amount of securities they planned to offer, well in advance, of issuing securities throughout the penalty period, and to pay any associated registration fees for those securities upfront. Defendants also needed to track the amounts of securities that they sold over the duration of the shelf to ensure that they did not exceed the amount previously registered and paid.

~~42.~~63.   As set forth in the SEC's Cease and Desist Order that Barclays and BBPLC entered into on or about September 29, 2022, Barclays and BBPLC knew after losing its WKSI status that BBPLC had to implement internal controls to track, in real time, its securities offers and sales off any shelf registration going forward:

> Following the loss of WKSI status, certain personnel from BBPLC understood the consequences of this status change, including that they should consider implementing a mechanism to track offers and sales of securities off any shelf, relative to the registered amount of securities available to be offered or sold off that shelf, in order to ensure that no securities in excess of the amount registered were offered or sold.

SEC 2022 Order, ¶19.

64.    ~~BBPLC Establishes~~Despite having become an ineligible issuer in March 2017, Barclays initially misrepresented on its Forms 20-F during the three-year penalty period, filed on February 22, 2018, by self-identifying as a WKSI.

65.    On March 19, 2018, Barclays filed a post-effective amendment to its 2017 Form 20-F ("2017 Form 20-F/A"), where it amended and acknowledged its new status as a non-WKSI issuer. Defendants at the same time, also declared that they understood the additional responsibilities of a non-WKSI.

66.    Barclays' acknowledgement in its 2017 Form 20-F/A that it was then a non-WKSI issuer and that it understood the additional responsibilities of its new status as a non-WKSI issuer

reflect that Barclays was aware of its change in status, and that it was therefore required to change its internal processes.

### 1.2. Defendants Established a Formal Working Group to Address itsTheir Ongoing Securities Offerings as a Non-WSKIWKSI Issuer; and Recognized the Need to Track Actual Offers and Sales Against Shelf Registrations.

43.67.   To determine how Barclays and BBPLC as a non-WKSI issuer would do itsconduct their securities offerings going forward, in January 2018, Barclays and BBPLC convened a "Working Group" consisting of the trading desk heads from itstheir structured products group, product origination personnel, a compliance officer, and an in-house attorney. Among other things, theThe Working Group converted BBPLC's pending WKSI shelf into a non-WKSI, and filed the 2018 shelf registrationShelf Registration that authorized BBPLC to sell up to $21.3 billion worth of securities over the next 18 months. It also obtained estimates of securities issuance needs from key business units, and based on those estimates BBPLC filed a 2019 Shelf registrationRegistration statement that was deemed effective on August 1, 2019, and which authorized BBPLC to offer and sell up to $20.8 billion of mainly structured notes and ETNs, for a period of three years. SEC 2022 Order, ¶¶20-21.10 11; Barclays' Form F-3, filed August 1, 2019.

68.     "On March 28, 2018, Barclays filed a post-effective amendment, which amended its prior Registration Statement, and anticipated issuing some $21.3 billion worth of securities in

---

10 BBPLC filed a 2019 shelf registration for $20.76 billion that became effective on August 1, 2019. It also paid the required upfront registration fees on the entire authorized amount. *See* www.sec.gov/Archives/edgar/data/312070/0001193125 19 173793/0001193125-19-173793 index.htm; www.sec.gov/Archives/edgar/data/312070/000119312519206925/d778493df3a.htm
11 BBPLC filed a 2019 shelf registration for $20.76 billion that became effective on August 1, 2019. It also paid the required upfront registration fees on the entire authorized amount. *See* www.sec.gov/Archives/edgar/data/312070/0001193125219173793/0001193125-19-173793-index.htm; www.sec.gov/Archives/edgar/data/312070/000119312519206925/d778493df3a.htm

only 18 months ("2018 Amended Shelf Registration"). The Company also paid for the filing fees for the 2018 Shelf.

69.     In 2019, the Working Group reconvened with largely the same membership as in 2018. However, unlike the calculations for the 2018 Shelf, in 2019, the Working Group was required to perform calculations to account for the remaining capacity in the 2018 Shelf. The SEC 2022 Order later exposed that "[a]t ~~During the pendency of the Working Group's efforts, the need to track actual offers and sales of securities against the amount of registered securities on a real-time basis was understood by and discussed among members of the Working Group. Nevertheless, no internal control was established to track offers and sales of securities, nor was any member of the Working Group or other BBPLC personnel performing that task." SEC Order, ¶24.~~

44.70.  "~~At~~ the time of the registration of both the 2018 Shelf and the 2019 Shelf, certain BBPLC personnel recognized the need to accurately record relevant information about securities that were offered or sold so as to be able to track the aggregate amount of securities that were cumulatively offered and sold from each respective Shelf on a real-time basis, thereby ensuring that BBPLC did not offer or sell any securities in excess of what had been registered." ~~*Id.*, ¶5.~~SEC 2022 Order, ¶5. As stated therein:

> During the pendency of the Working Group's efforts, the need to track actual offers and sales of securities against the amount of registered securities on a real-time basis was understood by and discussed among members of the Working Group. Nevertheless, no internal control was established to track offers and sales of securities, nor was any member of the Working Group or other BBPLC personnel performing that task.

*Id.*, ¶24.

C.    ~~Defendants' Material Omissions in Barclays' SEC Filings as to the Effectiveness of its Internal Controls over Financial Reporting.~~

71.    Although Defendants were aware of the additional responsibilities that resulted from losing their WKSI status and had impaneled a working group to explore the need for any changes to Barclays' and BBPLC's internal processes, Barclays and BBPLC inexplicably failed to task anyone with developing and maintaining an infrastructure with the technology and processes necessary to establish and implement internal controls.

### D.    Defendants' Incomplete and Inaccurate Statements Concerning Internal Controls During the Class Period

45.72.  Despite knowing that ~~it~~they needed to implement controls to track issuances against prior shelf registrations, and that such information would be material to short- sellers, ~~Barclays~~Defendants repeatedly failed to apprise the market that ~~it~~they had no controls in place.

73.    ~~For example,~~During the Class Period, Defendants disseminated materially false and misleading statements to investors in ~~its~~their filings with the SEC regarding their internal controls. Defendants further omitted material facts that they had a duty to disclose in order to make the statements made by Defendants, in light of the circumstances under which they were made, not misleading at the time they were made.[12]

### 1.   February 13, 2020: FY 2019 Results and Filing of Form 20-F

74.    On February 13, 2020, Barclays filed their 2019 Annual Report ~~on Form 20-F~~, signed by Defendant Morzaria ~~and filed with the SEC on February 18, 2022 -- the same day that BBPLC exceeded the limit of 2019 Shelf -- Barclays stated~~. ("Barclays' 2019 Form 20-F").

46.75.  Barclays' 2019 Form 20-F touted the Company "is ***committed to operating within***

---

[12] Statements highlighted in ***bold and italics*** within this section were materially false or misleading because, among other reasons, they omitted material information of which Defendants were aware or reckless in not knowing. Because Defendants chose to speak on the issues described below, it was important that they not mislead investors or withhold material information. Other statements are included to provide context and to demonstrate the materially false and misleading nature of Defendants' representations, and Defendants' material omissions.

29

*a strong system of internal control.*" Barclays' 2019 Form 20-F at 37. Barclays even specified that ~~"management has assessed [BBPLC's] internal controls over financial reporting as of December 31, 2020" and concluded that "[BBPLC's] internal controls over financial reporting~~the Company was ~~effective as of 31 December 2020." [13] (alterations adopted). The 2020 Form 20-F also stated that Barclays and BBPLC's internal controls "successfully completed"~~on track to complete a three-~~years of review and rigorous testing pursuant to~~year program at the end of March 2020, known as the Barclays Internal Control Environment Programme~~" (" or~~ "BICEP~~")," that "~~strengthen~~was *focus[ed] on strengthening the internal control environment* ~~across the Group" and put Barclays and BBPLC,"~~ and had left the Company's internal controls environment "*in a much stronger position*." ~~Barclays 2020 20-F at 14. Barclays in its 2020 20-F further represented that it "is committed to operating within a strong system of internal control," and~~*Id.* at 11, 91. Furthermore, the Company's "*frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance*." *Id*. at ~~39~~37.

76.    Barclays' ~~2020~~2019 Form 20-F also stated that ~~"Management has assessed~~ the ~~internal control over financial reporting as of~~Barclays Board Audit Committee "concluded that, throughout the year ended 31 December ~~2020",~~2019 and ~~management concludes "~~to date, *the Group has operated a sound system of internal control that provides reasonable assurance of financial and operational controls and compliance* ~~with~~*within laws and regulations*." *Id*. at 38.

77.    Furthermore, Barclays reassured that "*Management has assessed the internal control over financial reporting as of 31 December 2019. In making its assessment, management*

---

[13] ~~See, e.g., Barclays' 2020 Annual Report on Form 20-F, filed with the SEC on February 18, 2021 ("2020 Barclays 20-F"), Barclays 2020 20-F, at 8, available at www.sec.gov/Archives/edgar/data/0000312069/000156276221000043/fy2020arbplc.htm.~~

*utilized the criteria set out in the 2013 COSO framework and concluded that, based on its*

*assessment, the internal control over financial reporting was effective as of 31 December 2019."*

*Id*.

47.78.  Attached as Exhibit 12.1 to the ~~Barclays 2020~~2019 Form 20-F were certifications

pursuant to 17 C.F.R. § 240.13(A)-14(A) signed by Defendants Staley and Morzaria, ~~as well as~~

~~Exhibit 13.1's certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2022 that was~~

~~also signed by Staley and Morzaria.~~which states:

1. ~~As 2021 progressed, BPLC issued~~ I have reviewed this annual report on Form

   20-F of Barclays PLC;

2. ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading with respect to the period covered by this report***;

3. Based on my knowledge, ***the financial statements, and*** *other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;*

4. The Company's **other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures** (as defined in Exchange Act Rules 13a-15(e) and 15-d-15(e)) and **internal control over financial reporting** (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

   (a) ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by other within those entities***, particularly during the period in which this report is being prepared;

   (b) ***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles***;

31

(c) *Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation*; and

(d) *Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting*; and

5.   The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's boards of directors (or persons performing the equivalent functions):

(a) *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize, and report financial information*; and

(b) *Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting*.

79.    Attached as Exhibit 13.1 to the 2019 Form 20-F was a certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 signed by Defendants Staley and Morzaria, which states-:

*2. The Annual Report on Form 20-F for the year ended December 31, 2018 (the "Report") of Barclays fully complies with the requirements of section 13(a) of the Securities Exchange Act of 1934 and information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Barclays*.

80.    Defendants' statements concerning Barclays' internal controls over financial reporting contained in ¶¶ 75-77, and the certifications referenced in ¶¶ 78 and 79, were materially false and/or misleading in that they failed to disclose:

(a) that Barclays had no internal controls to track the issuance of VXX shares pursuant to the 2018 and 2019 shelf registration statements;

32

(b) that Barclays had sold and was continuing to sell unregistered securities in excess of the amounts registered by the 2018 Shelf Registration Statement and the 2019 Shelf Registration Statement;

(c) a material weakness existed in Barclays' internal control environment evidenced by the fact that the over-issuances had occurred; and

(d) that Barclays would be required to halt the sale and issuance of VXX securities.

**2. February 14, 2020: BBPLC's FY 2019 Results and Filing of Form 20-F**

81.    On February 14, 2020, BBPLC filed with the SEC ~~three other reports attesting to~~ its 2020 Annual Report on Form 20-F (the ~~veracity of~~ "BBPLC's 2019 Form 20-F), which Chief Financial Officer, Steven Ewart signed.  Similar to Barclays, BBPLC acknowledged that it did not have WKSI status. BBPLC's 2019 Form 20-F at 2.

82.    In BBPLC's 2019 Form 20-F, the ~~companies'~~ Board begins its Corporate Governance Statement by outlining the Board's six core principles. *Id*. at 3-5. The fourth principle is "Audit, Risk and Internal Control." *Id*. at 4. This principle explicitly directs that

The board should establish formal and transparent policies and procedures to (i) identify the nature and extent of principal risks the company is willing to take in order to achieve its long-term strategic objectives; (ii) manage such risks effectively; *(iii) oversee the internal control framework*; (iv) promote the independence and effectiveness of internal and external audit functions; and (v) satisfy itself on the integrity of financial reporting.

*Id*.

83.    More specifically, the Board explained that the "[e]ffectiveness of risk management and internal controls is reviewed regularly by the Risk Committee (responsible for ~~financial reporting~~ providing oversight on current and potential future risk exposures) and the Audit Committee (responsible for controls, including ~~its First Quarter 2021 Report (1Q21~~ reviewing audit reports, internal controls and risk management systems)." *Id*.  Furthermore, during this time, the

Audit Committee's "principal role and responsibilities" included "[*e*]*valuating the effectiveness of the Barclays Bank Group's internal controls*, including internal financial controls" and "*evaluating the status of the most material control issues identified by management, including the Barclays Group Internal Control Enhancement Programme; receiving deep dives on the status of specific control issues across the business of Barclays Bank Group and functions*, and on progress of the related remediation programmes and lessons learned from critical risk events." *Id*

84.    BBPLC similarly represented that "[t]he Company is committed to operating *within a strong system of internal control* that enables business to be transacted and risk taken without exposure to unacceptable potential losses or reputational damage." 2019 Form 20-F at 14. BBPLC reassured that "[a] framework of disclosure controls and procedures is in place to support the approval of the financial statements of the Barclays Bank Group." *Id*.

85.    BBPLC reiterated that "[t]he Board together with the Audit Committee is responsible for ensuring the independent and effectiveness of the internal and external audit functions." *Id*. Furthermore, "Management is responsible for establishing and maintaining adequate internal controls over financial reporting under the supervision of the principal executive and financial officers, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements, in accordance with International Financial Reporting Standards (IFRS)." *Id*. In fact, the Board noted:

Internal control over financial reporting includes policies and procedures that pertain to the maintenance of records that, in reasonable detail:
- Accurately and fairly reflect transactions and dispositions of assets;
- Provide reasonable assurances that transactions are recorded as necessary to permit prepraration of financial statements in accordance with IFRS and that receipts and expenditures are being made only in accordance with authorisations of management and the respective Directors; and
- Provide reasonable assurance regarding prevention or timely detection of

34

unauthorized acquisition, use or disposition of assets that could have a material effect on the financial statement.

*Id.*

86.     According to BBPLC's 2019 Form 20-F, "***Management has assessed the internal control over financial reporting as of 31 December 2019. In making its assessment, management utilised the criteria set out in the 2013 COSO framework and concluded that, based on its assessment, the internal control over financial reporting as effective as of 31 December 2019.***" *Id*. Furthermore, the Audit Committee concluded that "***[t]hroughout the year ended 31 December 2019 and to date, the Company has operated a system of internal control that provides reasonable assurance of effective operations covering all controls, including financial and operational controls and compliance with laws and regulations***." *Id*. at 14.

87.     The 2019 Form 20-F also noted that "[t]here have been no changes in the Barclays Group's internal control over financial reporting that occurred during the period covered by this report, which have materially affected or are reasonably likely to materially affect the Barclays Group's internal control over financial reporting." *Id*. at 15.

88.     BBPLC's 2019 Form 20-F specified that:

The Chief Executive Office, [Defendant] Staley… conducted with Barclays Bank Group management an evaluation of the effectiveness of the design and operation of the Barclays Bank Group's disclosure controls and procedures of Barclays Bank PLC as at 31 December 2019, which are designed are defined as those controls and procedures designed to ensure that information required to be disclosed in reports filed or submitted under the US Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified int eh US Securities and Exchange Commission's rules and forms. As of the date of the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the design and operation of these disclosure controls and procedures were effective.

*Id.* at 205.

89.     BBPLC further reassured that:

A framework of disclosure controls and procedures is in place to support the

approval of the financial statements of the Barclays Bank Group. Specific governance committees are responsible for examining the financial reports and disclosures to ensure that they have been subject to adequate verification and comply applicable standards and legislation.

*Id*. at 14.

90.    Attached as Exhibit 12.1 to the 2019 Form 20-F were certifications, signed by Defendant Staley, which are identical to the language of the certification attached to Barclays' 2019 Form 20-F, which is stated in full above. *See* ¶ 78.

91.    Further, attached as Exhibit 13.1 to BBPLC's 2019 Form 20-F was a certification, also signed by Defendant Staley, which is identical to the SOX certification attached to Barclays' 2019 Form 20-F, and stated in full above. *See* ¶ 79.

92.    Defendants' statements concerning Barclays' internal controls over financial reporting contained in ¶¶ 84-89, and the certifications referenced in ¶¶ 90 and 91, were materially false and/or misleading in that they failed to disclose:

(a) that Barclays had no internal controls to track the issuance of VXX shares pursuant to the 2018 and 2019 shelf registration statements;

(b) that Barclays had sold and was continuing to sell unregistered securities in excess of the amounts registered by the 2018 Shelf Registration Statement and the 2019 Shelf Registration Statement;

(c) a material weakness existed in Barclays' internal control environment evidenced by the fact that the over-issuances had occurred; and

(d) that Barclays would be required to halt the sale and issuance of VXX securities.

### 3.   February 18, 2021: FY 2020 Results and Filing of Form 20-F

93.    On February 18, 2021, the same day that Barclays exceeded the limit of its registered securities under the 2019 Shelf Registration Statement, Barclays filed with the SEC its

2020 Annual Report on Form 20-F (the "Barclays' 2020 Form 20-F), which Defendant Morzaria signed.

94.    In the 2020 Form 20-F, Barclays again detailed the Company's purportedly "*robust internal controls*" and highlighted that Barclays had "successfully completed" a three-year program, known as the Barclays Internal Control Environment Programme or "BICEP." Barclays' 2020 Form 20-F at 14. The 2020 Form 20-F explained that BICEP "*was focused on strengthening the internal control environment across the Group*" and, having undergone BICEP, "*[t]he Group's control environment [] now in a much stronger position*." *Id*.

95.    The 2020 Form 20-F also touted that Barclays "*is committed to operating within in strong system of internal control*," and that the Company's "*frameworks, policies, and standards enable Barclays to meet the regulators' expectations relating to internal control and assurance*." *Id.* at 39. Additionally, the Form 20-F stated that "*[m]anagement has assessed the internal control over financial reporting as of 31 December, 2020 [], utilized the criteria set out in the 2013 COSO framework and concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2020*." *Id*. at 40. More succinctly, Barclays repeatedly underscored that "Management has operated within a robust framework for identifying and responding to control issues with appropriate reporting to the Committee and other Board Committees." *Id*. at 14.

96.    Individual Defendants directly managed oversight of Barclays' and BBPLC's internal controls.  Barclays also disclosed that "joint personal objectives" for Defendant Staley included "[e]mpower the effective management of the risks and controls agenda." *Id*. at 69. Similarly, Defendant Morzaria included "[c]ontinue to optimize financial management and reporting (particularly through technology) to drive benefits across the Group," and "[o]verse the

effective management of the risks and controls agenda across Group Finance, Strategy, Tax and Treasury." *Id*. at 14. The 2020 Form 20-F included a Board Audit Committee report. The Board Audit Committee Report stated, "***The Committee reached the conclusion that there are no control issues that are considered to be a material weakness and which merit specific disclosure***." *Id.*  The Board Audit Committee Report further stated, "***The Committee [] evaluated and tracked the status of the more significant control issues through regular reports from the Chief Controls Officer, including updates on the progress of remediation programmes, ongoing COVID-19 related issues and return to office planning***." *Id.* at 19. Finally, the Board Audit Committee Report stated that the Audit Committee "***concluded that, throughout the year ended 31 December 2020 and to date, the Group has operated a sound system of internal control that provides a reasonable assurance of financial and operational controls and compliance with laws and regulations***." *Id*. at 39.

97.     With respect to "Controls over financial reporting," the 2020 Form 20-F reported:

*A framework of disclosure controls and procedures is in place to support the approval of the financial statements of the Group.*

*Specific governance committees are responsible for examining the financial reports and disclosures to ensure that they have been subject to adequate verification and comply with applicable standards and legislation.*

*Where appropriate, these committees report their conclusions to the Board Audit Committee, which debates such conclusions and provides further challenge. Finally, the Board scrutinises and approves results announcements and the Annual Report and ensures that appropriate disclosures have been made. This governance process ensures that both management and the Board are given sufficient opportunity to debate and challenge the financial statements of the Group and other significant disclosures before they are made public.*

*Id*.

98.     Attached as Exhibit 12.1 to the 2020 Form 20-F were certifications, signed by Defendants Staley and Morzaria, which are identical to the language to the certifications attached

to 2019 Form 20-F, which is stated in full above. *See* ¶ 78.

99.    Further, attached as Exhibit 13.1 to the 2020 Form 20-F was a certification, signed by Defendants Staley and Morzaria, which is identical to the one attached to the 2019 Form 20-F, and stated in full above. *See* ¶ 79. In the SOX Certification, Defendants attested to the truthfulness of the statement: "***The Annual Report on Form 20-F for the year ended December 31, 2020 (the "Report") of Barclays fully complies with the requirements of section 13(a) of the Exchange Act of 1934 and information contained in the Report fairly presents, in all material respects, the financial conditions and results of operations of Barclays.***"

100.    Defendants' statements concerning Barclays' internal controls over financial reporting contained in ¶¶ 94-97, and the certifications referenced in ¶¶ 98 and 99, were materially false and/or misleading in that they failed to disclose:

(a) that Barclays had no internal controls to track the issuance of VXX shares pursuant to the 2018 and 2019 shelf registration statements;

(b) that Barclays had sold and was continuing to sell unregistered securities in excess of the amounts registered by the 2018 Shelf Registration Statement and the 2019 Shelf Registration Statement;

(c) a material weakness existed in Barclays' internal control environment evidenced by the fact that the over-issuances had occurred; and

(d) that Barclays would be required to halt the sale and issuance of VXX securities.

### 4.    February 18, 2021: BBPLC's FY 2020 Results and Filings of Form 20-F

101.    On February 18, 2021, BBPLC filed its Annual Report, Form 20-F, for the year ending 2020. ("BBPLC's 2020 Form 20-F").

102.    As in its prior Annual Reports, BBPLC touted that "[t]he Company is committed

39

to operating withing a ***strong system of internal control***." BBPLC's 2020 Form 20-F at 13. The BBPLC Board reassured that "[p]rocesses are in place for identifying, evaluating and managing the Principal Risks facing the Company." *Id*.

103.    The Audit Committee concluded that: "***Throughout the year ended 31 December 2020 and to date, the Company has operated a system of internal control that provides reasonable assurance of effective operations covering all controls, including financial and operational controls and compliance with law and regulations.***" *Id*. Furthermore, "***Management has assessed the internal control over financial reporting as of 31 December 2020. In making its assessment, management utilised the criteria set out in the 2013 COSO framework and concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2020.***" *Id*. The Board also reassured that "[t]here have been no changes in the Barclays Bank Group's internal control over financial reporting that occurred during the period covered by this report, which have materially affected or are reasonably likely to materially affect the Barclays Bank Group's internal control over financial reporting." *Id*. at 14.

104.    In BBPLC's 2020 Form 20-F, the Board again attested that:

The Chief Executive Officer, Jes Staley…conducted with Barclays Bank Group Management an evaluation of the effectiveness of the design and operation of the Barclays Bank Group's disclosure controls and procedures of Barclays Bank PLC as at 31 December 2020, which are defined as those controls and procedures designed to ensure that information required to be disclosed in reports filed or submitted under the US Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the US Securities and Exchange Commission's rules and forms. As of the date of the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the design and operation of these disclosure controls and procedures were effective.

*Id*. at 203.

105.    Attached as Exhibit 12.1 to the 2020 Form 20-F were certifications, signed by

Defendant Staley, which are identical to the language of the certification attached to Barclays' 2019 Form 20-F, which is stated in full above. *See* ¶ 78.

106.    Further, attached as Exhibit 13.1 to BBPLC's 2020 Form 20-F was a certification, also signed by Defendant Staley, which is identical to the SOX certification attached to Barclays' 2019 Form 20-F, and stated in full above. *See* ¶ 79.

107.    Defendants' statements concerning Barclays' internal controls over financial reporting contained in ¶¶ 102-104, and the certifications referenced in ¶¶ 105 and 106, were materially false and/or misleading in that they failed to disclose:

   (a) that Barclays had no internal controls to track the issuance of VXX shares pursuant to the 2018 and 2019 shelf registration statements;

   (b) that Barclays had sold and was continuing to sell unregistered securities in excess of the amounts registered by the 2018 Shelf Registration Statement and the 2019 Shelf Registration Statement;

   (c) a material weakness existed in Barclays' internal control environment evidenced by the fact that the over-issuances had occurred; and

   (d) that Barclays would be required to halt the sale and issuance of VXX securities.

**5.  April 30, 2021: Q1 2021 Results and Filing of Form 6-K**

108.    On April 30, 2021, Barclays issued its Q1 2021 Results Announcement~~) on April 30, 2021;~~, containing financial results for Barclays for the quarter ending March 31, 2021 ("Q1 2021 RA"). Barclays filed a copy of the Q1 2021 RA as an attachment, Exhibit 99.1, to a Form 6-K filed with the SEC on April 30, 2021.

109.    Barclays continued to emphasize that "Barclays remain in a strong capital position." Q1 2021 RA at 5.

110.    The Q1 2021 RA incorporated the 2020 Form 20-F by reference, discussed above in ¶¶ 94-99. Therefore, for the reasons set forth in ¶ 100, the statements in the Q1 2021 RA were materially false and/or misleading for their failure to disclose the true state of Barclays' internal controls.

### 6.   July 28, 2021: Q2 2021 Results and Filing of Form 6-K

111.    On July 28, 2021, Barclays issued its Interim 2021 Financial Results ~~on July 28, 2021; and its Third Quarter~~for the six-month period ending June 30, 2021 ("Q2 2021 RA"). Barclays filed a copy of the Q2 2021 RA as an attachment, Exhibit 99.1, to a Form 6-K filed with the SEC on July 28, 2021.

112.    The Q2 2021 RA incorporated the 2020 Form 20-F by reference, discussed above in ¶¶ 94-99. Therefore, for the reasons set forth in ¶ 100, the statements in the Q1 2021 RA were materially false and/or misleading for their failure to disclose the true state of Barclays' internal controls.

### 7.   October 21, 2021: Q3 2021 Results and Filing of Form 6-K

~~48.~~113.        On October 21, 2021, Barclays issued its Q3 2021 Results Announcement ~~on October 21, 2021. Each of these disclosures incorporated the 2020 Form 20-F by reference and therefore failed to disclose the material weakness in their internal controls over financial reporting.~~ ~~14~~, containing financial results for the nine months ended September 30, 2021 ("Q3 2021 RA").

---

~~14    Barclays    Q1    2021    RA,    available    at www.sec.gov/Archives/edgar/data/312069/0001562762221000175/q121ex991.htm~~: Barclays    Q2    2021    RA,    available    at www.sec.gov/ix?doc=/Archives/edgar/data/0000312069/000031206921000064/bcs-20210630.htm.; Barclays    Q3    2021    RA,    available    at www.sec.gov/Archives/edgar/data/312069/000031206921000089/q321barclaysplc6-kex991.htm.

Barclays filed a copy of the Q3 2021 RA as an attachment, Exhibit 99.1, to a Form 6-K filed with the SEC on October 21, 2021.

114.    The Q3 2021 RA incorporated the 2020 Form 20-F by reference, discussed above in ¶¶ 94-99. Therefore, for the reasons set forth in ¶ 100, the statements in the Q1 2021 RA were materially false and/or misleading for their failure to disclose the true state of Barclays' internal controls.

### 8.   February 23, 2022: FY 2021 Results and Filing of Form 20-F

115.    On ~~or about~~ February 23, 2022, Barclays filed its 2021 ~~Annual Report (~~Form 20-F. ("Barclays' 2021 Form 20-F~~)~~). The 2021 Form 20-F ~~was~~ signed by Defendant Morzaria~~, which also failed to disclose the material weakness in it and its subsidiaries' internal controls, and instead touted the~~ .

116.    The 2021 Form 20-F stated, in pertinent part, that Barclays "*is committed to operating within a strong system of internal control,*" and that the Company's "*frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance*." Barclays' 2021 Form 20-F at 45. Similar to its 2020 Form 20-F, the 2021 Form 20-F stated that "*[m]anagement has assessed the internal control over financial reporting as at 31 December 2021… and concluded that, based on its assessment, the internal control over financial reporting was effective as at 31 December 2021.*" *Id.* at 46.

117.    The 2021 Form 20-F further stated that Barclays' Audit Committee: was charged with "[o]verseeing the integrity of our financial disclosures and the effectiveness of the internal control environment," was "*[k]eenly focused on the Group's internal control environment*" *and* "*continued to oversee the ongoing evolution and enhancement of the internal control environment*." *Id.* at 22.

43

118.    The 2021 Form 20-F also stated within its section on "Risk management and internal control" that "*[t]he Group is committed to operating within a strong system of internal control." Id.* at 45. In the next paragraph, the Annual Report states that "*[p]roccesses are in place for identifying, evaluating and managing the Principal Risks facing the Group in accordance with the 'Guidance on Risk Management, Internal Control and Related Financial and Business Reporting', published by the FRC." Id.* Defendants falsely reassured that "*Group-wide frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance.*" *Id*.

119.    In the 2021 Form 20-F, Barclays also noted in its section on "Effectiveness of internal controls. ~~¹⁵~~." that the Board's Audit Committee "*has concluded that, throughout the year ended 31 December 2021 and to date, the Group has operated a sound system of internal control*

---

~~¹⁵        *See       Barclays      2021       20-F,     available       at* www.sec.gov/Archives/edgar/data/0000312069/000031206922000059/bcs-20211231.html. For instance, it stated that Barclays' Audit Committee is charged with "Overseeing the integrity of our financial disclosures and the effectiveness of the internal control environment," and is "keenly focused on the Group's internal control environment"; the Audit Committee "continued to oversee the ongoing evolution and enhancement of the internal control environment"; the Company "is committed to operate within a strong system of internal control"; and the Company's "frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance."; and Barclays Board Audit Committee "concluded that, throughout the year ended 31 December 2021 the Group has operated a sound system of internal control that provides reasonable assurance of financial and operational controls and compliance with laws and regulations." The Barclays 2021 20-F also affirmatively represented that Barclays Board Audit Committee "concluded that, throughout the year ended 31 December 2021 and to date, the Group has operated a sound system of internal control that provides reasonable assurance of financial and operational controls and compliance with laws and regulations." Attached as Exhibit 12.1 to the Barclays 2021 20-F were certifications pursuant to 17 C.F.R. § 240.13(A)-14(A) signed by Defendants Venkatakrishnan and Morzaria. The text of the certifications were identical to the certifications attached as Exhibit 12.1 to the Barclays 2020 20-F (¶52). Id. at 46. Additionally, the Barclays 2021 20-F stated that "Management has assessed the internal control over financial reporting as at 31 December 2021…and concluded that, based on its assessment, the internal control over financial reporting was effective as at 31 December. 2021." Id. at 23. In fact, there were no internal controls for purposes of ensuring that issuances were registered under prior shelf registrations, for on the same day the 2020 Annual report was filed, Barclays began issuing and selling securities in excess of the authorized amounts under its 2019 Shelf registration in violation of the federal securities laws' registration requirements.~~

*that provides reasonable assurance of financial and operational controls and compliance with laws and regulations." Id.* Within the section on "controls over financial reporting," Defendants represented that "*[a] framework of disclosure controls and procedures is in place to support the approval of financial statements of the group." Id.* at 45.

120.    Attached as Exhibit 12.1 to the Barclays 2021 Form 20-F were certifications signed by Defendants Vakatakrishnan and Morzaria. The text of the certifications was identical to the certifications attached as Exhibit 12.1 to the Barclays 2019 Form 20-F. *See ¶* 78.

121.    Attached as Exhibit 13.1 to the Barclays 2021 Form 20-F was a certification signed by Defendants Vankatakrishnan and Morzaria. The text of the certification was identical to the certification attached as Exhibit 13.1 to the Barclays 2019 Form 20-F, except the certification was made for the Barclays 2021 20-F. *See* ¶ 79.

122.    Defendants' statements concerning Barclays' internal controls over financial reporting contained in ¶¶ 116-119, and the certifications referenced in ¶¶ 120 and 121, were materially false and/or misleading in that they failed to disclose:

(a) that Barclays had no internal controls to track the issuance of VXX shares pursuant to the 2018 and 2019 shelf registration statements;

(b) that Barclays had sold and was continuing to sell unregistered securities in excess of the amounts registered by the 2018 Shelf Registration Statement and the 2019 Shelf Registration Statement;

(c) that a material weakness existed in Barclays' internal control environment evidenced by the fact that the over-issuances had occurred; and

(d) that Barclays would be required to halt the sale and issuance of VXX securities.

**9.   February 23, 2022: BBPLC's FY 2021 Results and Filing of Form 20-F**

49.123.    On February 23, 2022, BBPLC filed its Annual Report, Form 20-F, for the year ending in 2021. ("BBPLC's 2021 Form 20-F").

124.    As in prior Annual Reports, the Board stated: "The Company is committed to operating within a ***strong system of internal control***." BBPLC's 2021 Form 20-F at 13.

125.    BBPLC's 2021 Form 20-F reassured:

A framework of disclosure controls and procedures is in place to support the approval of the financial statements of the Barclays Bank Group. Specific governance committees are responsible for examining the financial reports and disclosures to ensure that they have been subject to adequate verification and comply with the applicable standards and legislation.

*Id*. at 12.

126.    The Audit Committee concluded that "***Throughout the year ended 31 December 2021 and to date, the Company has operated a system of internal control that provides reasonable assurance of effective operations covering all controls, including financial and operational controls and compliance with laws and regulations.***" *Id.* Furthermore, "***Management has assessed the internal control over financial reporting as at 31 December 2021. In making its assessment, management utilised the criteria set out in the 2013 COSO framework and concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2021.***" *Id.*

127.    The Board also noted that "[t]here have been no changes in the Barclays Bank Group's internal control over financial reporting that occurred during the period, covered by this report, which have materially affected or are reasonably likely to materially affect the Barclays Bank Group's internal control over financial reporting." *Id.*

128.    BBPLC's 2021 Form 20-F also noted that Defendant Venkat was appointed as CEO in November 2021. *Id*. at 13. Furthermore, it attested that:

> The Chief Executive, C.S. Venkatakrishnan…conducted with Barclays Bank Group Management an evaluation of the effectiveness of the design and operation of the Barclays Bank Group's disclosure controls and procedures of Barclays Bank PLC as at 31 December 31, which are defined as those controls and procedures designed to ensure that information required to be disclosed in reports filed or submitted under the US Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the US Securities and Exchange Commission's rules and forms. As of the date of the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the design and operation of these disclosures and procedures were effective.

*Id.* at 207.

129.    Attached as Exhibit 12.1 to the 2021 Form 20-F were certifications, signed by Defendant Venkat, which are identical to the language of the certification attached to Barclays' 2019 Form 20-F, which is stated in full above. *See* ¶ 78.

130.    Further, attached as Exhibit 13.1 to BBPLC's 2021 Form 20-F was a certification, also signed by Defendant Venkat, which is identical to the SOX certification attached to Barclays' 2019 Form 20-F, and stated in full above. *See* ¶ 79.

131.    Defendants' statements concerning Barclays' internal controls over financial reporting contained in ¶¶ 124-128, and the certifications referenced in ¶¶ 129 and 130, were materially false and/or misleading in that they failed to disclose:

(a) that Barclays had no internal controls to track the issuance of VXX shares pursuant to the 2018 and 2019 shelf registration statements;

(b) that Barclays had sold and was continuing to sell unregistered securities in excess of the amounts registered by the 2018 Shelf Registration Statement and the 2019 Shelf Registration Statement;

(c) a material weakness existed in Barclays' internal control environment evidenced by the fact that the over-issuances had occurred; and

(d) that Barclays would be required to halt the sale and issuance of VXX securities.

**E.      BBPLC Abruptly Suspends Sales of VXX ETNs and Creates a Short Squeeze**

132.    On March 8, 2022, a member of Group Treasury at Barclays reached out to a member of the legal department asking about the available securities from the 2019 Shelf because Group Treasury was planning a sale of corporate debt securities. SEC 2022 Order, ¶ 29. After Barclays attempted to calculate the total amount of securities offered and sold from the 2019 Shelf, "it became clear to all involved that there was no internal control in place to track in real time the amount of securities offered and sold against the amount of securities registered." *Id*. ¶ 30. Around March 9, 2022, Barclays' senior managers were informed of the company's major failure and that it had issued and sold billions of unregistered securities, 48ncludeng VXX notes.

133.    On March 14, 2022, Barclays and BBPLC "alerted the regulators about the over-issuance and disclosed to the market that BBPLC did not have sufficient issuance capacity to support further sales from inventory and any further issuances of certain ETNS," including VXX. *Id*. ¶ 31. This disclosure was made approximately seventeen minutes before the VXX securities market opened on March 14, 2022, and stated that Barclays and BBPLC were "immediately suspending until further notice, any further sales from inventory and further issuances" of securities, specifically including "VXX ETNs and another of its most popular ETNs that tracked the price of crude oil." Barclays further stated that the immediate suspension of VXX sales was because "Barclays does not currently have sufficient issuance capacity to support further sales from inventory and any further issuances of ETNs." *Id*.

134.    Barclays' shocking suspension of further VXX ETNs had the predictable and foreseeable effect of causing the price of VXX securities to rise sharply relative to its indicative value, as buyers came to appreciate that Barclays and BBPLC could no longer serve its critical function of selling additional securities upon the price rising above its indicative value. A

significant short squeeze ensued.

135.    In the hours that followed, the market price of VXX securities skyrocketed, rising to more than 140% of its indicative value—higher than any price deviation in the security's history.[16] The security's price remained untethered from its indicative value for months, until Barclays and BBPLC were once again allowed to issue VXX securities, in September 2022.

136.    In a March 15, 2022 note, Goldman Sachs's analyst explained the impact of Barclays' and BBPLC's abrupt suspension:

> As long as this suspension remains in place, the creation/redemption mechanism that typically keeps the VXX share price close to its [indicative value] will only work in one direction: one can redeem shares for a cash payment equal to their [indicative value], setting [it] as a floor on the share price, but one can no longer create shares at [indicative value]. This leaves the potential for the share price to exceed its [indicative value] because of the shares' scarcity.the [17]

137.    Lead Plaintiff was forced to close out his position and sustain substantial losses – losses entirely unrelated to the position he took on market volatility. Indeed, had the price of the VXX securities remained tethered to its indicative value, the call options that Lead Plaintiff sold would have expired "in the money"—without being exercised, since the indicative value of the security never exceeded the strike prices of the options.

**F.    The Aftermath**

**1.    Defendants Offer to Compensate Investors Who Were Long VXX Securities, Rather Than Those Short VXX Securities**

---

[16] Barclays further admitted that prior to March 31, 2022, it put on specific hedges to offset the costs of illegally selling billions of dollars of unregistered securities. In its 2022 half year regulatory filing, Barclays estimated that the costs of the over-issuance to be £ 1.5 billion, which was "substantially offset by £0.8bn of income from hedging arrangements" put on after discovery of the over-issuance. Interim Results Announcement, Form 6-F, for Second Quarter of 2022, filed July 28, 2022 ("Q2 2022 RA") at 2. These hedging arrangements were essentially bets against short sellers of VXX like Lead Plaintiff and the Class, thereby contributing to the rapid and sustained rise in price of VXX securities following the March 14, 2022 disclosure.

[17] R. Wigglesworth, Barclays' Galaxy -Brain Structured Notes Screw-up Explained, Financial Times (4/1/22) https://www.ft.com/content/f6422619-fd92-4a32-9ffd-6bd3cfbb083c

138.    While investors that were "long" the security benefited from Barclays' suspension of sales, because the price of the security rose relative to its indicative value, Barclays nonetheless was required by SEC regulation to offer to rescind any purchases by direct purchasers who bought the unregistered securities from Barclays and who had lost money in the subsequent months.

139.    On July 25, 2022, Barclays issued a one-paragraph press release announcing that "BBPLC expects to commence a rescission offer on 1 August 2022 to eligible purchasers of c.U.S.$17.6 billion of relevant securities issued in excess of amounts registered by BBPLC under its U.S. shelf registration statements." This public announcement was formalized in Barclays' Prospectus Supplement, Form 6-K, filed prior to the market opening on August 1, 2022 ("Rescission Offer"), which was amended on August 12, 2022. This Offer expired on September 12, 2022.[18]

140.    According to the Rescission Offer, Barclays offered to give direct purchasers of the securities who had sold the affected securities, "at a loss: an amount equal to the excess, if any, of the amount you paid for such Subject Security over the proceeds from the subsequent sale, redemption or maturity of each such Subject Security, *plus* interest." Rescission Offer at 1. Months later, the Company filed a Form 6-K on September 15, 2022 ("September 2022 Form 6-K") disclosing that investors of the impacted structured notes validly submitted claims valued at nearly $7.7 billion.

141.    Thus, direct purchasers of VXX securities from Barclays received a windfall—they

---

[18]  The Rescission Offer further disclosed that from February 18, 2021, through March 14, 2022, BBPLC sold $16.37 billion of unregistered securities in excess of the maximum $20.8 billion of securities registered under the August 2019 Shelf Registration Statement (for a total of approximately $37 billion). *Id*. at S-6, S-25. The Rescission Offer also disclosed that BBPLC sold an additional $1.27 billion of unregistered securities in excess of the maximum registered pursuant to the 2018 Shelf Registration Statement. *Id.*

got their money back and interest, even though their original bet proved directionally incorrect; while short sellers, whose investment was directionally correct and suffered actual harm due to Barclays' and BBPLC's abrupt suspension of further issuances, got nothing. Worse, in at least one respect, Barclays benefited from its suspension, because the halting of further issuances caused the price of the security to rapidly rise and remain elevated, thereby reducing the losses Barclays had to otherwise pay direct purchasers under its legally mandated Recission Offer. Stated differently, if Barclays had not suspended further issuances and the price of VXX securities remained tethered to its indicative value, the cost of Barclays' Recission Offer would have been even higher.

**2. Defendants Admit to Recklessness**

142. In the months following March 14, 2022, Defendants issued a series of admissions relating to their lack of internal controls and their issuances of unregistered securities. In these statements, Defendants acknowledge their responsibility and admit reckless disregard in their misconduct during the Class Period.

143. For example, Defendants admitted that:

a) BBPLC began selling in excess of the $20.76 billion maximum issuance capacity as early as February 18, 2020, and that "securities issued in excess of the limit are considered to be 'unregistered securities' for the purposes of US securities law…" First Quarterly Report for 2022, filed April 28, 2022 ("Q1 2022 RA");

b) "management has concluded that, by virtue of the fact that the over-issuances occurred and was not immediately identified, both BPLC and BBPLC had a material weakness in relation to certain aspects of their internal control environment and, as a consequence, their internal control over financial reporting for the year ended 31 December 2021 was not effective…" *Id.*;

c)  BBPLC amended its 2021 Form 20-F on May 23, 2022, to "amend the disclosure…to reflect management's conclusion that the Company's **internal control over financial reporting and disclosure controls and procedures were not effective under the applicable Committee of Sponsoring Organizations (COSO) Framework as of 31 December 2021 due to a material weakness in the Company's internal control over financial reporting** identified subsequent to the Original Filing Date **as a result of the Over-issuance of Securities having occurred and not been immediately identified**." BBPLC's 2021 Form 20-F/A at Explanatory Note.

d)  "…we do not get everything right. Let me say a few words about our recently reported failure to comply with SEC registration requirements, a failure which has cost us hundreds of millions of pounds, and more in reputation…. **This is not rocket science** and we can and will do better, learning from this particular issue and applying discipline across all our controls." Nigel Higgins, Chairman of Barclays, 2022 Annual General Meeting, May 4, 2022;

e)  "…First, all of us here were dismayed that, after so much progress, we had this entirely self-inflicted problem. We have not yet finished the review, but I believe that we will find that, in all our complexities, **we missed some simple tasks.** Defendant Venkat, 2022 Annual General Meeting, May 4, 2022;

f)  "**This situation was entirely avoidable and I am deeply disappointed that it occurred.** The necessity of a strong controls culture has never been clearer to me." CEO Venkat, 2022 Annual General Meeting, May 4, 2022;

g)  "…management has concluded that, by virtue of the fact that there was a weakness in controls over the identification of external regulatory limits related to securities issuance

and monitoring against these limits, the Barclays Bank Group had a material weakness in relation to certain aspects of its internal control environment, and, as a consequence, its internal control over financial reporting and disclosure controls and procedures as at 31 December 2021 were not effective." Interim Results Announcement, Form 6-F, for Second Quarter of 2022, filed July 28, 2022 ("Q2 2022 RA") at 5, 6;

h) "[t]he material weakness that has been identified relates to a weakness in controls over the identification of external regulatory limits related to security issuance…**As a result of this weakness,** Barclays Bank PLC issued securities in excess of the amount under the U.S. shelf registration statements…" *Id*. at 5;

i) "the issuance of securities in excess of the maximum aggregate offering price for Barclays Bank PLC's 2019 U.S. Shelf **resulted from a failure to monitor issuances during the period in which Barclays Bank PLC's status changed from a 'well-known seasoned issuer' to an 'ineligible issuer' for U.S. securities law purposes…**" *Id*. at 29;

j) "…while the majority of over-issuance occurred under the 2019 Shelf, a small portion of the over-issuance also occurred under the Predecessor Shelf." *Id*. at 5-6, 30; and "The over-issuance occurred because Barclays did not put in place a mechanism to track issuances after BBPLC became subject to a limit on issuance. Among the principal causes of the over-issuance were, **first, the failure to identify and escalate to senior executives the consequences of the loss of well-known issuer status and, secondly, a decentralized ownership structure for securities issuances."** Form 6-K, filed September 30, 2022. ("Sept. 2022 Form 6-K")

144.    Defendants' admissions underscore the fact that they knew or were deliberately reckless in failing to implement appropriate internal controls and/or discover the over-issuances;

or, alternatively, to apprise the market of the lack of such controls and that they had sold billions of dollars of unregistered securities.

### 3.    Further indicia of Recklessness

#### (b)    Barclays agrees to settle the related SEC action and admits to having no internal controls regarding tracking issuances and to issuing billions of dollars of unregistered securities

145.    Similar to the $97 million settlement with the SEC in 2017, on September 29, 2022, the SEC ordered cease-and-desist proceedings against Barclays and BBPLC concerning "BBPLC's failure to put into place any internal control around the real-time tracking of securities being offered or sold off of its Commission-registered shelf registration statement." *In the Matter of Barclays PLC and Barclays Bank PLC* (SEC Sept. 29, 2022), ⁋ 1.

146.    The SEC 2022 Order, which included the settlement between Barclays and the SEC, highlighted that "[a]t the time of the registration of both the 2018 Shelf and the 2019 Shelf, certain BBPLC personnel recognized the need to accurately record relevant information about securities that were offered or sold so as to be able to track the aggregate amount of securities that were cumulatively offered and sold from each respective [s]helf on a real-time basis." *Id.* ⁋ 5. Such tracking would "ensur[e] that BBPLC did not offer or sell any securities in excess of what had been registered." *Id.* Yet, "no internal control was established" and "the amount of securities that were offered and sold was not tracked." *Id.*, ⁋ 24.

50.147.    The SEC's Order states, "Noinvestigation exposed that "[n]o internal control was established to address this issue, and the amountamounts of securities that were offered and sold was not tracked" by BBPLC or Barclays. *Id.*, ⁋ 5. As a result, **beginning on or around June 26, 2019**, BBPLC offered and sold securities in excess of the amount remaining on the 2018 Shelf, ultimately leading to BBPLC offering and selling approximately $1.3 billion of securities

in excess of what was registered with the SEC on the 2018 Shelf. ~~SEC Order, ¶~~*Id.*, ¶ 6.

~~51.~~148.        Due to its failure to establish any internal controls to track the amount of securities that were offered or sold on a real-time basis, BBPLC sold and continued to illegally sell unregistered securities in excess of the amounts authorized by the 2019 Shelf as well. Thus, "**beginning on or around January 28, 2021**, BBPLC offered and sold securities in excess of what was registered on the 2019 Shelf. Over the next 14-month period, BBPLC offered and sold approximately $16.37 billion of securities in excess of what was registered with the Commission on the 2019 Shelf~~.~~." *Id.*, ¶¶ 7.

~~15.      As a result of Barclays and BBPLC having no internal controls for purposes of ensuring that issuances were registered under existing shelf registrations, Barclays and BBPLC repeatedly violated the federal securities laws and SEC regulations by issuing billions of dollars of unregistered securities into the market place. And as a consequence of having failed to register billions of dollars of securities, Barclays was legally prohibited from issuing any further VXX securities, which (as described earlier) is necessary to keep the VXX price tethered to its indicative value.~~

~~D.      Barclays Alerts the SEC of Internal Control Failures, Leading to its Suspension of Further VXX Sales.~~

~~16.      On March 9, 2022, BBPLC discovered that it failed to have internal controls in place necessary to track its issuances and sales of securities from its multi-billion-dollar shelf registration statements. On March 10, 2022, Barclays senior managers were informed of the company's failure to track sales and issuances off its shelf registrations, and that it had issued and sold billions of dollars of unregistered securities, including VXX notes. Yet it was not until March 14, 2022, that Barclays and BBPLC "alerted the regulators about the over-issuance and disclosed~~

~~to the market that BBPLC did not have sufficient issuance capacity to support further sales from inventory and any further issuances of certain ETNs" including VXX. SEC Order, ¶31.~~

149. ~~That public disclosure was made approximately seventeen minutes before the VXX market opened on March 14, 2022, in which Barclays stated that it and BBPLC were "immediately suspending until further notice, any further sales from inventory and further issuances" of securities, specifically including "VXX ETNs and another of its most popular ETNs that tracked the price of crude oil." Barclays further stated that the immediate suspension of VXX sales was not based on the substantial increase in market volatility following Russia's February 26, 2022, invasion of Ukraine (which increased VXX's daily trading float to nearly $1 billion a day), but only that it was because "Barclays does not currently have sufficient issuance capacity to support further sales from inventory and any further issuances of ETNs."~~The SEC required Barclays to adopt and implement the "BBPLC Shelf Review recommendations" which include:

(a) the centralization of oversight of BBPLC's SEC-registered shelves in Group Treasury;

(b) the maintenance of clear minimum control requirements for BBPLC's SEC-registered shelves, including, but not limited to, a process for reviewing any change in WKSI status for BBPLC and the tracking of offers and sales of BBPLC's SEC-registered shelves as appropriate; and

(c) the maintenance of data repository, with appropriate controls and governance designed to ensure reliability of the data, for the purpose of tracking offers and sales, as appropriate, off of BBPLC's SEC-registered shelves.

*Id.* at p. 10.

150. Furthermore, the SEC 2022 Order also instructed Barclays to complete an audit of its "policies and procedures and internal controls relating to compliance with Section 5 of the

Securities Act in connection with Barclays' SEC-registered shelves to confirm the adoption and implementation" of the procedures described in the SEC 2022 Order and to submit an Internal Audit Report to the BBPLC Board of Directors Audit Committee. *Id*. The SEC further directed Barclays to certify, in writing, compliance with the procedures described in the Order no later than thirty days after the Internal Audit report was submitted to the BBPLC Audit Committee. *Id*.

17.    As part of this SEC Order *Id*.

18.    Barclays' shocking suspension and halt of further VXX sales had the predictable effect of causing the price of VXX to rise sharply, and to keep rising far above its indicative value, as it became untethered to the VIX volatility index. This was due to the fact that the VXX market knew that due to BBPLC's suspension it could no longer serve the essential market making function of selling additional VXX notes to increase supply when the price rose above its indicative value. A significant short squeeze then ensued.

19.    Without BBPLC being ready and able to sell new notes to drive down its price, the market price of VXX skyrocketed, rising to more than 140% of its indicative value. Plaintiff was forced to close out his position and sustain substantial losses—losses entirely unrelated to the position he originally took on market volatility. Indeed, had the price of the VXX remained tethered to its indicative value, Plaintiff's position would have been "in the money."

52.1.    In a March 15, 2022 note, Goldman Sachs's analyst explained the expected impact as a result of BBPLC's immediate suspension of selling any more VXX notes:

> As long as this suspension remains in place, the creation/redemption mechanism that typically keeps the VXX share price close to its [indicative value] will only work in one direction: one can redeem shares for a cash payment equal to their [indicative value], setting [it] as a floor on the share price, but one can no longer create shares at [indicative value]. This leaves the potential for the share price to exceed its [indicative value] because of the shares' scarcity. R. Wigglesworth, Barclays' Galaxy Brain Structured

Notes Screw-up Explained, Financial Times (4/1/22) https://www.ft.com/content/f6422619-fd92-4a32-9ffd-6bd3cfbb083c

E.    Barclays and BBPLC's Subsequent Disclosures and Admissions

20.    Not until two weeks after its VXX suspension did Barclays begin to answer the pressing question of why it imposed the VXX suspension. On March 28, 2021, Barclays and BBPLC finally admitted to the public that due to their failure to put into place internal controls necessary to track in real time BBPLC's securities offerings and sales from its shelf registrations, BBPLC had illegally offered and had sold more than $17 billion worth of unregistered securities in excess of its shelf registrations' capacity.[19]

21.    The materiality of this news was reflected in VXX trading at a large premium to its indicative value, and for a sustained period, due to the lack of supply as a result of BBPLC not issuing new ETNs, and further reflected in the loss of nearly 90% of VXX's daily trading volume. As of March 28, 2022, approximately two weeks after its announcement, VXX still traded at a 30% premium to its indicative value, with trading volumes down dramatically since Barclays' March 14th suspension of selling additional VXX ETNs.

22.    On April 28, 2022, Barclays issued its First Quarterly report for 2022, which disclosed that BBPLC began selling in excess of the $20.76 billion maximum issuance capacity as early as February 18, 2021, and that "securities issued in excess of the limit are considered to be 'unregistered securities' for the purposes of US securities law," giving rise to the right of rescission for all purchasers of such securities. Barclays Q122 at 37.[20]

---

[19] 3/28/22 Barclays and BBPLC Press Release, "Impact of over-issuance under BBPLC US Shelf", and filed with the SEC on Form 6-K on March 28, 2022 , available at www.sec.gov/Archives/edgar/data/0000312069/000165495422003926/a1574gn.htm
[20] See www.sec.gov/Archives/edgar/data/312069/000031206922000073/version2-barclaysplc6xkcom.htm

58

23.    Barclays also disclosed in its interim financial results for the quarter ending June 30, 2022, that BBPLC also exceeded the maximum issuance capacity of 2018 Shelf by $1.2 billion, and Barclays nearly tripled its estimated liability exposure by "an additional provision of £1.3bn for the expected rescission costs related to the over-issuance of securities". Barclays 2Q22 Form 6k, at p.3.

24.    Barclays further admitted that it put on specific hedges to protect itself from the costs of the over issuance, which in its 2022 half year regulatory filing it estimated to be £1.5 billion. Specifically, Barclays disclosed that it put on specific "hedging arrangements" by the end of March 2022 and these hedging arrangements generated a profit of over $900 million: These hedging arrangements were essentially bets against short sellers of VXX like Plaintiff and may have further increased their damages by further inflating the price of VXX above its indicative value.

F.    Barclays Admits its Massive Over-Issuance and Sales of Unregistered Securities Was Due to its Failure to Put into Place or Maintain Adequate Internal Controls.

25.    Barclays and BBPLC admitted that BBPLC's massive over-issuance of unregistered securities was due to their failure to put into place and maintain proper internal financial and reporting control functions that, among other things, accounted in real time for BBPLC's securities sales and the remaining shelf issuance capacity. As Barclays admitted, "The over-issuance occurred because Barclays did not put into place a mechanism to track issuances after BBPLC first became subject to limits on issuance [in 2019]. Among the principal causes of the over issuance were, first, a failure to identify and escalate to senior executives the consequences of the loss of well-known issuer status and, secondly, a decentralized ownership

structure for securities issuances."²¹ This was particularly troubling since risk tracking and management was crucial to BBPLC's business, and it and its parent, Barclays, had made vast expenditures of time and money in purportedly strengthening its internal risk controls since 2016.

53.151.    On or about September 29, 2022, Barclays and BBPLC agreed to a $361 million settlement with the SEC, including a $200 million fine, to resolve the SEC's enforcement action against them for their "failure to put into place any internal control around the real-time tracking of securities being offered or sold off of its Commission-registered shelf registration statements" which led to BBPLC selling "an unprecedented amount of securities---cumulatively totaling approximately $17.7 billion in excess of what it had registered with the Commission, in violation of Sections 5(a) and(c) of the Securities Act…[and leading Barclays to] restate their year-end audited financial statements."²² *Id.* ¶ 1. As the Director of the SEC's Division of Enforcement stated in releasing news of the settlement, "This case highlights why it is essential for firms like Barclays to have robust internal controls over their offers and sales of securities….[T]he control deficiencies and the scope of the conduct at issue here was simply staggering." 9/28/22 SEC Press Release, "Barclays Agrees to a $361 Million Settlement to Resolve SEC Charges Relating to Over-Issuances of Securities", https://www.sec.gov/news/press-release/2022-179.²³

26.    As set forth in the Barclays' SEC settlement, BBPLC knew that it had to put into place internal controls to track real time securities offerings and maintaining issuance capacity

---

²¹ Barclays' 9/30/22 filing entitled "Update on over Issuance under Barclays Bank PLC U.S. Shelf", available at https://home.barclays/content/dam/home-barclays/documents/investor-relations/IRNewsPresentations/2022News/20220930-Update-on-over-issuance-under-BBPLC-US-Shelf.pdf.

²² SEC Cease and Desist Order, ¶ 1, *In Re Barclays PLC and Barclays Bank PLC, File No. 3-1181* (9/29/22 SEC Admin Order) (emphasis added).

²³ 9/28/22 SEC Press Release, "Barclays Agrees to a $361 Million Settlement to Resolve SEC Charges Relating to Over-Issuances of Securities", https://www.sec.gov/news/press-release/2022-179.

~~under its shelf registrations but, "no internal control was established to address this issue, and the amount of securities that were offered and sold was not tracked." *Id*. As a result, BBPLC offered and sold billions of securities in excess of the 2018 and 2019 Shelf registrations' authorizations. SEC Order, ¶¶5-6.~~

~~G.    Defendants' Admit That They Issued a Large Amount of Unregistered Securities for a Significant Period Prior to March 14, 2022~~

152.    Significantly, the SEC 2022 Order refers to the tracking of offers and sales of securities as an "internal control" function, lending further support to Plaintiff's contention that Barclays' statements, highlighted above, concerning having "robust internal controls" were indeed misleading, inaccurate and incomplete.

### (c)    Defendants claw back compensation

153.    Finally, a week after the Rescission Offer expired, on September 19, 2022, Barclays began issuing additional shares of VXX.

154.    Prior to the market opening on February 15, 2023, in its Annual Report, Form 20-F, for the year ended 2022 ("2022 Form 20-F"), Barclays disclosed that it:

> Considered regular updates on the Over-Issuance of Securities, including its financial impact and associated hedging arrangements, the implications of the Over-Issuance of Securities for the Company's financial statements, including the approval of the restatement of the BBPLC 2021 financial statements included in the amended annual report on Form 20-F for the year ended 31 December 2021. ***The Board also approved the launch of the rescission offer and had oversight of the remediation of the material weakness in internal control over financial reporting which led to the Over-Issuance of Securities***, as well as work required to address the specific requirements of the [SEC], set out in its order of 29 September 2022. The Board also reviewed the findings of a review by external counsel of the facts and circumstances relating to the Over-Issuance of Securities and, among other things, the control environment related to such issuances.

2022 Form 20-F at 9.

155.    In fact, one of the principal activities of the Board's Risk Committee included "[c]onsidering updates on the Over-Issuance of Securities, including the hedging arrangements

designed to manage the risks to Barclays arising out of the rescission offer." *Id*. at 12. The Audit Committee also had direct oversight of internal controls relating to financial reporting. *Id*.

156.    In the aftermath of this blunder that cost the Defendants billions of dollars in remediation, the Board's conclusion was: "Whilst the control environment was determined to be effective, the Over-Issuance of Securities underlined to the Board the need to continue to focus on embedding Barclays' Values and Mindset at all levels of the Barclays Bank Group to achieve operational and controls excellence." *Id*. at 14. The Board also delineated the additional changes made to their internal environment. *Id*. at 15.

157.    Barclays also revealed that the Company was clawing back compensation from Defendant Venkat and Defendant Morzaria by a combined £1 million ($1.2m) due to regulatory errors and oversights, including the over-issuance. Specifically, the Company decreased 2022 bonus for Defendant Venkat by £403,000 and prior compensation awards from Defendant Morzaria. *Id*. at 125.

158.    In the 2022 Form 20-F, Brian Gilvary, the Chair of the Barclays Boards' Remuneration Committee specified:

> The Over-issuance of Securities under BBPLC's US shelf registration statements was a deeply disappointing feature of 2022. A review of the facts and circumstances was completed by external counsel and the Committee has taken the findings of that review seriously. We have **thoughtfully and deliberately adjusted our remuneration decisions to ensure that this over-issuance matter is reflected.**

*Id.* at 120 (emphasis added).

159.    Notably, after an internal investigation, "[t]he [Remuneration] Committee exercised its discretion not to exclude the impacts associated with the Over-issuance of Securities in the US or the monetary penalties imposed by the SEC and CFTC for the use of unauthorized business communications channels." *Id.* at 125.

27.    On May 4, 2022, Barclays held its 2022 Annual General Meeting (AGM), where Nigel Higgins, Chairman of Barclays, and Defendant C.S. Venkatakrishnan, Barclays's Chief Executive, addressed investors in their 2022 AGM Statements. In his 2022 AGM Statement, Higgins addressed the over-issuance:

> As I have said before, we do not get everything right. Let me say a few words about our recently reported failure to comply with SEC registration requirements, a failure which has cost us hundreds of millions of pounds, and more in reputation. First, all of us here were dismayed that, after so much progress, we had this entirely self-inflicted problem. We have not yet finished the review but I believe that we will find that, in all our complexities, we missed some simple tasks. This is not rocket science and we can and will do better, learning the lessons from this particular issue and applying discipline across all of our controls.[24]

28.    CEO Venkatakrishnan also addressed the over-issuance in his remarks on May 4, 2022, saying that:

> This situation was entirely avoidable and I am deeply disappointed that it occurred. The necessity of a strong controls culture has never been clearer to me. In fact, we have made considerable progress improving our controls since 2016. So, the fact that this happened is particularly upsetting.

29.    Barclays' senior management's admissions that the over-issuance was entirely avoidable, and that it was not "rocket science" to stop the over-issuance from taking place, confirms that the Defendants were severely or deliberately reckless in failing to ensure internal controls were in place to stop the over-issuance.

30.    On September 19, 2022, more than six months after first halting further issuances of VXX ETNs, Barclays announced that it would once again issue new VXX securities.

---

[24] See Barclays 2022 AGM Statement, available at home. Barclays/content/dam/home-barclays/documents/investor-relations/IRNewsPresentations/2022News/20220504-Barclays-AGMstatements-2022.pdf.

Predictably, the market price of VXX immediately returned to its indicative value. By that time, however, the damage was done. Traders (including the vast majority of short sellers) had long left the security, with daily trading volumes but at a fraction of what they were on March 13, 2022.

## III.V.  ADDITIONAL SCIENTER ALLEGATIONS

160.    The fact that Barclays and BBPLC did not have controls and had issued billions of dollars of unregistered securities under its 2018 and 2019 Shelf Registrations was material to VXX short investors.

54.161.        As alleged herein, during the Class Period, Defendants acted with scienter in that Defendants knew, or were reckless in not knowing and/or failingshould have known that they had no internal controls in place to track the sale of VXX, which it failed to disclose material information during the Class Period..

55.162.        Among other things, each Defendant knew that the issuing and selling of securities ishas been and continues to be a core business of Barclays and BBPLC, and that since they no longer enjoyed WKSI status, BBPLC's shelf registrations  no longer being a WKSI issuer   were were critical to this core business of issuing and selling securities. The language included in Barclays' Waiver Requests, including the one for 2017, reflects Defendants' awareness of the burdens to their business operations that would arise from losing its WKSI status. As Barclays described, "The WKSI shelf[] process …provides an important means of accessing capital and funding for Barclays' global operations." More specifically, as noted in prior Waiver Requests, since 2011, 89% of all regulatory capital securities issued by Barclays was issued off the WKSI shelf and losing the status would affect its $68 billion business of securities it was issuing off of the WKSI shelf. *See supra*, ¶ 58.

163.    Moreover, Barclays itself recognized that loss of WKSI status would "curtail

important channels of communication to investors," weaken the Company's ability to respond to "current regulatory and market conditions and uncertainties that are significantly transforming the landscape for financial institutions like Barclays," and harm "the speed at which Barclays could strengthen its capital position if require[d] to do so" by a financial regulator. *See* ¶ 59.

~~56.~~164.    Barclays and BBPLC were responsible for creating, and all Defendants were responsible for overseeing, Barclays' and BBPLC's internal controls ~~over financial reporting~~. Even though Barclays and BBPLC were experts in the registration requirements of the federal securities laws by virtue of being serial issuers who issued and sold ~~between $10 billion and $15 billion~~tens of billions of newly issued securities each year, they and the Individual Defendants utterly failed or recklessly disregarded the need to implement "simple" control procedures to ensure that the "entirely avoidable" over-issuance of billions of dollars of unregistered securities above the maximum amount of securities registered under Barclays March 2018 and August 2019 Shelf Registration Statements did not occur. *See supra,* ¶ 143(f). As admitted by Nigel Higgins, Chairman of Barclays, "this is not rocket science." *See supra*, 143(d)

165.    Barclays' Form Amendment to and original 20-F filings on in 2018 also make clear that the Defendants were aware of the additional burdens created by losing its WKSI status. *See supra*, ¶¶ 64-66. Specifically, considering that in 2018 the Board filed an amendment admitting to its loss of WKSI status, there is no doubt that Defendants were aware of the additional securities obligations resulting from losing WKSI status. The SEC 2022 Order exposed and confirmed that "[f]ollowing the loss of WKSI status, certain personnel from BBPLC understood the consequences of this status change, including that they should consider implementing a mechanism to track offers and sales of securities off any shelf." *See supra*, ¶ 63.

166.    Individual Defendant Staley served as the Company's CEO from December 2015

through October 2021 (including the entire time Barclays was an ineligible issuer), throughout which time he signed the SOX Certifications associated with the Company's Form 20-F filings. He also functioned as the CEO of BBPLC (the Barclays subsidiary at which the over-issuances occurred) from March 2019 through October 2021. Furthermore, as CEO, Defendant Staley attested in BBPLC's 2019 and 2020 Form 20-Fs that he, along with the CFO, had "conducted…an evaluation of the effectiveness of the design and operation of the Barclays Bank Group's disclosure controls and procedures of Barclays Bank PLC." *See* ¶¶ 88, 104.

167.    Individual Defendant Venkat served as the Company's Chief Risk Officer from May 2017 to May 2020 (including the entire time Barclays was an ineligible issuer); the Co-President of BBPLC from October 2020 to October 2021; and the CEO of Barclays after October 2021; he thereafter signed the SOX Certifications associated with the Company's Form 20-F filings in Staley's place. Furthermore, as CEO of BBPLC, Defendant Venkat attested in BBPLC's 2021 Form 20-F that he, along with the CFO, had "conducted…an evaluation of the effectiveness of the design and operation of the Barclays Bank Group's disclosure controls and procedures of Barclays Bank PLC." *See* ¶ 128.

168.    Individual Defendant Morzaria was the Group Finance Director (the most senior finance position at Barclays) throughout the time that Barclays was an ineligible issuer and when the bulk of the alleged misstatements were made; he signed the SOX Certifications associated with both 2020 and 2021 Form 20-Fs.

169.    As early as February 2018, Defendants were clearly on notice of at least two material weaknesses within their internal controls environments: (1) a failure to identify and escalate to senior executives the consequences of the loss of WKSI status; and (2) a decentralized ownership structure for securities issuances. During the entire Class Period, Defendants unlawfully

66

failed to disclose these material weaknesses.

57.170.        Defendants further knew or were reckless in not knowing that VXX short sellers would be substantially harmed should ~~it~~they be forced to stop fulfilling ~~its~~their vital market ~~function~~issuer of being ready and able to issue new securities whenever the price of the ETN rose above its indicative value.

58.171.        Barclays and the Individual Defendants were reckless in supervising BBPLC's offering and sales of securities, and their supervisory failures are especially noteworthy because they knew the severe consequence to investors in their securities should they fail to comply with the securities laws' registration requirements.

~~31.    Even after uncovering their unlawful sale of billions of dollars in unregistered securities on March 9, 2022, Barclays and BBPLC waited several days before reporting their internal control failures to the SEC or to the public, and even their March 14, 2022, disclosure was incomplete and cryptic. During this nondisclosure period, Barclays and BBPLC were able to put in place hedges that generated over $900 million in profits to offset the costs of their malfeasance. Some of those hedging profits may have come at the expense of those investors like Plaintiff and the other members of the class who were short the VXX.~~

~~32.    Given this obvious risk to investors, and the potential exposure of BBPLC and Barclays to the securities laws and legal liability from the over-issuance of securities, the need to have control procedures in place to account for the number of securities issued against the number of securities registered is so obvious that the failure to have done so constitutes deliberate recklessness.~~

33.    Due to the control failures that caused BBPLC to illegally issue and sell over $ 17.7 billion of unregistered securities, Barclays clawed back more than $ 1.2 million in compensation from the Individual Defendants.

**CLASS ACTION ALLEGATIONS**

172.    Barclays and BBPLC's failures to inform investors and the market that it Among other indicia supporting Barclays' and BBPLC's knowledge and/or recklessness are the following known facts, as alleged herein:

i) Barclays and BBPLC were experts in the registration requirements of the federal securities laws by virtue of being serial issuers who issued and sold billions of newly issued securities each year;

ii) Defendants were aware that they had lost WKSI status and admitted to understanding the responsibilities that came with being a non-WKSI issuer;

iii) the Working Group was tasked only with proactively calculating the total amount of securities that the Company anticipated issuing from each shelf, and not actually designing and implementing a tracking system for such issuances;

iv) the SEC investigation determined that Defendants had "no internal control" in place to track the issuances of securities;

v) Barclays subsequent admission that its failure to have controls was "entirely avoidable," resulted from its failure to undertake a "simple task," was "deeply disappointing," and was "not rocket science";

vi) Barclays' settlement with the SEC in which it agreed to implement new controls relating to offers and sales of securities, and to pay a fine of several hundred million dollars;

vii) Barclays' need to implement a Rescission Offer, costing billions of dollars;

68

vii) Barclays' decision to claw-back over $1.2 million in compensation, a remuneration adjustment which focused on "the areas of the [Company] closest to where the incident occurred," for Defendants Morzaria and Venkat after an internal investigation; and

viii) the great magnitude of the harm inflicted on short sellers following Barclays halting future issuances, which caused the stock to rise more than 140% above its indicative value, particularly in light of the simple steps that could (and should) have been taken to avoid the harm.

## VI.    ADDITIONAL LOSS CAUSATION ALLEGATIONS

173.    As detailed herein, during the Class Period, Defendants engaged in a course of misconduct by making inaccurate and incomplete statements which omitted material information necessary to make statements by Defendants not misleading, which directly and proximately caused the economic loss, i.e., damages, suffered by Lead Plaintiff and the Class.

174.    The risk of not having internal controls to track the issuance of VXX materialized when Barclays and BBPLC imposed an immediate suspension on their VXX sales, which caused the price of VXX securities to soar above its indicative values and become untethered from its underlying VIX volatility index, and inflicted substantial economic loss, damage, and harm to the Lead Plaintiff and the Class.

## VII.    NO SAFE HARBOR

175.    The statutory safe harbor provided by the Private Securities Litigation Reform Act of 1995 ("PSLRA") for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged herein.

176.    The statements alleged to be false and misleading herein are all related to then-existing facts and conditions. To the extent certain statements alleged to be false and misleading

are determined to be mixed statements of historical or present information and future information, such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

177.    To the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningfully cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

178.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Barclays who knew that the statement was false when made.

## VIII.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE

179.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentation or failed to disclose material facts;

(b)    The omissions and misrepresentations were material;

(c)    The Company's VXX ETNs traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the security; and

(e)     Lead Plaintiff and other members of the Class purchased VXX ETNs before Defendants abruptly suspended the securities and during which time Defendants misrepresented or failed to disclose material facts.

180.    During the Class Period, the market for VXX ETNs was well-developed, efficient, and open for the following reasons, among others:

(a)     Barclays ETNs were listed and actively traded on CBOE, a highly efficient and automated market;

(b)     As a regulated issuer, Barclays filed periodic public reports with the SEC and/or the CBOE;

(c)     Barclays regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on major newswire services and through other wide-ranging public disclosures, such as communications with financial analysts, financial press, and other similar reporting services; and/or

(d)     Barclays was followed by securities analysts and firms, including UBS, Credit Suisse, Bank of America, Jeffries, Deutsche Bank, JP Morgan, and BNP Paribas, who published reports about the Company. These reports were then distributed to the sales force and certain customers of their respective brokerage firms. These reports were also publicly available and entered the public marketplace.

181.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded in Defendants' omissions of material fact, which they had a duty to disclose, including but not limited to the fact that BBPLC had no controls in place to

determine whether it had any registered securities available to be sold, and ~~that it had been~~ was selling unregistered securities.

182.    Because this Action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects, information that Defendants had a duty to disclose but did not, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions. ~~VXX securities, caused great harm to the Class members during the class period, as they lost substantial sums as the VXX price became untethered from its underlying indicative value and the VIX, and the value of~~ Given the importance of the omissions set forth above, that requirement is satisfied here.

~~59.~~183.    Defendants' material misstatements and/or omissions, which the Defendants were aware or reckless in not knowing, artificially deflated and/or artificially maintained the price of VXX ETNs prior to Barclays' March 14 disclosure and operated in fraud or deceit on all persons or entities who entered into their short positions ~~declined quickly and sharply~~on or, after May 9, 2019, and maintained the short position on VXX ETNs through March 14, 2022. Defendants concealed or improperly failed to disclose material facts with respect to Barclays and its failure to maintain adequate internal controls following its loss of WKSI privileges; Lead Plaintiff and the Class sold short the Company's ETNs relying upon the integrity of the market and price of Barclays ETNs, and public information relating to Barclays and BBPLC, and have been damaged thereby.

184.    As a result of Defendants' material misstatements and omissions and sudden suspension of VXX ETNs, Lead Plaintiff and the Class suffered substantial economic loss. Under

these circumstances, all persons or entities who sold or otherwise acquired short positions on VXX ETNs, on or after May 9, 2019, and held such positions through March 14, 2022, suffered similar injury through their sale of Barclays' VXX at artificially low or maintained prices, and the presumption of reliance applies.

## IX.    CLASS ACTION ALLEGATIONS

60.185.        Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of itselfhimself and all members of the proposed Class defined as follows:

> All persons, corporations, and other legal entities who had acquired, on or after May 9, 2019, a short position in VXX due to selling VXX ETNs, selling VXX call options, and/ or buying VXX put options[25] and who heldmaintained that position as of the close ofwhen the market opened on March 1314, 2022.

186.    Because the Defendants' relevant acts and omissions were uniform and affect Class members uniformly throughout the United States, Lead Plaintiff seeks certification of a nationwide class under Rule 23(b)(3) and/or Rule 23(b)(2).

61.187.        Numerosity: The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds and possibly thousands of members in the proposed Class.

62.188.        Typicality: Lead Plaintiff's claims are typical of the claims of the other

---

[25] Excluded from the Class are Defendant in this action, the officers and directors of the Company during the Class Period (the Excluded D&Os), members of Defendant's and Excluded D&Os' immediate families, legal representatives, heirs, successors or assigns, and any entity in which Defendants or the Excluded D&Os have or had a controlling interest, and its parent, subsidiaries and corporate affiliates, officers, directors, employees, assigns, successors, and co-conspirators; the Court and its staff; Defendant's counsel, and all respective immediate family members of the excluded entities described above. Plaintiff reserves the right to revise the definition of the Class based upon subsequently discovered information and reserves the right to establish Sub-Classes where appropriate.

members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal securities laws as complained of herein. Lead Plaintiff and the Class sustained damages arising out of the same illegal actions and conduct by Defendants.

63.189.    Adequacy: Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

64.190.    Commonality: Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether Defendants violated Section 10b10(b) of the Exchange Act and Rule 10b-5 by the omissions as alleged herein;

(b)    Whether and when Defendants sold unregistered VXX ETNs;

(c)    Whether the securities were required to be registered under Section 5 of the Securities Act;

(d)    Whether the sales of unregistered VXX ETNs were the result of Defendants' failure to put in place reasonable internal controls;

(e)    Whether there have been violations of "material misstatement" liability provisions under Rule 10b-5 of the Exchange Act;

(b)(f)    Whether Defendants knew or recklessly disregarded that their omissions were materially false and misleading; and

(g)    Whether the price of the Company's VXX ETNs was artificially deflated and/or maintained; and

(c)(h)    Whether the Class members sustained damages, the proper measure of damages, and the actual amountsamount of actual damages, costs, restitution, disgorgement, and pre- and post- judgment interest should be awarded to the Class.

191.    Plaintiff's claims are typicalPredominance: Common questions of the claims of thelaw or fact predominate over any questions affecting only individual Class Plaintiff seeksmembers.

192.    Superiority: A class action is superior to represent. As alleged herein, Plaintiff all other available methods for the fair and the Class sustained damages arising outefficient adjudication of this lawsuit because individual litigation of the claims of all Class members is economically unfeasible and procedurally impractical. Furthermore, individualized litigation would most likely result in varying, contradictory, and/or inconsistent judgments and unnecessarily worsen the delay and expense to all the parties and the court systems due to the necessity of multiple trials regarding the same illegalunderlying facts and issues. Finally, Lead Plaintiff knows of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

65.193.    Notice: Upon information and belief, Lead Plaintiff alleges that record owners and other members of the Class may be identified from records maintained by Barclays or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions and conduct by Defendants..

66.194.    Lead Plaintiff is willing and prepared to serve the Class in a representative capacity with all of the obligations and duties material thereto. Lead Plaintiff will fairly and adequately protect the interests of the Class and have no interests adverse to or in conflict with the interests of the other members of the Class.

75

67.195.       Lead Plaintiff's interests are co-extensive with and are not antagonistic to those of absent Class members. Lead Plaintiff will undertake to represent and protect the interests of absent Class members and will vigorously prosecute this action.

34.     Lead Plaintiff has engaged the services of the undersigned counsel. Counsel isare experienced in complex litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Lead Plaintiff and absent Class members.

35.     Class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

68.196.       Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to Class members predominate over any questions affecting only individual Class members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

69.197.       Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

70.198.       For all of these reasons, a class action therefore is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

**LOSS CAUSATION**

36.     Defendants' wrongful omissions of material fact, as alleged herein, directly and proximately caused the economic loss, i.e., damages, suffered by Plaintiff and the Class.

37.    During the Class Period, as detailed herein, Defendants failed to disclose material information. This artificially maintained the prices of VXX and operated as a fraud or deceit on the Class.

38.    When BBPLC imposed an immediate suspension on its VXX sales, the price of VXX soared above its indicative values and became untethered from its underlying VIX volatility index, inflicting great loss, damage and harm to the Plaintiff and the Class.

**RELIANCE UNDER *AFFILIATED UTE***

39.    A Class-wide presumption of reliance is appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded in Defendants' omissions of material fact, which they had a duty to disclose, including but not limited to the fact that BBPLC had no controls in place to determine whether it had any registered securities available to be sold, and was selling unregistered securities.

40.    Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects, information that Defendants had a duty to disclose during the Class Period but did not, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions. Given the importance of the Class Period omissions set forth above, that requirement is satisfied here.

## ~~IV.~~X.   CAUSES OF ACTION

### COUNT I

~~Violations of Section 10(b) of the Exchange Act and Rule 10b-5~~

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
**(Against All Defendants)**

~~71.~~199.        Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

~~72.~~200.        This cause of action is ~~based upon~~asserted pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, against all Defendants.

~~73.~~201.        Based upon the facts alleged herein, ~~during the Class Period~~ Defendants violated Section 10(b) and Rule 10b-5 in connection with the purchase and sale of Barclay's VXX ETNs, by:

    (a)  using or employing manipulative and deceptive devices or contrivances in contravention of rules and regulations set forth by the SEC;

    (b)  employing devices, schemes, and artifices to defraud;

    (c)  omitted to state material facts necessary to make prior statements not misleading; and/or

    (d)  engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the Plaintiff and the Class.

~~74.~~202.        ~~-~~Defendants engaged in a plan, scheme, and course of conduct that was intended to and did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially maintain a market for VXX ETNs; and (iii) cause Lead

Plaintiff and other members of the Class to invest in VXX ETNs ~~by short-selling those securities or by purchasing or selling short options contracts based on the investors' expectations that Defendants could continue to sell the VXX securities~~. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

~~75.~~203.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information ~~about Barclays' business and operations~~, as specified herein.

~~76.~~204.    The Individual Defendants made, or caused to be made, material misrepresentations and omissions ~~that and because of their positions within Barclays, possessed the power and authority to control the contents of Barclays and BBPLC's reports to the SEC.~~. Each of the Individual Defendants ~~was provided with copies of and/or~~ contributed to Barclays' material omissions of fact alleged herein, and each had the ability and opportunity to prevent their issuance or caused them to be corrected. Because of their positions, and their access to material non-public information available to them but not to the public, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations and omissions being made were materially misleading. ~~The Individual Defendants are liable for the material omissions pleaded herein.~~

~~77.~~205.    Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning Barclays and BBPLC. In addition, the Individual Defendants ~~were involved in drafting, producing, reviewing, and/or disseminating~~disseminated Barclays' SEC

filings that contained false and misleading statements and omitted to disclose the material information alleged herein, were aware of, or recklessly disregarded, the misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

41.    Defendants, individually and in concert, directly and indirectly, employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information which they had a duty to disclose.

78.206.    Defendants knew or should have known of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Defendants' material misrepresentations and omissions were done knowingly or recklessly and for the purpose and effect of artificially maintainingmaintained the public market for VXX securities.

79.207.    As demonstrated by Defendants' misrepresentations and omissions of material fact, if they did not have actual knowledge of the misrepresentations and omissions alleged, then they were reckless and/or grossly reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to ensure that only the registered amount of securities were issued.amounts of securities were issued. If not actually aware of the acts and omissions stated herein, Defendants were reckless in failing to obtain such knowledge by deliberately and recklessly failing to take the steps necessary to mitigate the scheme or end it.

208.    As a result of the omitted material facts, as set forth above, the market price of, and market for, Barclays' VXX ETNs and VXX options, were artificially maintained.

80.209.    Lead Plaintiff and the other members of the Class, relying directly or

indirectly upon the integrity of the market in which VXX securities trade, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, and (but not adequately disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class took), entered into and maintained short positions in Barclays'on VXX ETNs during the Class Periodsecurities on or after May 9, 2019, and through March 14, 2022, and were damaged thereby.

81.210.        VXX ETNs are traded in interstate commerce. Indeed, many billions of dollars of purchases and sales of VXX ETNs and other VIX-linked instruments such as options and futures contracts are entered into each year in interstate commerce in the United States. Defendants' unlawful issuance of unregistered securities including VXX ETNs had a direct, substantial, and foreseeable impact on interstate commerce in the United States.

82.211.        At the time of said omissions, hadAs a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class, who entered into short positions in VXX ETNs on or after May 9, 2019, and maintained the positions through March 14, 2022, suffered damages in connection with their sale and/or maintenance of short positions of VXX ETNs. At the time of said misrepresentations and omissions, had Lead Plaintiff and the other members of the Class and the marketplace known of the truth regarding the sale of unregistered securities by BBPLC, or Barclays' and its inabilityBBPLC's failure to know whether it hadmaintain any registered securities available to sell,controls regarding its issuances versus prior Shelf registration capacities, Lead Plaintiff and the other members of the Class would not have taken short positions in VXX ETNs, either through selling VXX short or by buying or selling options.

83.212.        By virtue of the foregoing, Defendants violated Section 10(b) of the

Exchange Act and Rule 10b-5 promulgated thereunder.

42.    Defendants are liable both directly and indirectly for their violations of Section 10(b) and Rule 10b-5 and the wrongs complained of herein.

43.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of positions which were short the VXX during the Class Period.

## COUNT II

Violations of Section 20(a) of the Exchange Act
### Violations of Section 20(a) of the Exchange Act
### (Against Barclays and the Individual Defendants )

44.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

213.    BarclaysPlaintiff respectfully incorporates paragraphs 1-212 of this Amended Complaint by reference. To the extent any factual allegation alleged in support of this claim conflicts with any other, it should be deemed to have been pled in the alternative.

214.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against Barclays and Individual Defendants, on behalf of Lead Plaintiff and the Class.

84.215.    Barclays and Individual Defendants functioned as a controlling personpersons of BBPLC within the meaning of Section 20(a) of the Exchange FunctionAct as alleged herein.

85.216.    By virtue of Barclays' ownership and control overAt all relevant times, directly or indirectly, Barclays had the power to and exercised its influence and control of the decision-making of BBPLC, its wholly- owned subsidiary BBPLC, and Barclays'. Barclays had intimate knowledge of and participation in BBPLC's business affairs and operations including

BBPLC's issuance of unregistered, such as overseeing the August 2022 Rescission Offer for the over-issued securities, Barclays had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company.. This is further supported by the fact that Barclays was also subject to the September 29, 2022, SEC Cease-and-Desist Order, which included a $200 million penalty.

86.217.    Barclays was also was responsible for creating and, testing, and maintaining its own internal controls and BBPLC's internal controls over securities issuances and operational and financial reporting and failed to install controls that Barclays recognizes were "simple" and "not rocket science" that would have prevented the sale of unregistered securities.misconduct alleged herein.

45.    As set forth above, Barclays by virtue of its position as controlling person of BBPLC, violated Section 10(b) and Rule 10b-5 by its omissions as alleged in this Complaint. As a direct and proximate result thereof, Plaintiff and other members of the Class suffered damages in connection with their VXX short sales or options trades during the Class Period.

The Individual Defendants, as senior executive officers and directors of Barclays and BBPLC, were able to and did control the content of various SEC filings and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided with copies of the documents and statements alleged herein to contain factual omissions that rendered the SEC filings as materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein. . Due

218.    The Individual Defendants, due to their positions of control and authority as senior executive officers and directors of Barclays and BBPLC,, Individual Defendants had access to the adverse undisclosed information about BBPLC's core business' reliance on its ability and expertise in using its shelf registrations to issue and sell billions of dollars' worth of securities into

the public markets, including— through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held meetings, as well as other management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.other management and Board of Directors meetings and committees thereof, and requests and other information provided to them in connection therewith. Defendant Staley served as the CEO of Barclays, a Director on Barclays' Board of Directors, the CEO of BBPLC, and a Director on BBPLC's Board of Directors. Defendant Venkatakrishnan has been the CEO of Barclays, a member of its executive Committee, Director on the Barclays' Board of Directors, CEO of BBPLC, and a Director on the BBPLC Board of Directors since November 1, 2021. Prior to that time, he served as Barclays' Chief Risk Officer from May 2017 through May 2020, and as Co-President of BBBPLC from October 2020 to October 2021. Defendant Morzaria served as Barclays' Group Finance Director, a Member of Barclays' Board of Directors, and as a Director on the BBPLC on the BBPLC Board. He retired from these positions effective April 22, 2022, and currently serves as Chairman of the Global Financial Institutions Group of Barclays' Investment Bank. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged herein to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

87.219.    The Individual Defendants had direct involvement in the day-to-day operations of the Company, and therefore are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein. The Individual Defendants signed forms and certifications attached with SEC filings and authorized

the filings and dissemination of the Form 20-Fs, Form 6-Ks, and press releases alleged herein, which contained materially false and misleading statements or material omissions. Defendants Staley, Venkatakrishnan, and Morzaria signed certifications pursuant to 17 C.F.R. § 240.13(A)-14(A) that was attached to the Form 20-F as Exhibit 12.1, and certifications pursuant to Section 906 of the Sarbanes-Oxley Act of 2022 (18 U.S.C. § 1350) that was attached to the Form 20-Fs as Exhibit 13.1, which omitted material factual information in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

88.220.    As senior officers and controlling persons of a publicly held company and its primary subsidiary, BBPLC, who regularly issued and sold securities, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information issued in statements that were or had become materially misleading or untrue, so that the market price of VXX would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations and violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

221.    As set forth above, Barclays and the Individual Defendants by virtue of their positions as controlling persons of BBPLC, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, by its omissions and misrepresentations as alleged in this Complaint.

222.    This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with reckless disregard of the falsity of their statements and the fraudulent nature of its scheme.

223.    By reasons of such wrongful conduct, Barclays and Individual Defendants are liable pursuant to § 20(a) of the Exchange Act As a direct and proximate result of Barclays and

85

Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their VXX short sales or options trades.

## XI.     JURY DEMAND

46.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable. As set forth above, the Individual Defendants had control over Barclays and made the materially false and misleading omissions on behalf of Barclays and BBPLC within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their executive positions and their culpable participation, as alleged above, the Individual Defendants had the power and influence and control and did, directly or indirectly, influence and control the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged herein to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

47.     In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company, and therefore are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

## V. XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully requests that this Court enter judgment against each of the Defendants and in favor of Lead Plaintiff and the Class, and award the following relief:

86

A.      ~~Certifying~~Declaring this ~~action as a~~ class action to be proper pursuant to Rule 23(a~~)~~), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein~~, declaring Plaintiff as the representative of the Class, and finding that Plaintiff's counsel will serve as counsel for the Class;~~;

B.      Enter judgment in favor of Lead Plaintiff and the other members of the Class and adverse to each of the Defendants for the damages incurred by Lead Plaintiff and the Class;

C.      ~~An award of~~Awarding actual damages, restitution, disgorgement, statutory pre- and post- judgment interest, reasonable attorneys' fees, expert witness fees and other costs in amounts to be proven, and in favor of Plaintiff and the Class and against each of the Defendants for their violations of the federal securities laws; and

D.      Awarding ~~such~~other such relief as this Court deems appropriate, just and equitable under the facts and circumstances of this action.

~~**DEMAND FOR JURY TRIAL**~~

Dated: July 26, 2024

**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox
Robert N. Kaplan
Donald R. Hall
Brandon Fox
Chang Hahn
800 Third Avenue, 38th Floor
New York, NY 10022
T:  212-687-1980
F:  212-687-7714
ffox@kaplanfox.com
rkaplan@kaplanfox.com
dhall@kaplanfox.com
bfox@kaplanfox.com
chahn@kaplanfox.com

**SPERLING & SLATER**

Joseph M. Vanek
Timothy Sperling
Jeff Bergman
Jerry Santangelo
55 West Monroe Street, Suite 3200
Chicago, IL 60603
Telephone: (312) 641-3200
Fax: (312) 641-6492
jvanek@sperling-law.com
tsperling@sperling-law.com
jbergman@sperling-law.com
jsantangelo@sperling-law.com

*Lead Co-Counsel for Lead Plaintiff Michael
Puchtler and the Proposed Class*


Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.


Dated: March 12, 2024

KAPLAN FOX & KILSHEIMER LLP

*/s/ Frederic S. Fox*
Frederic S. Fox
Robert N. Kaplan
Donald R. Hall
800 Third Ave., 38th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
ffox@kaplanfox.com
rkaplan@kaplanfox.com

88

dhall@kaplanfox.com


**SPERLING & SLATER**
Joseph M. Vanek
Timothy Sperling
Jeff Bergman
Jerry Santangelo
55 West Monroe Street
Suite 3200
Chicago, IL 60603
Telephone: (312) 641-3200
Fax: (312) 641-6492
jvanek@sperling-law.com
tsperling@sperling-law.com
jbergman@sperling-law.com
jsantangelo@sperling-law.com