UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
MICHAEL PUCHTLER,                                       :
                                                        :
                        Plaintiff,                      :
                                                        :
            -v-                                         :            24-cv-1872 (LJL)
                                                        :
BARCLAYS PLC, BARCLAYS BANK PLC,                        :          OPINION AND ORDER
JAMES E. STALEY, TUSHAR MORZARIA, and                   :
C.S. VENKATAKRISHNAN                                    :
                                                        :
                        Defendants.                     :
------------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:   3/21/2025
```

LEWIS J. LIMAN, United States District Judge:

      This is a companion case to *May v. Barclays*, Case No. 23-cv-2583-LJL (S.D.N.Y.), *and In re Barclays PLC Securities Litigation*, 22-cv-8172-KPF (S.D.N.Y.). Lead Plaintiff Michael Puchtler ("Plaintiff") brings claims for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder as well as control person liability under Section 20(a) of the Exchange Act. Dkt. No. 45 ("Amended Complaint").

      Defendants[1] move to dismiss Plaintiff's Amended Complaint in its entirety, alleging that it fails to allege an actionable misstatement or omission, scienter, or loss causation. Dkt. No. 46. For the reasons that follow, the motion to dismiss is granted with prejudice.

## BACKGROUND

      The Court accepts as true for purposes of this motion the well-pleaded allegations of the Amended Complaint as supplemented by the documents incorporated by reference. The Court

---

[1] Defendants are Barclays Bank PLC ("Barclays Bank"), Barclays PLC ("BPLC," and, together with Barclays Bank, "Barclays"), James E. Staley ("Staley"), Tusha Morzaria ("Morzaria"), and C.S. Venkatakrishnan ("Venkatakrishnan" and, together with Staley and Morzaria, the "Individual Defendants").

may also consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also In re Turquoise Hill Resources Ltd.*, 2024 WL 4711185, at *9 (S.D.N.Y. Nov. 7, 2024) (such documents may not be considered for their truth, but to establish what statements they contain).

### A.    VXX and The Relevant Parties

BPLC is a bank holding company headquartered in London, United Kingdom. Dkt. No. 45 ¶ 19. Through its subsidiaries, it provides global banking and other financial services, including investment banking and sponsoring structured products. *Id.* Barclays Bank, a wholly-owned subsidiary of BPLC, is a bank that provides various financial services, including the creation, issuance, and sale of structured notes, exchange traded notes ("ETNs"), and other new derivative securities. *Id.* ¶ 20.

Staley, Morzaria, and Venkatakrishnan are officers or directors of BPLC. Staley was Chief Executive Officer ("CEO") of BPLC, a member of its Executive Committee, and a director on its Board of Directors from December 2015 through October 31, 2021. *Id.* ¶ 23. Staley also served as the CEO of Barclays Bank and as a director on its Board of Directors from March 2019 through October 31, 2021. *Id.* Venkatakrishnan has been the CEO of BPLC, a member of its Executive Committee, and a director on its Board of Directors since November 1, 2021. *Id.* ¶ 25. He has also served as the CEO of Barclays Bank and a director on its Board of Directors since November 1, 2021. *Id.* Venkatakrishnan served as BPLC's Chief Risk Officer from May 2017 through May 2020 and as the Co-President of Barclays Bank from October 2020 to October 2021. *Id.* During all relevant times, Morzaria served as BPLC's Group Finance Director, a member of BPLC's Board of Directors, and as a director on the Board of Directors of Barclays Bank. *Id.* ¶ 27.

Since its creation thirty years ago, the Chicago Board of Options Exchange's ("CBOE") Volatility Index ("VIX") has become a recognized index reflecting short-term market volatility. *Id.* ¶ 31. Market participants cannot invest directly in the VIX because it is simply a mathematical calculation of ever-changing prices of S&P 500 Index option contracts listed for trading on the CBOE. *Id.* Barclays Bank created and issued the Barclays Bank PLC iPath Series B S&P 500 VIX Short-Term Future ("VXX"[2]), an ETN designed to permit investors to get exposure to the VIX. *Id.* ¶ 33. Barclays Bank initially offered VXX to the public on January 29, 2009. *Id.* ¶ 34. It made six additional offerings of VXX from 2018 through 2021. *Id.*

The VXX has several mechanisms that are designed to ensure that its price is correlated with real-time market changes to VIX futures. *Id.* ¶¶ 36–40. The notes come with a redemption right that enables certain holders to put the note to the issuer and redeem it for the closing indicative value, which serves to keep the market price from falling below its indicative value. *Id.* ¶ 38. Market buyers will keep the price of the VXX ETNs from trading below the value that mimics the VIX futures because they know they can make a profit whenever the price of the security falls below the published indicative value simply by buying the note at the lower value and then putting it to Barclays at the indicative value, thereby driving up demand. *Id.* To ensure that the VXX ETNs do not trade above the indicative value because of the forces of supply and demand, Barclays maintains a shelf capacity to issue and sell new VXX securities. *Id.* ¶ 39. If there is excess demand, Barclays can satisfy that demand and increase supply by the simple expedient of issuing additional securities. *Id.* Indeed, the mere threat of Barclays issuing new securities disincentivizes buyers from bidding the price of the security above its indicative value to squeeze short sellers—any

---

[2] The Barclays Bank PLC iPath Series B S&P 500 VIX Short-Term Future trades under the ticker symbol "VXXB." *Id.* ¶ 1.

person who buys above the indicative prices is at risk that Barclays will issue additional securities, driving down the market price. *Id.*

The ability of an ETN issuer to sell new securities into the market is of paramount importance to short sellers of ETNs and particularly of ETNs such as VXX that are heavily shorted. *Id.* ¶ 42. Because the security is already hard to borrow, short sellers of ETNs that are heavily shorted are particularly dependent upon the ETN issuer to maintain appropriate shelf capacities to issue further securities to ensure that the price of ETNs do not rise above their indicative value. *Id.* The abilities to redeem and issue new securities are standard pricing mechanisms employed by ETN issuers to ensure that the price of the ETN remains "in-line" with their indicative value. *Id.* ¶ 41.

The VXX pricing supplement warns that "**We Have No Obligation to Issue Additional ETNs, and We May Cease or Suspend Sales of the ETNs**." Dkt. No. 48-1 at 27.[3] It states:

> Any limitation or suspension on the issuance or sale of the ETNs may materially and adversely affect the price and liquidity of the ETNs of that series in the secondary market. Alternatively, the decrease in supply may cause an imbalance in the market supply and demand, which may cause the ETNs of that series to trade at a premium over their indicative value. Any premium may be reduced or eliminated at any time.

*Id.*

Michael Puchtler ("Plaintiff") is an individual investor who invested in short positions on VXX securities. Dkt. No. 45 ¶¶ 3, 18.

**B.     WKSI Status**

Historically, Barclays Bank offered VXX and other structured notes and ETNs to the public as a Well-Known Seasoned Issuer ("WKSI") pursuant to a shelf registration offering. *Id.* ¶ 52. WKSI status permits an issuer to dispense with the requirements applicable to non-WKSI issuers

---

[3] ECF pagination.

that (1) a registration statement be filed with the SEC and declared effective before securities are offered to the public, (2) the registration statement estimate the amount of securities the issuer will issue over a period that may not exceed three years, and (3) the issuer pay in advance filing fees to the SEC for the total amount of those securities. *Id.* ¶ 52; 17 C.F.R. § 230.405. WKSI status gives the most widely followed issuers "greater flexibility in accessing the United States public capital markets than most other institutions." *In re Barclays Bank PLC Sec. Litig.*, 2024 WL 757385, at *2 (S.D.N.Y. Feb. 23, 2024). A WKSI can file a single shelf registration statement that becomes effective immediately upon filing and that can be used to register securities for offerings that are to be made on a continuous or delayed basis over a specific time frame. Dkt. No. 45 ¶ 54; 17 C.F.R. § 230.415.

On May 10, 2017, Barclays Bank lost its WKSI status after the SEC instituted a public administrative cease-and-desist proceeding against its subsidiary, Barclays Capital Inc. *Id.* ¶ 60. As a result, Barclays was required to define and designate the specific dollar amount of securities it planned to register and issue and pay the registration fee up front before selling them. *Id.* ¶¶ 61–62. Barclays also needed to monitor how many securities had been issued so as not to exceed the limit. *Id.* ¶¶ 62–63.

In January 2018, Barclays Bank convened a working group to determine how it would conduct its securities offerings going forward as a non-WKSI. *Id.* ¶ 67. The working group consisted of the trading desk heads from Barclays Bank's structured products group, product origination personnel, a compliance officer, and an in-house attorney. *Id.*

The working group converted Barclays Bank's pending WKSI shelf into a non-WKSI, 2018 shelf registration ("2018 Shelf") that authorized Barclays Bank to sell up to $21.3 billion worth of securities over the following eighteen months. *Id.* Barclays Bank also filed a 2019 shelf

registration statement ("2019 Shelf") based on the working group's estimates of securities issuance needs from key business units. *Id.* The 2019 Shelf was deemed effective on August 1, 2019, and authorized Barclays Bank to offer and sell up to $20.8 billion of mainly structured notes and ETNs, for a period of three years. *Id.*

Despite having become an ineligible issuer in March 2017, BPLC initially misrepresented that status on its Form 20-F filed on February 22, 2018, by self-identifying as a WKSI. *Id.* ¶ 64. On March 19, 2018, BPLC filed a post-effective amendment to its 2017 Form 20-F that acknowledged its non-WKSI status, stating that it understood the additional responsibilities of its new status. *Id.* ¶¶ 65–66.

## C.    Suspension of Issuances

On or around March 8, 2022, BPLC discovered that there were no internal controls in place necessary to track its issuances and sales of securities from the shelf registration statements. *Id.* ¶ 132. On March 9, 2022, Barclays senior managers were informed of the company's failure to track sales and issuances off its shelf registrations, and that it had issued and sold billions of unregistered securities, including VXX ETNs. *Id.*

Barclays alerted regulators about the over-issuance on March 14, 2022. *Id.* BPLC also disclosed the over-issuance to the market on March 14, 2022, shortly before the VXX market opened. *Id.* ¶ 133. The disclosure stated that Barclays was "immediately suspending until further notice, any further sales from inventory and further issuances" of securities, specifically including "VXX ETNs" because "Barclays does not currently have sufficient issuance capacity to support further sales from inventory and any further issuances of ETNs." *Id.*

Barclays' announcement that it was suspending any further issuances and sales of new VXX ETNs caused a significant short squeeze in the market. *Id.* ¶¶ 8–10, 134–136. When the market became aware that Barclays could no longer issue new VXX ETNs into the market, the

market price of VXX securities skyrocketed as no mechanism existed to absorb excess demand, rising to more than 140% of its indicative value—higher than any price deviation in the security's history.  *Id.* ¶¶ 8, 135.  The security's price remained untethered from its indicative value for months until Barclays was once again allowed to issue VXX securities in September 2022.  *Id.* ¶ 135.  Plaintiff was forced to close out his position and sustained substantial losses.  *Id.* ¶ 137.

On July 25, 2022, Barclays announced that it would be commencing a rescission offer for eligible purchasers.  *Id.* ¶ 139.  The rescission offer expired on September 12, 2022.  *Id.*

### D.    Subsequent Disclosures

In the months following the March 14, 2022 disclosure, Defendants issued a series of admissions relating to their lack of internal controls and their issuances of unregistered securities. On April 28, 2022, Barclays Bank filed its First Quarterly Report for 2022 in which it disclosed that Barclays Bank began selling in excess of the $20.76 billion maximum issuance capacity as early as February 18, 2021, and that "securities issued in excess of the limit are considered to be 'unregistered securities' for the purposes of US securities law."  *Id.* ¶ 143(a).  That report also stated that "management has concluded that, by virtue of the fact that the over-issuances occurred and was not immediately identified, both BPLC and Barclays Bank had a material weakness in relation to certain aspects of their internal control environment and, as a consequence, their internal control over financial reporting for the year ended 31 December 2021 was not effective."  *Id.* ¶ 143(b).

At Barclays annual general meeting on May 4, 2022, its Chairman, Nigel Higgins, stated:

> . . . we do not get everything right.  Let me say a few words about our recently reported failure to comply with SEC registration requirements, a failure which has cost us hundreds of millions of pounds, and more in reputation. . . . This is not rocket science and we can and will do better, learning from this particular issue and applying discipline across all our controls.

*Id.* ¶ 143(d) (emphasis omitted).  At the same meeting, Barclays' CEO Venkat concluded that the over-issuance was an "entirely self-inflicted problem," and that "we missed some simple tasks." *Id.* ¶ 143(e) (emphasis omitted).  He stated:  "This situation was entirely avoidable and I am deeply disappointed that it occurred.  The necessity of a strong controls culture has never been clearer to me."  *Id.* ¶ 143(f) (emphasis omitted).

On May 23, 2022, BPLC amended its Form 20-F annual statement "to reflect management's conclusion that the Company's internal control over financial reporting and disclosure controls and procedures were not effective under the applicable [COSO] Framework as of 31 December 2021 due to a material weakness in the Company's internal control over financial reporting identified subsequent to the Original Filing Date as a result of the Over-issuance of Securities having occurred and not been immediately identified."  *Id.* ¶ 143(c) (emphasis omitted).

BPLC stated in a Form 6-F filed for the Second Quarter of 2022 on July 28, 2022, that:

> [M]anagement has concluded that, by virtue of the fact that there was a weakness in controls over the identification of external regulatory limits related to securities issuance and monitoring against these limits, the Barclays Bank Group had a material weakness in relation to certain aspects of its internal control environment, and as a consequence, its internal control over financial reporting and disclosure controls and procedures as at 31 December 2021 were not effective.

*Id.* ¶ 143(g).  Moreover, the Form 6-F stated that as a result of the weakness, Barclays Bank had issued securities in excess of the amount permitted under the 2018 and 2019 Shelves, *id.* ¶ 143(h), and that the issuance of securities in excess of the maximum permitted under the shelf "resulted from a failure to monitor issuances during the period in which Barclays Bank PLC's status changed from a 'well-known seasoned issue' to an 'ineligible issuer' for U.S. securities law purposes," *id.* ¶ 143(i) (emphasis omitted).

In a form 6-K filed on September 30, 2024, Defendants stated that "among the principal causes of the over-issuance were, first, the failure to identify and escalate to senior executives the

consequences of the loss of well-known issuer status and, secondly, a decentralized ownership structure for securities issuances." *Id.* ¶ 143(j) (emphasis added).

BPLC stated that it would claw back compensation from Venkat and Morzaria by a combined £1 million due to regulatory errors and oversights, including the over-issuance. *Id.* ¶¶ 157–158.

### E.    The SEC Order

The SEC pursued an enforcement action against Barclays for Barclays' alleged "failure to put into place any internal control around the real-time tracking of securities being offered or sold off of its Commission-registered shelf registration statements" which led to Barclays Bank selling "an unprecedented amount of securities—cumulatively totaling approximately $17.7 billion in excess of what it had registered with the Commission, in violation of Sections 5(a) and(c) of the Securities Act . . . [and leading BPLC to] restate [its] year-end audited financial statements." *Id.* ¶ 151.

On or about September 29, 2022, the SEC ordered cease-and-desist proceedings against Barclays concerning "BBPLC's failure to put into place any internal control around the real-time tracking of securities being offered or sold off of its Commission-registered shelf registration statement." *Id.* ¶ 145.  The SEC found that "[a]t the time of the registration of both the 2018 Shelf and the 2019 Shelf, certain [Barclays Bank] personnel recognized the need to accurately record relevant information about securities that were offered or sold so as to be able to track the aggregate amount of securities that were cumulatively offered and sold from each respective [s]helf on a real-time basis," and that such tracking would have ensured that Barclays Bank did not offer or sell any securities in excess of what had been registered. *Id.* ¶ 146.  But it found that "no internal control was established" and "the amount of securities that were offered and sold was not tracked." *Id.*  The SEC concluded that, beginning on or around June 26, 2019, Barclays Bank offered and

sold securities in excess of the amount remaining on the 2018 Shelf, ultimately offering and selling approximately $1.3 billion of securities in excess of what was registered with the SEC on the 2018 Shelf. *Id.* ¶ 147. The SEC also found that, beginning on or around January 28, 2021, Barclays Bank offered and sold securities in excess of what was registered on the 2019 Shelf, ultimately offering and selling $16.37 billion of securities in excess of what was registered with the SEC on the 2019 Shelf. *Id.* ¶ 148.

The SEC required BPLC to implement remedial reforms, to complete an audit of its internal controls relating to compliance with Section 5 of the Securities Act in connection with its SEC-registered shelves, and to pay $361 million to the SEC, including a $200 million fine. *Id.* ¶¶ 149–151. In announcing the settlement, the SEC's director of enforcement stated that "[t]he control deficiencies and the scope of the conduct at issue here w[ere] simply staggering." *Id.* ¶ 151.

The SEC order does not allege that BPLC or Barclays Bank violated any fraud- or negligence-based provision of the securities laws.

### F.    The Alleged Misrepresentations and Omissions

Plaintiff alleges that Defendants' SEC filings contain material misrepresentations and omissions as to (1) whether Defendants would "only" issue VXX in registered form and (2) the strength and effectiveness of Defendants' internal controls and procedures.

On May 9, 2019, Barclays Bank filed a Form 8-A12B Registration Statement for securities, including VXX. *Id.* ¶¶ 46–49. In an attached exhibit to the Form 8-A12B, Barclays Bank stated that "[t]his Security, and any other Securities of this series and of like tenor, are issuable only in registered form without coupons in denomination of any multiple of $50." *Id.* Plaintiff alleges that this statement is false because Barclays Bank did not "only" issue the ETNs in registered form, but also in unregistered form. *Id.* ¶ 49.

10

BPLC's 2019 Form 20-F stated that it "is committed to operating within a strong system of internal control" and that it was on track to complete a three-year program known as the Barclays Internal Control Environment Programme ("BICEP") at the end of March 2020 which "was focus[ed] on strengthening the internal control environment," and had left the company's internal controls environment "in a much stronger position." *Id.* ¶ 75. BPLC's 2019 Form 20-F also stated that the Barclays Board Audit Committee "concluded that, throughout the year ended 31 December 2019 and to date, the Group has operated a sound system of internal control that provides reasonable assurance of financial and operational controls and compliance within laws and regulations." *Id.* ¶ 76. BPLC additionally stated that "[m]anagement has assessed the internal control over financial reporting as of 31 December 2019" and that "[i]n making its assessment, management utilized the criteria set out in the 2013 [Committee of Sponsoring Organizations ("COSO")] framework and concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2019." *Id.* ¶ 77.

Barclays Bank's 2019 Form 20-F states that "Audit, Risk and Internal Control" is one of the Board's core principles and that the "[e]ffectiveness of risk management and internal controls is reviewed regularly by the Risk Committee (responsible for providing oversight on current and potential future risk exposures) and the Audit Committee (responsible for controls, including reviewing audit reports, internal controls and risk management systems)." *Id.* ¶¶ 82–83. It further stated that Barclays Bank "is committed to operating within a strong system of internal control that enables business to be transacted and risk taken without exposure to unacceptable potential losses or reputational damage" and that "[a] framework of disclosure controls and procedures is in place to support the approval of the financial statements of the Barclays Bank Group." *Id.* ¶ 84. Like BPLC's filing, Barclays Bank's Form 20-F stated that management had assessed the internal

11

control over financial reporting as of December 31, 2019, using the 2013 COSO framework and concluded that the internal control over financial reporting was effective. *Id.* ¶ 86. Furthermore, the Audit Committee concluded that "[t]hroughout the year ended 31 December 2019 and to date, the Company has operated a system of internal control that provides reasonable assurance of effective operations covering all controls, including financial and operational controls and compliance with laws and regulations." *Id.* The 2019 Form 20-F also noted that "[t]here have been no changes in the Barclays Group's internal control over financial reporting that occurred during the period covered by this report, which have materially affected or are reasonably likely to materially affect the Barclays Group's internal control over financial reporting." *Id.* ¶ 87. Barclays Bank further stated that "[a] framework of disclosure controls and procedures is in place to support the approval of the financial statements of the Barclays Bank Group" and that "[s]pecific governance committees are responsible for examining the financial reports and disclosures to ensure that they have been subject to adequate verification and comply [with] applicable standards and legislation." *Id.* ¶ 89. It also stated that the CEO and CFO had evaluated Barclays Bank's disclosure controls and procedures and concluded that they were effective. *Id.* ¶ 88.

BPLC's 2020 Form 20-F stated the company had "robust internal controls" and highlighted that BPLC had "successfully completed" BICEP, leaving the Group's control environment "now in a much stronger position." *Id.* ¶ 94. The 2020 Form 20-F also stated that management had assessed the internal control over financial reporting as of December 31, 2020, using the 2013 COSO framework, and had concluded that the internal control over financial reporting was effective. *Id.* ¶ 95. The 2020 Form 20-F included a Board Audit Committee report which concluded that "the Group has operated a sound system of internal control that provides a reasonable assurance of financial and operational controls and compliance with laws and

regulations" and "there are no control issues that are considered to be a material weakness and which merit specific disclosure." *Id.* ¶ 96.

Barclays Bank's 2020 Form 20-F stated that "[t]he Company is committed to operating within a strong system of internal control" and that "[p]rocesses are in place for identifying, evaluating and managing the Principal Risks facing the Company." *Id.* ¶ 102. It concluded that "[t]hroughout the year ended 31 December 2020 and to date, the Company has operated a system of internal control that provides reasonable assurance of effective operations covering all controls, including financial and operational controls and compliance with law and regulations." *Id.* ¶ 103. It also stated that "management utilised the criteria set out in the 2013 COSO framework and concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2020" and that no material changes had been made to the Group's control over financial reporting. *Id.* According to the 2020 Form 20-F, the CEO and CFO had assessed the company's controls and found them effective. *Id.* ¶ 104.

In BPLC's announcement of its Q1 2021 results on April 30, 2021, it stated that "Barclays remain[s] in a strong capital position." *Id.* ¶¶ 108–109. BPLC's Q1 2021, Q2 2021, and Q3 2021 results all incorporated its 2020 Form 20-F by reference. *Id.* ¶¶ 110, 112, 114.

Barclays Bank's 2021 Form 20-F once again stated that the Audit Committee was charged with "[o]verseeing the integrity of our financial disclosures and the effectiveness of the internal control environment," was "[k]eenly focused on the Group's internal control environment," and "continued to oversee the ongoing evolution and enhancement of the internal control environment." *Id.* ¶ 117. It also represented that "[t]he Group is committed to operating within a strong system of internal control," "[p]rocesses are in place for identifying, evaluating and managing the Principal Risks facing the Group in accordance with the 'Guidance on Risk

13

Management, Internal Control and Related Financial and Business Reporting', published by the FRC," and "[g]roup-wide frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance." *Id.* ¶¶ 116, 118. The Form 20-F further repeated many of the previous representations that Barclays Bank "operated a system of internal control that provides reasonable assurance of effective operations" as determined by the Audit Committee, CEO, and CFO's assessments. *Id.* ¶ 119.

The Individual Defendants provided SOX certifications that accompanied Barclays Bank's and BPLC's Form 20-F filings, stating that the signer was responsible for establishing and maintaining disclosure controls and procedures and internal controls over financial reporting. ¶¶ 78–79, 90–91, 98–99, 105–106, 120–121, 129–130.

## PROCEDURAL HISTORY

This case was initiated by complaint filed on March 12, 2024. Dkt. No. 1.

On June 3, 2024, the Court signed an order, pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B)(iii), appointing Michael Puchtler as Lead Plaintiff and Kaplan Fox & Kilsheimer LLP and Sperling & Slater, LLC as co-lead counsel. Dkt. No. 39.

On August 26, 2024, Plaintiff filed the First Amended Complaint. Dkt. No. 45. The Amended Complaint contains two counts: (1) a claim for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against all Defendants, *id.* ¶¶ 199–212, and (2) control person liability under Section 20(a) of the Exchange Act against BPLC and the Individual Defendants. *Id.* ¶¶ 213–223. Plaintiff brings suit on behalf of a class defined as all persons, corporations and other legal entities who had acquired, on or after May 9, 2019, a short position in VXX due to selling VXX ETNs, selling VXX call options, and/or buying VXX put options and who maintained that position when the market opened on March 14, 2022. *Id.* ¶ 185.

On August 26, 2024, Defendants filed the instant motion to dismiss the Amended Complaint, pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). Dkt. No. 46. Defendants filed a memorandum of law and a declaration of counsel attaching exhibits in support. Dkt. Nos. 47–48. On September 25, 2024, Plaintiff filed a memorandum of law in opposition to the motion to dismiss. Dkt. No. 49. On October 10, 2024, Defendants filed a reply memorandum of law in further support of the motion to dismiss. Dkt. No. 50.

On Friday, March 14, 2025, the Court heard oral argument from the parties as well as from the parties in related case *May v. Barclays*, No. 23-cv-2583 (S.D.N.Y.).

## STANDARD OF REVIEW

On a 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff. *See York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002), *cert. denied*, 537 U.S. 1089 (2002). This requirement "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

A complaint must offer more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007). The ultimate question is whether "[a] claim has facial plausibility, [*i.e.*] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence

[supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 46 (2011).

A claim for fraud is subject to the particularity requirements of Federal Rule of Civil Procedure 9(b). A plaintiff must: "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent; (2) identify the speaker; (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004); *see also Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001) (stating that to plead fraud with particularity, a complaint must "specify the time, place, speaker, and content of the alleged misrepresentations" and "should explain how the misrepresentations were fraudulent"). Allegations that are "conclusory and unsupported by assertions of fact" are not sufficient to meet the Rule 9(b) standard. *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986).

The Private Securities Litigation Reform Act ("PSLRA") imposes additional requirements on a plaintiff bringing a private securities fraud action. Plaintiff must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). Plaintiff cannot plead "the materiality of the alleged misstatements or omissions . . . in a conclusory or general fashion." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 626 (S.D.N.Y. 2005) (citation omitted); *see In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 367 (E.D.N.Y. 2013) ("The materiality of allegedly false financials may not be pled in a conclusory or general fashion."). "[P]laintiffs must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 564 (S.D.N.Y. 2018) (citation omitted), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019).

16

In addition, where scienter is at issue, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u–4(b)(2). Under this heightened pleading standard for scienter, a "complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). In determining whether a strong inference exists, the allegations are not to be reviewed independently or in isolation, but the facts alleged must be "taken collectively." *Id.* at 323.

## DISCUSSION

### I.    Section 10(b)

To plead a claim for damages under Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, a plaintiff must satisfy each of the following six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014); *see Matrixx*, 563 U.S. at 37–38; *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 n.23 (2d Cir. 2017); *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 236 (S.D.N.Y. 2023). Defendants argue that Plaintiff has not pleaded a material misrepresentation or omission, scienter, or loss causation.

### A.    Material Misrepresentation or Omission

Plaintiff states that "Defendants' Class Period statements concerning (a) the strength and effectiveness of Defendants' internal controls and procedures, and (b) that they would 'only' issue registered securities were materially false and misleading because, [a] undisclosed to investors, Defendants had failed to implement any internal controls and procedures to track and monitor their

issuances of securities, including VXX" and because [b] Defendants issued unregistered securities in addition to the registered notes. Dkt. No. 49 at 13–14. Defendants contend that none of the alleged statements are actionable misrepresentations. Dkt. No. 47 at 9–15.

"'The test for whether a statement or omission is materially misleading' . . . is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'" *In re Vivendi S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (quoting *Rombach*, 355 F.3d at 172 n.7). This test is objective and looks to the understanding of the "ordinary investor." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187 (2015). Moreover, under the federal securities laws, "literal accuracy is not enough." *Id.* at 192. "An issuer must also desist from misleading investors by saying one thing and holding back another." *Id*. Companies have a duty of disclosure "only when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'" *Matrixx*, 563 U.S. at 44 (quoting 17 C.F.R. 240.10b-5(b)).

At the outset, Defendants invoke *Fershtman v. Schectman* to argue that none of the alleged misrepresentations and omissions could be material in light of its contractual right to suspend ETN issuances. Dkt. No. 47 at 1–2, 10 (citing *Fershtman v. Schectman,* 450 F.2d 1357 (2d Cir. 1971) (Friendly, J.)); Dkt. No. 50 at 3 (citing same). In *Fershtman*, the Second Circuit affirmed the dismissal of a suit brought individually and derivatively by a set of limited partners against their general partners under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. *See Fershtman,* 450 F.2d 1357. The limited partners challenged the invocation by the general partners of a clause in the partnership agreement that allowed the general partners to terminate the partnership by repaying the limited partners' contributions in full. *Id.* at 1358–60. The plaintiffs

alleged that the general partners made misrepresentations in connection with both the plaintiffs'

purchase of the limited partnership interests and what they characterized as the "forced sale" of

those interests. *Id.* at 1359. The Second Circuit affirmed dismissal of the plaintiffs' claim, ruling

that the alleged misrepresentations in connection with the purchase of the interests neither were

material nor caused any damages and that, with respect to the alleged misrepresentations in

connection with the forced sale, "if defendants were legally entitled to terminate the partnership

. . ., in their sole discretion, it would make no difference what they misrepresented or concealed."

*Id.* at 1360.

There is some lack of clarity regarding whether the *Fershtman* holding turns on materiality

or causation. Judge Meskill issued a concurring opinion in *Goldberg v. Meridor*, 567 F.2d 209

(2d Cir. 1977), which Judge Friendly did not join, in which Judge Meskill read the *Fershtman*

dictum to speak to materiality. *Id.* at 223 (Meskill, J., concurring). But materiality turns on

whether the mispresented fact would have been significant to the hypothetical reasonable investor

in making an investment decision and not on whether it was important to the actual investor

bringing suit. *See Vivendi*, 838 F.3d at 250; *cf. TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438,

449 (1976) (Section 14(a)). Thus, the fact that the misrepresentation would have made no

difference to the individual plaintiff would not alone defeat materiality. Other courts have

understood *Fershtman* to speak to loss causation. *See, e.g.*, *Benson v. RMJ Sec. Corp.*, 683 F.

Supp. 359, 368–69 (S.D.N.Y. 1988) (reading *Fershtman* to support the conclusion that when the

plaintiff is required to sell pursuant to a valid shareholders agreement, there is no loss causation,

because the plaintiff would have suffered the same loss regardless whether misrepresentations

were made).

19

*Fershtman* does not dispose of this case. It does not follow from the fact that Defendants had the unfettered right to suspend further issuances of ETNs that a misrepresentation about Barclays' internal control for tracking issuances and/or that it had issued unregistered securities would have been unimportant to a reasonable investor or to a VXX short seller in making an investment decision. At least in theory, there is a possibility that a reasonable investor could have considered statements regarding such issues (depending on their specificity) in determining whether Barclays would exercise its contractual rights and thus in deciding how to act including whether to sell VXX short in the amounts or timing that they did. *See Plumber & Steamfitters*, 11 F.4th at 100. Accordingly, the Court must examine the statements themselves to determine if they would have been significant to a reasonable investor and cannot rest on Defendants' argument that no matter whether Barclays' statements were sufficiently specific or were made with scienter, Plaintiffs' claim must be dismissed because Barclays had the right to suspend ETN issuances. However, it is apparent that Plaintiffs have failed to state a claim for relief for other reasons.

Many of the alleged statements concern optimistic statements of Defendants' commitments or values. *See, e.g.*, Dkt. No. 45 ¶¶ 75, 84, 95, 102, 116, 118, 124 (stating that Barclays is "committed to operating within a strong system of internal control"), 82 (naming "Audit, Risk and Internal Control" as a "core principle"). Such "simple and generic assertions" regarding Defendants' commitment to compliance are "not materially misleading absent significantly more detailed assurances of actual compliance." *In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *14 (S.D.N.Y. Mar. 24, 2023) (punctuation omitted); *see also Mucha v. Volkswagen Aktiengesellschaft*, 540 F. Supp. 3d 269, 297 (E.D.N.Y. 2021) (references to the company's "goals" and "guiding principles" were not actionable), *aff'd sub nom. Mucha v. Winterkorn*, 2022 WL 774877 (2d Cir. Mar. 15, 2022); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 401–02

(S.D.N.Y. 2016) (defendants' statements regarding the company's commitment to corporate integrity and compliance efforts were immaterial puffery).

Even Defendants' less aspirational backwards-looking statements that Barclays' "frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance," Dkt. No. 45 ¶¶ 75, 84, 89, 95, 97, 102, 116, 118, 119, 125, and that "[Defendants have] operated a sound system of internal control that provides reasonable assurance of financial and operational controls and compliance with laws and regulations," *id.* ¶¶ 76, 86, 96, 103, 116, 118–119, 124, 126, are too general to be materially false and misleading, *see Sanofi*, 155 F. Supp. 3d at 401–02 (holding that statements about the company's maintenance of an "effective compliance organization" are too general to cause a reasonable investor to rely on them). The Second Circuit has held "simple and generic assertions about having 'policies and procedures' and allocating 'significant resources'" to regulatory compliance to be insufficient to give rise to a Section 10(b) claim. *Singh v. Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019). "No investor would take such statements seriously in assessing a potential investmenot, for the simple fact that almost every investment bank makes these statements." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009); *see also Singh*, 918 F.3d at 63. Accordingly, "numerous district courts in this Circuit have found general policy- and compliance-related statements, such as those at issue here, to be unactionable." *In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, 675 F. Supp. 3d 273, 290 (E.D.N.Y. 2023) (collecting cases), *aff'd sub nom. Bos. Ret. Sys. v. Telefonaktiebolaget LM Ericsson*, 2024 WL 4023842 (2d Cir. Sept. 3, 2024). Those alleged statements are nothing more than "milquetoast corporate-speak" that fail to provide any description of specific initiatives or assurances of efficacy upon which a

reasonable investor could have relied. *See Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 513 (S.D.N.Y. 2017).[4]

In holding Defendants' statements about Barclay's internal controls to be nonactionable, the Court departs from Judge Failla's holding in *In re Barclays PLC Securities Litigation*.[5] There, Judge Failla held that "Defendants' statements were not materially misleading because they misrepresented the strength of the Company's internal controls[;] [r]ather, Defendants' statements were materially misleading because they omitted the Company's failure in the first instance to create a means of tracking the issuance of securities from the Shelves." *Barclays PLC Sec. Litig.*, 2024 WL 757385, at *12; *see also id.* at *13 ("Stated differently, the dueling assertions that (i) Barclays 'operated a sound system of internal control' and (ii) Barclays had no system of

---

[4] The case most favorable to Plaintiff is *Meyer v. Jinkosolar Holdings Co.*, in which the Second Circuit held that a Chinese company's "description of pollution-preventing equipment and 24-hour monitoring teams gave comfort to investors that reasonably effective steps were being taken to comply with applicable environmental regulations" could be misleading where the description omits known problems. 761 F.3d 245, 251 (2d Cir. 2014); *see also* Dkt. No. 49 at 26 (arguing that Defendants' statements were "comparable to promising investors that your factory is clean, safe, and efficient, all while having no system in place to even check if the lights are on" (quotation omitted)). However, *Jinkosolar* is easily distinguished, as the statements at issue in that case comprised a detailed description of 24-hour "environmental teams at each of our manufacturing facilities to monitor waste treatment and ensure that [these] waste emissions comply with [People's Republic of China] environmental standards," a description of the installation of "pollution abatement equipment at our facilities to process, reduce, treat, and where feasible, recycle the waste materials before disposal" and a representation that "waste water, gaseous and liquid waste and other industrial waste produced during the manufacturing process" are treated before discharge. *Id.* at 247. Against the backdrop of such specific representations, the Second Circuit held that the company's "failure to disclose that the prophylactic steps were then failing to prevent serious ongoing pollution problems rendered that description misleading." *Id.* at 250. As the Second Circuit later described it, in *Jinkosolar,* "the company described its compliance measures in confident detail, including references to 24-hour monitoring teams, specific compliance equipment, and its clean compliance record." *Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019). Plaintiff here does not point to any representation of the specific processes by which Defendants controlled ETN issuances even approximating that level of specificity. *See Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 409 (S.D.N.Y. 2020); *Menaldi*, 277 F. Supp. 3d at 513–14 (distinguishing *Jinkosolar* on similar grounds).
[5] Judge Failla withdrew the opinion on March 18, 2025. Dkt. No. 59.

internal control whatsoever over the issuance of securities from the Shelves cannot at the same time be true.").  The distinction between a failure of internal controls and the absence of internal controls is a specious one.  Any "failure" of an existing but insufficient control can just as easily be described as the absence of a control that would have prevented the failure.  Ultimately, it is not the degree of falsity that determines whether a misstatement is material—it is whether the alleged misstatement is "sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome."  *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014).  A reasonable investor would not rely upon the "open-ended and subjective" alleged representations concerning the strength Barclays' internal controls that Plaintiff has alleged here.  *Id.* at 186; *see also id.* at 183 ("Plaintiffs' claim that these statements were knowingly and verifiably false when made does not cure their generality, which is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment."); *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 98 (2d Cir. 2016).  Such representations are therefore immaterial regardless whether they are false because the controls were too weak or because the controls never existed in the first place.

Defendants additionally argue that the statements at issue cannot be read to provide reassurance as to Barclays' controls over VXX issuances as they spoke generally to efforts to strengthen "the internal control environment across the Group."  Dkt. No. 47 at 11 (quoting Dkt. No. 45 ¶ 94).  The Second Circuit's holding in *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, is instructive.  750 F.3d 227 (2d Cir. 2014).  That case centered in part on allegations that Barclays had misrepresented that "minimum control requirements had been established for all key areas of identified risk" when in fact Barclays "had no specific systems or controls for its LIBOR and EURIBOR submissions process until December 2009," leading to the

submission of falsely low rate submissions that were contrary to the definition of LIBOR. *Id.* at 230–31, 236.[6]  The Second Circuit "concluded that statements contained in Barclays's SEC filings concerning the company's minimum control requirements were not materially false because they were not specifically tied to Barclays's LIBOR practices." *Id.* at 235.  The alleged statements by Barclays "d[id] not mention LIBOR, nor d[id] they say that Barclays had established 'specific systems or controls' relating to LIBOR submission rates." *Id.* at 236.  Instead, the Circuit noted, "[b]ased upon the SEC filings referenced in the complaint, Barclays does not appear to have made representations that it had established internal controls for LIBOR, but only that it had established controls for other areas of its business." *Id.*  Here too, no alleged statement made any representation to investors about Barclays' procedures for tracking ETN issuances; the statements instead spoke to a group-wide effort to improve non-specific internal controls. Dkt. No. 45 ¶¶ 74, 94.  Plaintiff does not prove that Barclays' statements on the matter were false—*i.e.* that Barclays *did not* strengthen the internal control environment across the Group—even if it lacked sufficient controls over the discrete matter of ETN issuances.

Finally, Plaintiff argues that Defendants' alleged statement on May 9, 2019 in the Registration Statement, that VXX ETNs "and any other Securities of this series and of like tenor, are issuable only in registered form without coupons in denomination of any multiple of $50" were misleading because Barclays "knew, or should have known, that it had already issued unregistered securities and lacked appropriate controls to ensure the accuracy of its statements." Dkt. No. 49 at 19 (quoting Dkt. No. 45 ¶¶ 46–49).  In the Form F-3 Barclays Bank filed on June 14, 2019,

---

[6] LIBOR, the London Interbank Offered Rate, is a benchmark interest rate calculated based on the daily submissions of certain banks' statements of the cost at which they could borrow funds. *See Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 765–66 (2d Cir. 2016).  EURIBOR, the Euro Interbank Offered Rate is calculated similarly.  *See Sullivan v. Barclays PLC*, 2017 WL 685570, at *2 (S.D.N.Y. Feb. 21, 2017).

Barclays Bank stated that it would undertake to file a post-effective amendment to reflect any facts "which represent a fundamental change in the information set forth in the Registration Statement." Dkt. No. 45 ¶ 47. Defendants' statement of issueability does not merely refer to a future intent to issue only registered shares as it does not specify a plan or subjective state of mind. Instead, the statement is most naturally read to represent that the securities issued pursuant to the registration statement and those of "like tenor," *i.e.* those with the same CUSIP number[7], could be—and were then being—issued only in registered form, without coupons, and in denominations of any multiple of $50. *See Wilson v. Triller, Inc.*, 598 F. Supp. 3d 82, 91 (S.D.N.Y. 2022) (noting that "the suffix 'able' means 'capable of'" (quotation omitted)). Plaintiff does not allege that Barclays had actually issued any unregistered shares as of May 9, 2019, and the statement was thus not false when made. *Id.* ¶ 49 ("Starting June 26, 2019, Defendants began issuing unregistered securities from the 2018 Shelf."); *see In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) ("[W]ithout contemporaneous falsity, there can be no fraud."), *aff'd*, 604 F. App'x 62 (2d Cir. 2015). Plaintiff instead argues that the statement gave rise to a duty to correct and/or update. Dkt. No. 49 at 19.

"The duty to correct applies when a company makes a historical statement that at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not." *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 109 (2d Cir. 1998) (quotation omitted). For the duty to correct to apply, the statement must have been false at the time it was made, though the defendant only later learned of the statement's falsity or was reckless in not learning that the earlier statement was false or misleading. *See id.* ("IBM's statements were not misleading when made and therefore we reject any claim by plaintiffs that IBM was under a

---

[7] A CUSIP number is a serial number used to identify a particular financial instrument. *See Dinosaur Fin. Grp. LLC v. S&P Glob., Inc.*, 2023 WL 4562031, at *1 & n.2 (S.D.N.Y. July 14, 2023).

duty to correct them."); *see also Overton v. Todman & Co., CPAs, P.C.*, 478 F.3d 479, 486–87 (2d Cir. 2007); *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 301 (S.D.N.Y. 2009). Because Defendants' representation that the notes would be issued only as registered securities was not false when made, no duty to correct could have arisen.

"A duty to update may exist when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event." *Int'l Bus. Machs.*, 163 F.3d at 110; *accord Pipefitters Union Loc. 537 Pens. Fund v. Am. Express Co.*, 773 F. App'x 630, 632 (2d Cir. 2019) (summary order); *see, e.g.*, *Tecku v. Yieldstreet, Inc.*, 2022 WL 1322231, at *10 (S.D.N.Y. May 3, 2022) (holding that even if the company's statements concerning its diligence process were accurate when made, the company's later divergence from the process "rendered the statements false, requiring Defendants to at least update investors that the diligence process differed from the process outlined in the document"). Once Defendants issued unregistered securities, the statement that VXX ETNs "and any other Securities of this series and of like tenor, are issuable only in registered form" became misleading. According to the complaint, Barclays' offer and sale of unregistered shares began on or around June 26, 2019. Dkt. No. 45 ¶ 147. Defendants nonetheless argue that no duty to update arose at that time and that it was not until Barclays knew about the over-issuances that it became subject to the duty. Dkt. No. 50 at 7 (citing *Tecku*, 2022 WL 1322231, at *10; *SEC v. SolarWinds Corp.*, 741 F. Supp. 3d 37, 95 (S.D.N.Y. 2024); *In re Ferrellgas Partners, L.P., Sec. Litig.*, 2018 WL 2081859, at *11 (S.D.N.Y. Mar. 30, 2018) (Sullivan, J.), *aff'd*, 764 F. App'x 127 (2d Cir. 2019)).

Although the duty to correct hinges on a defendant's knowledge and thus is somewhat coextensive with scienter, *see Int'l Bus. Machs.*, 163 F.3d at 109 ("[I]f and when a speaker learns that a prior statement was misleading when made, a duty to correct arises."), the Second Circuit

has held that the same is not true of the duty to update, which "arises when those [prior] statements 'have become misleading as the result of intervening events,'" *Ill. State Bd. of Inv. v. Authentidate Holding Corp.*, 369 F. App'x 260, 263 (2d Cir. 2010) (summary order) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)). A defendant's knowledge of a statement's misleading nature is crucial to the scienter inquiry, but is typically irrelevant to the issue of material falsity. *See Venkataraman v. Kandi Techs. Grp., Inc.*, 2022 WL 4225562, at *6 (S.D.N.Y. Sept. 13, 2022) ("Whether Defendants *knew* of their falsity . . . is the scienter question, not the falsity question."); *In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 541–44 (S.D.N.Y. 2024) (rejecting argument that would "improperly[] collapse the falsity and scienter inquiries").[8] "Plaintiffs need not demonstrate Defendants had knowledge or a belief that they were making a material misrepresentation or omission in order to satisfy the element[;] [r]ather, to prove this first element Plaintiffs need show only that a false statement was made or that an omission of material fact occurred." *Westchester Teamsters Pension Fund v. UBS AG*, 604 F. App'x 5, 7 n.2 (2d Cir. 2015) (summary order) (citing *Int'l Bus. Machs.*, 163 F.3d at 109); *see In re Symbol Techs., Inc. Sec. Litig.*, 2013 WL 6330665, at *7 (E.D.N.Y. Dec. 5, 2013) (noting that Federal Rule of Civil Procedure 9(b) and the PSLRA "require allegations as to the circumstances or reasons why the statements were fraudulent or misleading, and separate allegations as to the speaker's state of mind").

The speaker's knowledge is not necessarily determinative of the statement's falsity when made or at a later date; a statement or omission may be materially false even where it is not made

---

[8] However, where the statement at issue is an opinion, "the dual inquiries of objective falsity and subjective scienter effectively collapse into one: whether the defendant actually believed his own stated opinion." *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 301 (S.D.N.Y. 2013); *see Omnicare*, 575 U.S. at 184–85.

with scienter. *See, e.g. Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 836–43, 848–54 (S.D.N.Y. 2019) (Nathan, J.) (dismissing Section 10(b) claim based on several otherwise actionable omissions for lack of scienter); *Lottery.com*, 715 F. Supp. 3d at 535–60 (same). There is no reason the duty to update would operate differently— where a once-true statement becomes misleading due to subsequent events, it may be a materially false statement that the defendant has a duty to update under the securities laws even if a violation of that duty cannot be prosecuted in a private action under Section 10(b) because of a lack of scienter. *See SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1096–97 (2d Cir. 1972) (noting that enforcement proceedings pursuant to Section 17(a) of the Securities Act require a showing of mere negligence and thus that the "appellants' claim that they acted in good faith, even if accepted, would not bar their liability" for failing to update a misleading prospectus), *abrogated on other grounds by Liu v. SEC*, 591 U.S. 71 (2020).

Defendants' motion to dismiss for failure to plead a material misrepresentation or omission accordingly may be granted with respect to the statements concerning Barclays' internal controls but not with respect to the statement that the notes were issuable only in registered form.

## B.    Scienter

Plaintiff's failure to sufficiently plead scienter provides independent grounds to grant the motion to dismiss in full.

To plead scienter under the PSLRA, a plaintiff must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *JP Morgan Chase Co.*, 553 F.3d at 198 (quoting 15 U.S.C. § 78u–4(b)(2)). The scienter required under Section 10(b) and Rule 10b-5 to sustain a private civil claim is an "an intent to deceive, manipulate or defraud." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting *Ganino*, 228 F.3d at 168). "A plaintiff may establish scienter by alleging facts that either (1) show that the defendant

had both the 'motive and opportunity' to commit the alleged fraud, or (2) constitute 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 317 (S.D.N.Y. 2021) (quoting *JP Morgan Chase Co.*, 553 F.3d at 198). To create a strong inference, however, the inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Ivanhoe Inv. Partners, L.P. v. Windsor Sec., LLC*, 2025 WL 573497, at *2 (2d Cir. Feb. 21, 2025) (quoting *New Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 48 (2d Cir. 2023)). In assessing whether this inference exists, courts consider both the inferences urged by plaintiffs as well as any reasonable competing inferences that can be drawn from the complaint. *See Francisco*, 559 F. Supp. 3d at 317; *see also Tellabs*, 551 U.S. at 314 ("[T]o determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court . . . must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged."). "Moreover, the facts alleged must support an inference of an intent to defraud the plaintiffs rather than some other group." *Francisco*, 559 F. Supp. 3d at 317.

"When the defendant is a corporate entity, . . . the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). "[I]t is possible to plead corporate scienter by pleading facts sufficient to create a strong inference either (1) that 'someone whose intent could be imputed to the corporation acted with the requisite scienter' or (2) that the statements 'would have been approved by corporate officials sufficiently knowledgeable about the company to know' that those statements were

misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (quoting *Dynex Cap.*, 531 F.3d at 195–96).

As he concedes, Plaintiff does not allege facts that would give rise to a motive to defraud. Dkt. No. 49 at 2–3, 20 & nn.9–10.  There is no allegation that any Individual Defendant or person whose intent could be ascribed to Barclays benefitted in any "concrete and personal way" from concealing the defect in Barclays' internal controls or the fact that Barclays had exceeded the amount of securities permitted under the registration statement. *JP Morgan Chase Co.*, 553 F.3d at 198 (quoting *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000)).  Indeed, there is no allegation that any Individual Defendant or person whose intent could be ascribed to Barclays had so much as a generic profit motive that might show some benefit derived from turning a blind eye to Barclays' internal control failures.  Had the executives at Barclays known or intended at the time of the registration statements that they were going to issue more shares than permitted under those statements, they would have had every interest in seeking to register those shares.  There was no limit on the amount of securities Barclays was permitted to register under a registration statement.  Had Barclays' executives known that the bank had over-issued, they would have been incentivized to address the problem by registering more shares rather than letting the problem grow.  An alleged scheme that defies common sense or economic reason "does not yield a reasonable inference of fraudulent intent."  *Kalnit*, 264 F.3d at 140–41; *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994); *Medis Inv. Grp. v. Medis Techs., Ltd.*, 586 F. Supp. 2d 136, 147 (S.D.N.Y. 2008), *aff'd*, 328 F. App'x 754 (2d Cir. 2009).  Courts may reject a scienter argument resting on allegations that the defendant made deliberate decisions contrary to its interests.  *See, e.g.*, *Kraft v. Third Coast Midstream*, 2021 WL 860987, at *25 (S.D.N.Y. Mar. 8, 2021).

Plaintiff relies instead on allegations of "conscious misbehavior or recklessness."  Dkt. No. 49 at 19–20.  "When a plaintiff seeks to plead scienter by alleging conscious misbehavior or recklessness, the complaint must 'allege[] that defendants . . . had access to non-public information contradicting their public statements.'"  *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 485 (S.D.N.Y. 2017) (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001)). "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  *Dynex Cap.*, 531 F.3d at 196 (quoting *Novak*, 216 F.3d at 309); *see In re Adient plc Sec. Litig.*, 2020 WL 1644018, *27 (S.D.N.Y. April 2, 2020) (concluding that scienter was insufficiently pled where plaintiffs "fail to show what 'specific contradictory information' was available to any Defendant at the time they made any alleged false or misleading statement").  Contrary facts may also be learned in other ways, including through observation.  *See, e.g.*, *In re Aphria, Inc. Sec. Litig.*, 2020 WL 5819548, at *9 (S.D.N.Y. Sept. 30, 2020).  Where a plaintiff cannot make the motive showing, then the strength of the circumstantial allegations must be correspondingly greater.  *See Kalnit*, 264 F.3d at 142.

To show conscious misbehavior or recklessness, Plaintiff relies on the Amended Complaint's allegations concerning: (1) the impact of WKSI status on Barclays' core operations, Dkt. No. 45 ¶¶ 54–62, 65–66, 162–163; (2) Defendants' awareness of the loss of WKSI status, *id.* ¶¶ 57–62, 65–66; (3) conduct on the part of the Individual Defendants, *id.* ¶¶ 23–28, 56, 60–61, 78–79, 88, 90–91, 96, 98–99, 104–106, 110, 112, 114, 120–121, 128–130; (4) the BPLC Board's reductions to the remuneration of the Individual Defendants, *id.* ¶¶ 157–159, and (5) the sheer size of the fraud and ease of discoverability, *id.*, ¶¶ 138–140, 151; Dkt. No. 49 at 19–30.

Plaintiff invokes the core operations doctrine, stating that "chief" among the facts surrounding Defendants' alleged conduct supporting a finding of scienter, "is the importance of

Defendants' WKSI status to the companies." *Id.* at 21. "Under the core operations theory, if a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company." *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (Sullivan, J.) (quotation omitted). The "core operations doctrine" has been thrown into doubt by the enactment of the PSLRA in 1995. *See Glantz v. James River Grp. Holdings, Ltd.*, 2025 WL 278440, at *8 (S.D.N.Y. Jan. 23, 2025); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 239–40 (S.D.N.Y. 2022). "As a result of these doubts as to the doctrine's continuing import, the core operations inference may be considered as part of a court's holistic assessment of the scienter allegations, but it is not independently sufficient to raise a strong inference of scienter." *Id.* (quotation omitted).

Even when viewed as "supplementary but not independently sufficient means to plead scienter," *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011) (Sullivan, J.), Plaintiff's core operations allegations still do not support a finding of scienter because Plaintiff focuses on the wrong question. Plaintiff argues that "Defendants knew that they had lost their WKSI status" and that "Defendants' WKSI status was indeed important to the companies, which provides strong circumstantial evidence that Defendants' failure to disclose their lack of controls was reckless." Dkt. No. 49 at 21–22. But the allegedly false and misleading statements concern the quality of Barclays' internal controls for the issuance of VXX and other ETNs. *See supra*. The pertinent question is therefore whether Defendants knew Barclays did not have effective internal controls with respect to the issuance of such securities, not whether Defendants knew that Barclays had lost WKSI status such that it needed to have effective internal controls. Plaintiff

32

alleges nothing to suggest that the lost status itself was a red flag that made Defendants aware of the lack of controls. *See Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at *25 (S.D.N.Y. Mar. 30, 2021) ("For ignorance of supposed 'red flags' to rise to the level necessary to demonstrate conscious recklessness under the PSLRA's rigorous pleading standards, the warning signs must have been particularized, specific, and together, egregious to alert defendants to the precise misconduct that was occurring." (quotation and punctuation omitted)), *aff'd sub nom. Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 49 F.4th 790 (2d Cir. 2022), *and aff'd sub nom. Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82 (2d Cir. 2022); *Meyer v. Organogenesis Holdings Inc.*, 727 F. Supp. 3d 368, 397 (E.D.N.Y. 2024) (loss of pass-through status not a red flag requiring defendants to investigate a subsequent rise in revenue). Regardless whether Plaintiff alleges Defendants' WKSI status was core to Barclays' operation, Plaintiff does not allege that the core of Barclays' business was issuing or tracking VXX or ETNs in general such that the controls failures would have been apparent to the Individual Defendants. *See Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *18 (S.D.N.Y. July 23, 2018) (citing *JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d at 628); *Glantz*, 2025 WL 278440, at *5.[9]

Plaintiff argues that he sufficiently alleges Defendants were actually aware of the loss of WKSI status and of the attendant responsibilities that resulted from the loss. Dkt. No. 49 at 22–23. For example, Barclays Bank amended its 2017 Annual Report to correct its lack of WKSI

---

[9] Although Defendants submit two SEC filings purporting to show that the ultimately disgorged profits were a small fraction of Barclays' profits during the relevant period, Dkt. No. 47 at 19 (citing Dkt. Nos. 48-6, 48-10), for purposes of the instant motion to dismiss, those documents are not judicially noticeable for their truth. *See AppHarvest*, 684 F. Supp. 3d at 239–40; *Kesner v. Dow Jones & Co., Inc.*, 515 F. Supp. 3d 149, 161 n.2 (S.D.N.Y. 2021). Regardless, Plaintiff has not alleged that VXX constituted any large percentage of Defendants' business.

status and empaneled a working group to determine how it would conduct its securities offerings going forward as a non-WKSI.  Dkt. No. 45 ¶¶ 56–57.  Plaintiff quotes Judge Failla's opinion in *In re Barclays PLC Securities Litigation* that "[o]n the facts pleaded in [the] Amended Complaint, it is impossible to believe that the [Individual] Defendants were ignorant of the change in the Company's WKSI status."  Dkt. No. 49 at 23 (quoting *Barclays PLC*, 2024 WL 757385, at *19).  However, as stated, the relevant knowledge is not Defendants' non-WKSI status and the internal controls required of a non-WKSI, but rather whether Barclays was in fact implementing those internal controls.  Plaintiff alleges that the working group was responsible for aggregating Barclays' securities issuance needs, filing the 2018 and 2019 shelf registration statements and calculating remaining shelf capacity.  Dkt. No. 45 ¶¶ 67–69.  The working group presumably would have been aware of what mechanisms were (or were not) in place for tracking issuances. But Plaintiff does not allege that the working group ever transmitted information regarding that subject to the individuals responsible for the allegedly false statements.  *Patel v. L-3 Commc'ns Holdings Inc.*, 2016 WL 1629325, at *10 (S.D.N.Y. Apr. 21, 2016) (no scienter where the complaint did not specify what information was transmitted from lower-level employees to the company's headquarters); *see also, e.g.*, *Francisco v. Abengoa, S.A.*, 624 F. Supp. 3d 365, 401 (S.D.N.Y. 2022) (intent could not be imputed to the company where it was not clear that the executives with contradictory information played any role in creating the financial statements); *Barrett v. PJT Partners Inc.*, 2017 WL 3995606, at *7 (S.D.N.Y. Sept. 8, 2017) (similar).  Absent allegations that Defendants knew that the company was not tracking VXX issuances (or that it was acting recklessly with respect thereto), Defendants' failure to disclose the same does not show scienter.  *See In re Scholastic*, 252 F.3d at 76; *Wilbush*, 271 F. Supp. 3d at 485.  Plaintiff does not point to any allegations in the Amended Complaint showing "specific contradictory information"

34

as to Barclays' failure to track issuances that was available to any Defendant during the relevant period. *Adient*, 2020 WL 1644018, at *27.

Plaintiff asserts several categories of allegations concerning the Individual Defendants that he claims support an inference of scienter: (1) the Individual Defendants had high-ranking roles within Barclays, (2) the Individual Defendants signed SOX certifications, (3) Staley and Venkat, evaluated Barclays' disclosure controls and concluded that they were effective, and (4) the Individual Defendants had a duty to monitor Barclays' internal controls. Dkt. No. 49 at 23–27 (citing Dkt. No. 45 ¶¶ 23–28, 56, 60–61, 78–79, 88, 90–91, 96, 98–99, 104–106, 110, 112, 114, 120–121, 128–130). None suffice to show Defendants' conscious misbehavior or recklessness.

The Amended Complaint states that Staley was the CEO of BPLC from December 2015 to October 2021 and was the CEO of Barclays Bank from March 2019 to October 2021; Venkat served as BPLC's chief risk officers from May 2017 to May 2020, the co-president of Barclays Bank from October 2020 to October 2021, and the CEO of BPLC after October 2021; and Morzaria was the Group Finance Director throughout the time BPLC was an ineligible issuer. *Id.* ¶¶ 23, 25, 27, 166–168. However, the Individual Defendants' high-level positions do not, standing alone, raise a strong inference of scienter. *See Police & Fire Ret. Sys. of the City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 234 (S.D.N.Y. 2009) (Lynch, J.) ("Courts may not infer scienter 'solely from the fact that, due to the defendants' board membership or executive managerial position, they had access to the company's internal documentation as well as any adverse information.'") (quoting *In re Winstar Commc'ns*, 2006 WL 473885, at *7 (S.D.N.Y. Feb. 27, 2006)). "It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter." *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 588 (S.D.N.Y. 2010) (quotation

omitted); *see, e.g.*, *Saraf v. Ebix, Inc.*, 2024 WL 1298246, at *3 (2d Cir. Mar. 27, 2024) (summary order) (rejecting argument that individual defendants' "positions as CEO and CFO, respectively, mean that they knew or should have known that [the company's] internal controls were ineffective"); *In Re Renewable Energy Grp. Sec. Litig.*, 2022 WL 14206678, at *3 (2d Cir. Oct. 25, 2022) (summary order) (rejecting attempt to "impute[] blame on the individual defendants based on their high-ranking status within the Company").

Plaintiff's argument that scienter can be inferred because the Individual Defendants signed SOX certifications fails.  The Sarbanes-Oxley Act requires the Chief Executive and Chief Financial Officer of every registered and publicly traded company to certify annually the general effectiveness of the company's internal controls and procedures. 15 U.S.C. § 7241(a); *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 231 (S.D.N.Y. 2008).  For that matter, directors generally have a duty to have in place a reasonable board-level system of monitoring. *See Marchand v. Barnhill*, 212 A.3d 805, 822 (Del. 2019).  But that does not make them guarantors of the effectiveness of those internal controls or provide a basis to infer scienter whenever any one the controls proves to be ineffective.  "[T]hese certifications typically 'add nothing substantial to the scienter calculus' because 'allowing Sarbanes-Oxley certifications to create an inference of scienter in every case where there was an accounting error . . . by a public traded company would eviscerate the pleading requirements for scienter set forth in the PSLRA.'"  *Reilly*, 2018 WL 3559089, at *19 (quoting *Int'l Ass'n of Heat v. Int'l Bus. Machs. Corp.*, 205 F. Supp. 3d 527, 536 (S.D.N.Y. 2016)).

Barclay's SEC filings stated that Staley and Venkat had both, at times, evaluated the effectiveness of the relevant disclosure controls, ensured that the controls complied with SEC rules and regulations, and concluded that the design and operation of these disclosure controls and

procedures were effective.  Dkt. No. 45 ¶¶ 88, 104, 128.  An individual's personal involvement in designing and evaluating the company's internal controls "may give rise to a finding of scienter where the corporate actor's role makes them aware of information contradicting the company's public statements."  *Glantz*, 2025 WL 278440, at *7 (citing *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 247–48 (S.D.N.Y. 2012)).  However, Plaintiff does not allege what contrary information Staley and Venkat encountered that would have revealed any of the relevant statements to be false.  *See Dynex Cap.*, 531 F.3d at 196 (individual defendants' access to "raw data" that suggested that their public statements were inaccurate was insufficient to show scienter where the data had not been collected into reports showing the inaccuracy); *Patel v. L-3 Commc'ns Holdings Inc.*, 2016 WL 1629325, at *10 (S.D.N.Y. Apr. 21, 2016) (individual defendant's role monitoring internal controls does not itself create a strong inference of scienter when those controls were ultimately revealed to be lacking); *Glantz*, 2025 WL 278440, at *7 (similar).[10]

In some circumstances, "[a]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness."  *City of Sterling Heights Police and Fire Ret. Sys. v. Abbey Nat., PLC*, 423 F. Supp. 2d 348, 361 (S.D.N.Y. 2006) (Chin, J.) (quoting *Novak*, 216 F.3d at 308); *accord Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996).  In *Sterling Heights*, Judge Chin found that such an inference arose where executives made repeated

---

[10] Plaintiff invokes *In re American Bank Note Holographics, Inc. Securities Litigation*, where the court "found sufficient scienter allegations as to the CFO and Comptroller where the defendants were, because of their positions, 'uniquely situated' to control the revenue recognition procedures, and the revenues had been overstated for a period of two years in repeated SEC filings."  Dkt. No. 49 at 25 (quoting *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 448 (S.D.N.Y. 2000)).  However, the individual defendants in that case were not only alleged to have been "uniquely situated to control the revenue recognition procedures" of the company but were also specifically alleged to have engaged in a long-term scheme to "cook the books" of the company for their own benefit including by inflating revenues by more than 50%.  *Am. Bank Note*, 93 F. Supp. 2d at 446–48.

statements about the company's extensive risk monitoring structure and defendants examined the risk exposure both in response to a query and as an automatic response to held bonds being downgraded to nearly junk status. 423 F. Supp. 2d at 361. Plaintiff argues that the Individual Defendants had a similar duty to monitor Defendants' internal controls in light of Defendants' repeated representations concerning Barclays' internal controls. Dkt. No. 49 at 25–27. However, the simple repetition of an allegedly false statement does not indicate that the statement was made with scienter. *See Amorosa v. Gen. Elec. Co.*, 2023 WL 3847161, at *3 (S.D.N.Y. June 6, 2023) (holding that an argument that "Defendants repeatedly made false or misleading statements and that that is itself probative of scienter . . . is a circular argument without merit" (citation omitted)) (collecting cases). Particularly in a case such as this, where the purportedly false statements were presumably repeated due to regulatory requirements rather than zealous devotion to the matter being represented, no inference of scienter can be made. It would lead to absurd results to collapse the falsity and scienter requirements. Furthermore, a defendant's duty to review the company's internal controls "is not a substitute for specific allegations that he was provided with information that demonstrated the inadequacy of those internal controls." *Woodley v. Wood*, 2022 WL 103563, at *8 (S.D.N.Y. Jan. 11, 2022), *aff'd sub nom. Rotunno v. Wood*, 2022 WL 14997930 (2d Cir. Oct. 27, 2022) (summary order). Here, Plaintiff does not identify any "obvious" or "doubtful" fact that Defendants "egregiously" refused to see or investigate. *Sterling Heights*, 423 F. Supp. 2d at 361; *see Menora Mivtachim*, 2021 WL 1199035, at *25.[11]

---

[11] Plaintiff's argument that "the ease of discovery is evidence of recklessness," Dkt. No. 29, fails for the same reason. Even if a reasonable investigation would have demonstrated the falsity of the allegedly misleading statements, absent allegations that Defendants undertook such an investigation or that red flags required Defendants to undertake such an investigation, the possibility of a successful investigation does not show scienter. *See S. Cherry St., LLC v. Hennessy Grp. LLC*, 573 F.3d 98, 112 (2d Cir. 2009) (complaint failed to allege scienter where

Plaintiff argues that Barclays' claw back of the Individual Defendants' remuneration supports scienter because, in doing so, "Barclays let the Individual Defendants, its shareholders, and the world know what it thought about the Individual Defendants' culpability." Dkt. No. 9 at 28 (citing Dkt. No. 45 ¶¶ 158–159). However, the Amended Complaint contains no allegation indicating that the claw back was a response to the Individual Defendants' fraud, rather than, for example, mere mismanagement. *See Jackson v. Abernathy*, 960 F.3d 94, 96 (2d Cir. 2020) (per curiam); *cf. In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016) (plaintiffs established a strong inference of scienter where they alleged that the company clawed back millions of dollars' worth of compensation from the individual defendants and one of the provisions of the individual defendants' resignation agreements allowed for a claw back based on a determination by the board that the individual defendants "intentionally engaged in wrongdoing").

Plaintiff's allegations do not support the inference that Defendants acted with conscious recklessness to a level approximating actual intent rather than a form of mismanagement more closely resembling a heightened form of negligence. *See S. Cherry*, 573 F.3d at 109. Allegations such as those in Amended Complaint "that merely describe a lack of due diligence, without more, will not give rise to a strong inference of conscious recklessness." *Ivanhoe Inv. Partners*, 2025 WL 573497, at *2. Plaintiff fails to establish a strong inference that Defendants "knew their

---

it alleged that "[i]f Hennessee Group had asked various questions earlier, it would have further questioned the Bayou Accredited financial records or recognized the need to ask further questions"); *accord Stephenson v. PricewaterhouseCoopers, LLP*, 768 F. Supp. 2d 562, 573 (S.D.N.Y. 2011), *aff'd*, 482 F. App'x 618 (2d Cir. 2012). In fact, the ease of discovery could just as easily support an inference of nonfraudulent intent—given the obviousness of Barclays' need for controls tracking the number of issuances, there is no basis for the Individual Defendants whose intent Plaintiff seeks to impute to Barclays to have assumed that the controls were not implemented.

statements were false or that their conduct represented an extreme departure from the standards of ordinary care." *Id.*

Moreover, Plaintiff's arguments are neither cogent nor as compelling as the nonfraudulent inference available. *See Tellabs*, 551 U.S. at 324. Plaintiff does not allege any facts supporting the inference that at any time before March 8, 2022, any persons whose intent could be imputed to Barclays knew that Barclays had no system for tracking the amount of shares of VXX it had issued. It is illogical to presume that the executives had such knowledge. If, at the time of the Registration Statements, Barclays knew that there was no such system or that it was at risk of selling more securities than it had registered, Barclays easily could have accounted for those facts by implementing such a system. It was an admittedly "simple tas[k]." Dkt. No. 45 ¶ 142 (Defendants stated that "[t]his situation was entirely avoidable" and that "in all our complexities, we missed some simple tasks"). It also would have been easy for Barclays to register a greater amount of shares to avoid over-issuance. There was no limit on the amount of shares Barclays could register so long as it paid the registration fee. Furthermore, once the lack of internal control became known to Barclays' executives in March 2022, they alerted regulators, disclosed the lack of capacity to the market, suspended further sales and issuances, and announced a voluntary buy-back. *Id.* ¶¶ 132–133, 139. There was no particular urgency to make such a disclosure if Defendants were bent on fraud. There is no evidence that the fact of the over-issuance was otherwise about to be revealed. The inference naturally arises, to the contrary, that Defendants made the disclosure when they did because they were not previously aware of the over-issuances or lack of controls. *See Rotunno*, 2022 WL 14997930, at *3 (holding that the more compelling inference is the Defendants negligently made an oversight error and "subsequently corrected their disclosures to the [SEC] when they became aware of the error"). Such remedial efforts weaken the inference of scienter.

*See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 777 (2d Cir. 2010) (quotation omitted)); *accord Kasilingam v. Tilray, Inc.*, 2024 WL 4350118, at *13 (S.D.N.Y. Sept. 30, 2024); *Lululemon Sec. Litig.*, 14 F. Supp. 3d at 583.

Defendants' motion to dismiss accordingly may be granted for lack of scienter.

### C.    Loss Causation

"It is settled that causation under federal securities laws is two-pronged: a plaintiff must allege both transaction causation, *i.e.*, that but for the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation, *i.e.*, that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001). The former, transaction causation, "is based upon the plaintiff's reliance upon the defendant's deceptive statements or omissions; that is, but for such conduct by the defendant, the plaintiff would not have acted to his detriment." *Id.* at 96. The latter, loss causation, is more akin to the tort concept of proximate cause; that is, "in order for the plaintiff to recover it must prove the damages it suffered were a foreseeable consequence of the misrepresentation." *Id.* Like proximate cause in the tort context, a finding of foreseeability for purposes of loss causation "is predicated upon notions of equity because it establishes who, if anyone, along the causal chain should be liable for the plaintiffs' losses" and "must satisfy the judicial mind that such result conforms to 'a rough sense of justice'" *id.* (quoting *Palsgraf v. L.I.R.R. Co.*, 162 N.E. 99 (N.Y. 1928) (Andrews, J., dissenting)). A plaintiff may plead loss causation by alleging either "(a) the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud; or (b) that that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters Pension*, 750 F.3d at 232–33 (quotations omitted).

Plaintiff does not plead a negative market reaction to a corrective disclosure but instead argues that his loss was caused by the materialization of a concealed risk.  Dkt. No. 49 at 30–35. "To plead loss causation through the materialization of a concealed risk, plaintiffs must show their losses were: (1) foreseeable, that is, the 'materialized risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by the disappointed investor'; and (2) caused by the materialization of the concealed risk concealed by the fraud, *i.e.*, 'that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.'"  *In re Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 267 (S.D.N.Y. 2021) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)).  To show loss causation under a theory of materialization of concealed risk, the plaintiff must allege that his loss was caused by the fraud rather than merely the concealed risk.  *See Lentell*, 396 F.3d at 175 ("To plead loss causation, the complaint[] must allege facts that support an inference that [the defendant's] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss *absent the fraud*." (emphasis added)); *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 199 (2d Cir. 2003) ("[S]ecurities fraud plaintiffs [must] demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered." (quotation omitted)).

The Second Circuit clarified in *In re Vivendi, S.A. Securities Litigation*, that the Circuit's "past holdings do not suggest that 'corrective disclosure' and 'materialization of risk' create fundamentally different pathways for proving loss causation."  838 F.3d 223, 261 (2d Cir. 2016). Where a plaintiff pursues a materialization-of-concealed-risk theory, the disclosure takes the form of an "event[] constructively disclosing the fraud" instead of a clear statement correcting the prior

misstatement. *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020) (holding that plaintiffs must plead "that the fraud concealed something from the market that, when disclosed, would foreseeably and negatively affect the value of the security" and that "[g]enerally, plaintiffs sufficiently plead loss causation when they allege that their share's price fell significantly after the truth became known through an express, corrective disclosure or through events constructively disclosing the fraud like the materialization of the risk concealed" (quotations omitted)); *accord Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 380 (E.D.N.Y. 2022). For example, if a company falsely touts its "foolproof" sprinkler systems, the misstatement may be revealed when the company releases a statement explaining the systems' weaknesses (corrective disclosure) but the misstatement may alternatively be revealed when all the companies' factories burn down (materialization of the concealed risk). Any investor in the latter scenario must show that they were harmed not just by the fact of the fire, but by the truth the fire revealed. "Indeed, *Lentell* itself understood 'materialization of risk' as reflective of the principle that 'to establish loss causation, plaintiffs must show that a misstatement or omission concealed *something* from the market that, *when disclosed*, negatively affected the value of the security.'" *Vivendi*, 838 F.3d at 261–62 (cleaned up) (quoting *Lentell*, 396 F.3d at 174). Thus, the truth may come out "by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud." *Id.* at 262; *accord Abramson*, 965 F.3d at 179. In either event, it is the misrepresentations or omissions that must have caused the economic harm and not the event that is misrepresented. *See Lentell*, 396 F.3d at 173.[12]

---

[12] The federal securities laws track the common law of fraud. *See Dura Pharms. Inc. v. Broudo*, 544 U.S. 336, 343–44 (2005). Under the common law of fraud, "[t]o establish causation, the victim of fraud must show both transaction causation—that the fraud caused the victim to engage in the transaction in question—and loss causation—that the misrepresentations or omissions

According to Plaintiff, Barclays' announcement on March 14, 2022, that it was suspending issuances revealed the previously-concealed risk to the public and set off the short squeeze responsible for his loss.  Dkt. No. 45 ¶¶ 8–10, 133–137, 174 (alleging that "[t]he risk of not having internal controls to track the issuance of VXX materialized when Barclays and BBPLC imposed an immediate suspension on their VXX sales"); Dkt. No. 49 at 33–35.  The announcement disclosed that Barclays Bank was immediately suspending VXX sales because "Barclays does not currently have sufficient issuance capacity to support further sales from inventory and any further issuances of ETNs."  Dkt. No. 45 ¶ 133.

Rather than signaling fraud, Barclays' acts on May 14, 2022 were in line with its right to suspend issuances of VXX at any time at its sole discretion.  Dkt. No. 48-1 at 27.  Instead, the inference is that the market price of VXX rose astronomically due to the sudden absence of a safety valve to absorb excess demand—a safety valve that Barclays had no obligation to provide.  Dkt. No. 45 ¶¶ 8, 135.  That allegation fails to establish loss causation because Plaintiff fails to allege that the loss that he suffered was a result of the alleged misrepresentation.  In the hypothetical world where Defendants were upfront about Barclays' lack of internal controls or announced with certainty that there would come a time when Barclays would lack capacity, Plaintiff would have suffered the same loss upon the announcement that Barclays had exceeded its issuance capacity and was resultingly suspending issuances.  *See In re Lehman Bros. Sec. & Erisa Litig.*, 2015 WL 5294759, at *3–4 (S.D.N.Y. Sept. 10, 2015) (rejecting plaintiff's theory of loss causation that defendant "would be liable even if [warrant issuer] had been unable to satisfy its obligations for

---

caused the economic harm." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 2020 WL 5518146, at *83 (S.D.N.Y. Sept. 14, 2020) (quoting *Cont'l Grain Co. v. Meridien Int'l Bank, Ltd.*, 894 F. Supp. 654, 661 (S.D.N.Y. 1995)); *see also id.* at *97 ("If a false representation caused the plaintiff to engage in the transaction, but the plaintiff would have suffered the identical loss regardless of whether the representation was accurate or not, the plaintiff has not established loss causation.").

reasons having nothing whatsoever to do with the subject of [defendant's] alleged misstatements"); *Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 905 (5th Cir. 2018) (rejecting loss causation argument where the plaintiffs "would have suffered the exact same harm" whether the stock declined because defendant overstated its revenue or because it suffered a reputational harm). That Plaintiff might have chosen not to short sell the notes in such a world satisfies only the pleading requirements of transaction causation. It does not show loss causation.

Courts have held that where, as here, a plaintiff's loss is caused by the defendant's exercise of a reserved right rather than the revelation of a concealed fact, the plaintiff inherently would have suffered the same harm and no Section 10(b) claim can stand. *See Drachman v. Harvey* 453 F.2d 722 (2d Cir. 1971); *Levine v. Seilon, Inc.*, 439 F.2d 328, 334 (2d Cir. 1971) (Friendly, J.), *superseded by statute*; *Standard Metals Corp. v. Tomlin*, 503 F. Supp. 586, 599 (S.D.N.Y. 1980); *Benson*, 683 F. Supp. at 368–69; *see also Fershtman*, 450 F.2d 1357 ("[I]f defendants were legally entitled to terminate the partnership on March 31, 1968, in their sole discretion, it would make no difference what they misrepresented or concealed."). In *Drachman*, the Second Circuit held that the company's redemption of its convertible debentures, even if carried out with a "fraudulent motive and purpose of a conspiracy" could not be a "cognizable wrong[] where the securities markets and securities investors [we]re not adversely affected by [the] securities transaction." 453 F.2d at 731. The Circuit rejected the plaintiffs' loss causation argument, holding that "[t]here is no claim that the alleged fraud in any way infected the redemption transaction nor could there be; the redemption was effected in accordance with the terms of the debentures." *Id.* at 732; *see also id.* (holding that the contractual right meant that any fraud was not "in connection with" the securities transaction and that, regardless of improper motive or any associated corporate damage, "[t]he purity of the security transaction and the purity of the trading process were unsullied"

(quotation omitted)).  As Judge Friendly noted, "[i]t is hardly realistic to accuse a corporation of having secured an unjustified windfall or enrichment as a result of a redemption which was legally and financially within its power to effectuate quite independently of any action by the shareholders whose stock was redeemed."  *Levine*, 439 F.2d at 334 (dismissing Section 10(b) claim "because, on [the plaintiff's] own showing, he suffered no compensable loss").[13]

Plaintiff's failure to sufficiently plead loss causation provides independent grounds to grant the motion to dismiss in full.

## II.    Control Person Liability

Plaintiff asserts control person claims under Section 20(a) of the Exchange Act against BPLC and the Individual Defendants.  Dkt. No. 45 ¶¶ 213–223.

"To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *Kraft*, 2021 WL 860987, at *26 (quoting *ATSI*, 493 F.3d at 108).

---

[13] It is also not apparent from the complaint that either Barclays' announcement or its act of suspending issuances in fact revealed the truths that Plaintiff contends were concealed by Defendants' misrepresentations: (1) that Barclays had no internal controls for tracking issuances or (2) that Barclays has issued unregistered shares. *See Gruber v. Gilbertson*, 628 F. Supp. 3d 472, 481 (S.D.N.Y. 2022) ("any theory of loss causation must nevertheless rest on the revelation of the truth" (punctuation omitted) (quoting *Vivendi*, 838 F.3d at 262–63)).  Indeed, Plaintiffs' own allegations regarding the market's reaction to Barclays' ultimate revelation of the truth underscores that such revelation did not cause Plaintiff's loss.  According to Plaintiff, it was not until weeks after March 14, 2022—after the class period concluded—that BPLC "disclosed that the reason it had suspended all VXX sales and issuances was because it had illegally sold over $17.7 billion of unregistered securities, including VXX, in excess of its stated shelf registrations and in violation of SEC registration requirements" and that "that the reason for its unprecedented sales of unregistered securities was because it failed to put into place any 'simple' internal controls necessary to track the amount of securities it issued and sold off its multi-billion-dollar shelf registration statements."  *Id.* ¶ 11.  It was that event, and not any prior event, that revealed the omitted risk that materialized.

Because Plaintiff fails to allege any primary violation, he cannot establish control person liability.  Defendant's motion to dismiss Plaintiff's claim under Section 20(a) of the Exchange Act is granted.

**CONCLUSION**

Defendants' motion to dismiss is GRANTED.

"Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires,' it is within the sound discretion of the district court to grant or deny leave to amend."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (quoting Fed. R. Civ. P. 15(a)).  "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *Id.*  Plaintiff has not "proffered the content of any proposed amendment or given any clue as to how the complaint's defects would be cured."  *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 530 n.19 (S.D.N.Y. 2020) (citation omitted).  Plaintiff's failure to plead a material misrepresentation or omission, scienter, and loss causation does not appear to be the product of inartful pleading but rather substantive issues with Plaintiff's claims that make repleading futile.  *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).  The Amended Complaint is therefore dismissed with prejudice.

The Clerk of Court is respectfully directed to close this case.

SO ORDERED.

Dated: March 21, 2025
      New York, New York
                                        LEWIS J. LIMAN
                                United States District Judge